**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **CHRISTIAN BENTON, COALITION OF NEW JERSEY FIREARM OWNERS, GUN OWNERS OF AMERICA, INC., and GUN OWNERS FOUNDATION,** | **CIVIL ACTION NUMBER:** |
| **Plaintiffs,** | **24-cv-7098-KMW** |
| **v.** | **MOTION** |
| **MATTHEW PLATKIN, in his official capacity as the Attorney General of New Jersey, and CHIEF PHIL OLIVO, in his official capacity as the Police Chief of Pennsauken Township,** | |
| **Defendants.** | |

**Mitchell H. Cohen Building & U.S. Courthouse**
**4th & Cooper Streets**
**Camden, New Jersey 08101**
**March 31, 2025**
**Commencing at 11:08 a.m.**

**B E F O R E:** **THE HONORABLE KAREN M. WILLIAMS, UNITED STATES DISTRICT JUDGE**

**A P P E A R A N C E S:**

STAMBOULIEH LAW, PLLC
BY: STEPHEN D. STAMBOULIEH, ESQUIRE
P.O. Box 428
Olive Branch, Mississippi 38654
For the Plaintiffs

Sharon Ricci, Official Court Reporter
sharon.ricci.usdcnj@gmail.com
267-249-8780
Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

**APPEARANCES CONTINUED:**

BROWN & CONNERY, LLP
BY: MICHAEL J. MILES, ESQUIRE
ARLETTE LEYBA, ESQUIRE
360 Haddon Avenue
Westmont, New Jersey 08108
For the Defendant Chief Phil Olivo, in his official capacity as the Police Chief of Pennsauken Township

NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
DIVISION OF LAW
BY: GIANCARLO G. PICCININI, ESQUIRE
JUSTINE LONGA, ESQUIRE
124 Halsey Street, P.O. Box 45029
Newark, New Jersey 07101
For the Defendant Matthew Platkin, in his official capacity as the Attorney General of New Jersey

**ALSO PRESENT:**

Nicole Ramos, Courtroom Deputy
Kellie Desrochers, Judicial Law Clerk

(Proceedings held in open court before The Honorable Karen M. Williams, United States District Judge, at 11:08 a.m.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Good morning. Everyone please be seated.

We're here this morning in the matter of Benton and others vs. Platkin and others, Civil Action No. 24-7098.

May I have appearances of counsel, please.

MR. STAMBOULIEH: For the plaintiff, Stephen Stamboulieh.

MR. PICCININI: For the State, Giancarlo Piccinini.

MR. MILES: And for Chief of Police Philip Olivo, Michael J. Miles from Brown & Connery, along with Arlette Leyba.

THE COURT: Can plaintiffs' counsel say your name again for me?

MR. STAMBOULIEH: Yes, Your Honor. It's S-T-A-M-B-O-U-L-I-E-H.

THE COURT: All right. We're here this morning on the defendants', Chief of Police Olivo and the State through Mr. Platkin, motion to dismiss plaintiffs' claims.

I'll start with my understanding of Chief Olivo's motion. His key argument, I'll say, my wording, is that Mr. Benton has been issued all three firearms, and so all

three claims for delay are now moot; that the mootness applies under *Almeida* to the organizational plaintiffs as well; that there's no injury-in-fact because it's hypothetical; that there's no causal connection between Olivo and the waiting times; that under redress argument, there's no waiting, waiting is not an injury; the rightness argument, that's contingent on future events, and that the fact that it's contingent on future events renders it speculation; and that, finally, under the Fourteenth Amendment improcessing is negligence at best, which is not a violation of the Fourteenth Amendment.

With respect to Defendant Platkin, Platkin argues that Benton lacks standing because there's no injury, that same is moot, and delays are not traceable to the Attorney General. That's with respect to the, what I'll call processing; and that the association plaintiffs also lack standing.

One of the arguments that I think probably both defendants raise was that the affidavit submitted on behalf of the individuals post the initial moving papers is impermissible amendment to the pleading, that's the argument of the defendants.

I think I'm correct in saying, and I've gone through -- this is my little map of the case -- that defendant Platkin is not challenging the one-gun-a-month claims as they pertain to one gun a month.

Is that correct?

MR. PICCININI: That's correct, Your Honor.

And if I may just to clarify, the reason that the State didn't move on that particular statute as well is because it's unclear on the face of the complaint whether Mr. Benton qualifies for the exemption handgun permit that applies to that particular statute, and that is because the complaint is unclear as to why Mr. Benton seeks to obtain more than one handgun in a month. And so that is why the State moved on all of the provisions of the handgun permitting rules and not on the 58-3i, the one handgun a month.

THE COURT: All right. Mr. Miles, did I miss anything capturing pretty much what Chief of Police Olivo's motion --

MR. MILES: Judge, I think you articulated just about all of it. I would note the one additional argument that was part of our motion was that in the alternative the delay that's been alleged would not rise to the level of a Second Amendment violation. That would be our 12(b)(6).

THE COURT: All right. So with that framework, again, just the arguments were interesting and in some ways detailed, laid out fully.

These are defendants' motions. However you wish to take them on, to the extent you want to be heard further. I

have, obviously, read all of the submissions, understood the positions of all the parties, but this is your time for oral argument.

Mr. Miles?

MR. MILES: Thank you, Your Honor. I understand the Court is familiar with all our papers so I won't belabor those points, and the Court has articulately outlined our respective arguments.

So the things that I would just draw attention to are that as to subject matter jurisdiction there's just no remedy that the Court could offer at this time that checks the boxes necessary for this Court to assert subject matter jurisdiction over this matter.

And as to our argument in the alternative, that the claims fail to state a claim, I would just highlight again that decisions, even post-*Bruen*, have held that the type of delays that did occur here are not sufficient to rise to the level of a Second Amendment violation; and that in this case in particular, we know from the pleadings of the complaint, as well as from the certifications that have been submitted, that the plaintiff, the other members of the associations who have offered certifications at all times have been able to exercise their Second Amendment rights, have been able to defend themselves, have been able to keep and bear arms. And we think that's an important consideration as well, recognizing that the

delays here, while delaying their ability to obtain additional firearms, did not deny them that right to keep and bear arms in and of itself.

The delays we're talking about here as to the two permits from February, that would be four months in total from the time that the fee was received. The 35 days -- so much less if you consider when the completed background checks and preliminary steps actually made it to Chief Olivo.

And as to the June application, 28 days from the time the fee was received, only eight days from the time it actually made its way to Chief Olivo.

So for those reasons, we think that the facts here fit within the post-*Bruen* decisions that have found delays longer than those that occurred here to not rise to the level of a Second Amendment violation. And I'm, of course, happy to answer any questions that you may have.

THE COURT: So the only point that I think may be worth elucidating a little bit more is the issue with the First Amendment analogy, the argument that plaintiffs make, that with respect to standing or maybe its mootness, that the plaintiffs are going to continue to experience these delays with respect to their ability to get through the process within the time frame.

MR. MILES: Your Honor, it's not clear that they will continue to experience these delays. Certainly there is

evidence that's part of the record before the Court today that the plaintiff and two others have experienced delays, but that's not dispositive of what the future holds.

And there has been, in Pennsauken in particular, there's been a tremendous rise in these type of applications and the municipality has taken additional steps to ensure that these things are processed in a timely manner. That, I understand, is outside of the Court's record for today, but it does not change the nature of that from a speculative future harm.

And, you know, much in the same way, even in the First Amendment context, Your Honor, there needs to be some imminence to the harm, some proximity or assurance that it's likely to occur, and our position is that is not present here.

THE COURT: Okay. Counsel for Mr. Platkin?

MR. PICCININI: Thank you, Your Honor. And once again, Giancarlo Piccinini, Deputy Attorney General for Attorney General Matthew J. Platkin.

(Discussion held off the record.)

MR. PICCININI: Once again, Giancarlo Piccinini for Matthew J. Platkin.

I just want to clarify one more thing with respect to the scope of the State defendant's motion because plaintiffs have told us that they have disclaimed a challenge to the

fingerprinting fee and because they've clarified that the challenge to the delay is not traceable to the Attorney General. Here, what is on the scope of the State's motion is those provisions of New Jersey's handgun permitting law that apply to handgun purchase permits per se, and those include N.J.S.A. 2C:58-3a, c, d, e, f, and i.

Again, "i" is not subject of this motion because we didn't think, you know, there were sufficient facts on the face of the complaint to do so.

Perhaps Mr. Benton's counsel can clarify whether or not that is the case one way or the other. But those other provisions, those are the provisions that are operative with respect to New Jersey's handgun purchasing permitting rules.

And if I may also just touch on the First Amendment issue, Your Honor. I know plaintiff relies on the Second Circuit's decision in *Antonyuk* for the proposition that a challenge to licensure itself is sufficient for purposes of constitutional injury-in-fact, but *Antonyuk* is a different case, and certainly this case does not present facts that would counsel against following this Court's precedence in *Kendrick* and in *Koons* on the firearms permitting issue, as opposed to following the Second Circuit's decision in *Antonyuk*.

And on its own facts, *Antonyuk* involved a challenge

to New York's Disclosure Requirement law. That law required that individuals disclose information about themselves, their families, and their social media activity in order to apply for a firearms permit.

So, in that case we had a dual layer of constitutional harm and the allegation was that an individual must endure a First Amendment harm in order to exercise the Second Amendment right to keep and bear. This case is not at all like that. There are no allegations that here there is a First Amendment harm. That is a predicate to the right to exercise the Second Amendment right in this case. And that is why here we lacked a cognizable Second Amendment injury-in-fact for the purposes of standing.

This court in *Kendrick*, and reaffirmed in *Koons*, is clear that an individual must apply for and be denied a permit or have a permit revoked or make a showing of substantial futility with respect to a permit in order to suffer a cognizable Second Amendment injury-in-fact that is both concrete and particularized and actual and imminent.

We are lacking that here, and that is why this is no more than an abstract, generalized grievance against New Jersey's requirement for permitting per se.

And I won't get into the merits of it, I will leave that to Chief Olivo's counsel, but they did mention that courts

have been clear since the *Bruen* decision that that is not the type of injury that is cognizable under the Second Amendment, which again, is in contradistinction to the injury-in-fact jurisprudence pertaining to the First Amendment, especially because in the First Amendment context, with respect to standing, chill is a component that counsels finding injury-in-fact in First Amendment cases, and that is a key consensual difference to Second Amendment cases like this one.

And the Third Circuit was clear in its *ANJRPC vs. NJAG* decision in 2018. I know in 28(Sic), Judge Shwartz clarifies that we have not in this circuit wholesale imported First Amendment doctrine into the Second Amendment space, and Judge Kugler observed in *Kendrick* that we have certainly not done so with respect to standing. The reason is because the constitutional harm is different. It's a First Amendment harm and a Second Amendment harm. The two cannot be conflated.

So here, Mr. Benton's allegation that he is deterred from applying for more handgun purchase permits, that is insufficient for the purpose of injury-in-fact under the Second Amendment, and for that reason we ask that the Court grant our motion in full with respect to Mr. Benton.

And with respect to the association plaintiffs, if I may. The situation in the declaration with respect to the

association plaintiff members is no different than the situation with Mr. Benton. All of them had alleged that the need to apply for a handgun purchase permit is itself the constitutional injury. So for the same reasons that Mr. Benton lacks standing here, so too do the identifying members in the declarations of the associations.

But even further to the point, there are no members identified within those declarations for whom those individuals can have representational standing for the associations -- I know plaintiff has mentioned in his opposition that requiring members of an association to be named for the purposes of standing broaches a freedom-of-association issue. That is not the case with respect to standing on the merits.

Perhaps, yes, disclosure laws may inure a First Amendment injury, but as a matter of standing it's unclear how that really moves the needle for the associations because if those named individuals were bringing suit on their own behalf, certainly they would have to provide enough facts in their complaint and declaration to have standing on their own right, the same as -- the same is true with respect to the associations and to serve in a representational capacity for the associations.

So not only are there no individuals named, but the individuals named are situated no differently than Mr. Benton. And for the same reason Mr. Benton lacks standing, so do the

members identified of the associations.

And one last point with respect to remedy, Your Honor. Mr. Benton has alleged past harms as a basis for prospective injunctive relief, which as Chief Olivo's counsel mentioned, in the absence of allegations of certainly impending harm is insufficient to find standing.

And furthermore, Your Honor, in plaintiffs' opposition, he notes that his request for nominal damages suffices as a basis to find that the past harms can serve as a basis for standing here. That's also wrong because nominal damages are money damages, and this is a suit against a state official in an official capacity which is plainly precluded by the Eleventh Amendment.

It's not a matter of degree with respect to money damages claims, it's a matter of kind. And the fact of the matter is no matter whether it's one dollar or a million dollars requested, a money damages suit against the state is precluded by the Eleventh Amendment, the purpose being that money would still come from the public face, which is the core of the Eleventh Amendment prohibition on suits against states and against state officials acting in an official capacity, which is tantamount, of course, to a suit against the state.

So just to -- for a couple housekeeping items there, Your Honor. Of course, if the Court has any other questions, I

am happy to answer them.

THE COURT: Not at this time. Thank you.

MR. PICCININI: Thank you, Your Honor.

THE COURT: All right. Mr. Stamboulieh.

MR. STAMBOULIEH: Thank you, Your Honor.

There's just a couple of things that I want to say. I'm taking my glasses off because I'm going to have to keep flipping them down. Sorry.

I'd like to answer one of the questions that counsel for Chief Olivo said -- oh, I am sorry, for AG Platkin said, is why does he want to buy -- why does he want to buy this second handgun in a month? And this is the kind of government questioning that we would not expect in the First Amendment context when I would go to him and say, AG, I want to say something; and he would say, well, what do you want to say, Mr. Stamboulieh? I don't have to do any of that because it's my right as an American to engage in First Amendment protected conduct.

And the same thing is with the Second Amendment. I don't have to explain to the government why do I want to buy a gun, why do I want to do any of the things that the Second Amendment protects. And I think that's one of the misunderstandings that we have here, is that the government keeps looking at this saying these delays aren't really that bad. But *Heller*, *Bruen*, even *Rahimi* doesn't talk

about how bad the burden has to be to be a Second Amendment violation.

Of course, in *Heller* they talked about it had to be -- well, they didn't say had to be a complete ban, but they did find that the complete ban in D.C. violated the Second Amendment.

Here we have a 132-day wait for Mr. Benton to exercise his Second Amendment right. Chief Olivo says, "but he has other guns," but that still doesn't make a difference when it comes to whether or not his Second Amendment right was violated to acquire another one.

The Second Amendment is silent about when it says "the right for people to keep and bear arms." There's an "S" on that. It doesn't say you have a right to keep and bear an arm and you're limited to one purchase per month or anything like that. It's open-ended. I could buy as many as I want that I can afford and that's how it goes.

I will say that there's been a number of cases post-*Bruen*. And since actually the beginning of this year, the Ninth Circuit in *Yukutake vs. Lopez* -- and I had written down the name. Give me one second. The citation for that is 2025 U.S. App. LEXIS 6017. And on star pages 32 to 33, it says that people have a right to acquire arms and that the right to acquire is protected by the Second Amendment. And that's the thing that we're arguing about here where we

have a right to acquire a gun but the government is standing in our way.

We also have *Sedita vs. United States*, that was from the D.C. District Court -- I am sorry, *Yukutake* was a Ninth Circuit opinion that was released in early March. And then we have *Sedita vs. United States* which came out in early February. When an individual seeks to buy a firearm, the Second Amendment's plain text covers his conduct and the Constitution presumptively covers that conduct. This was a case against the United States for mixed background check delays. And, Judge, the delay in that case was three days, a maximum of three days.

The federal officers argue, otherwise insisting that no constitutional right is implicated here because *Sedita* was never denied a firearm. This is the same argument that the defendants make here where they say "but you were never denied a permit, you obviously were issued that permit eventually."

But then that leaves them open to do anything. They could add all kinds of time, delays. And as long as at the end of whatever they put in front of you or whatever roadblock they put in front of you that you can get over and you got a permit at the end of the day, they're saying the delay doesn't matter, Judge, and the courts agree, but the courts do not agree. And the citation for this one is 2025 U.S. Dist. LEXIS 19753 at

star 26.

I also want to just point back to a case that they cited to in *Marszalek*. One moment. Sorry. This is a case that Defendant Olivo cited to about delays in Illinois Southern District Court. In *Marszalek*, they did deny a preliminary injunction based on the likelihood of success. The judge there said, well, you've got some delays of four to five months, but we don't think you're going to win in this case.

Now, it's important to remember that was a pre-*Bruen* case that was going through the interest balancing test that *Bruen* said flatly you cannot do interest balancing anymore. But I'm going to read from 2022 U.S. District LEXIS 1047, at star 18. "The issue before the Court today is whether the plaintiffs have stated a plausible claim under Rule 12(b)(6). At this point, the Court determines the plaintiff has stated a plausible Second Amendment claim."

And that holding or that refusal to grant the defendant's 12(b)(6) was predicated on the amended complaint reciting the experience of individuals who had waited 60 to 90 days, who had been waiting five to nine months for an FOID application. And an FOID is not anything like what we have here where those last four, I believe it's ten years, and that's to buy a firearm. Whereas for me to buy a firearm, a handgun specifically in New Jersey, I have to get a permit to purchase every time I want to buy one.

Our declarations make clear that Benton wants to keep buying handguns. What's the reason for it? It doesn't matter why he wants to do it. It's his right to do it. And so he doesn't just get a one-and-done firearm identification card that lasts for ten years; he has to keep doing this.

And if we look to the Third Circuit's *Stepien* v. --

THE COURT: You said *Stepien*?

MR. STAMBOULIEH: S-T-E-P-I-E-N. And we briefed it, but unfortunately, I cannot find the citation to it. But it discusses mootness in -- it's in our brief, Your Honor.

But this is a perfect mootness type case where they said, well, you filed a lawsuit, we're going to issue you permits. But if we filed a lawsuit after X amount of days, it's still beyond the statutory time frame for them to get a license issued. And then we file a lawsuit, they immediately try to moot it out. Well, that's their actions that are doing it, plus we have it being too short to be fully litigated, so we plainly fit into the mootness exception.

A lot of what the defendant Olivo's counsel discussed was there's no remedy for the Court to exert its subject matter jurisdiction. So I disagree with that a hundred percent. We briefed a lot of the reasons why. But if this Court were to enjoin the one gun a month and the permit to purchase application, then my plaintiff -- who, by the way, Judge, is

still going to have to go through a background check every time he buys a firearm. So if he buys one today and one in 15 days, every time he goes to that federal firearm licensing, he's still getting a background check. So there's no fit here, it's just a prophylaxis on a prophylaxis.

We discussed that there is a certain time frame when you talk about delay that gives rise to a 2A claim. The Fifth Circuit in Louisiana, from a case that I litigated in McGrory, says that ten days isn't enough when you're talking about purchasing a firearm.

But then we have *Sedita,* which discusses the three-day time period. But ten, three days, we all can agree, I hope, that 132 days and 140 days for our people getting purchase permits is unconstitutional.

It's our position that when you apply the Second Amendment analysis to conduct that is covered by the Second Amendment, you have to go back and find a historical analog. Because we're in the Third Circuit, *Lara v. Commissioner of State Police* says that we have to look at 1791. And it's the defendant's burden, once we've made that showing that our conduct is covered by the Second Amendment, this regulation impairs conduct covered by the Second Amendment, it's time for them to put up their analogs and show the Court here's how we can justify these regulations here.

I'll say one more thing about Defendant Olivo's

argument. He keeps saying that the post-completed application -- and those weren't his words, but this is the argument he's making. Mr. Benton applied February 27th, 2024. And he's saying once he got all of the investigation completed from his office, he only took 35 days to approve it, but that's not what the statute says.

And we're not here making a process-based complaint where we just don't appreciate the process. It's that the entire process is unconstitutional. From the requirement to require a permit to purchase to Defendant Olivo's pattern and practice of taking way longer than the 30 days that the statute allows, they're both unconstitutional.

And I'll say one more thing, Your Honor. In Exhibit C of our complaint at paragraph 10, Mr. Benton discusses, like flat-out says: In other words, I am prevented, as a matter of law, from even purchasing a handgun until I have received an issued permit to purchase and then further limited in how many handguns I can acquire.

This response to, I believe it's Defendant Platkin, it says that Benton never even said that he was denied a firearm. Well, he's being denied in the 132 days it takes him to get a gun and he's being denied when he's -- he can only buy one handgun a month. These are denials -- I know it's not the standard denial that we think about, but they're still denials. They're disenfranchising my plaintiff from buying his gun for X

amount of days, and those days constantly change.

THE COURT: So interesting that at some point you frame this as Benton's right to buy when, in fact, the Second Amendment talks about his right to bear arms. And it seems undisputed based on the facts that he, in fact, has arms already, Mr. Benton does.

MR. STAMBOULIEH: Yes, Your Honor, he has arms already.

THE COURT: So this argument seems to me to suggest that what he's seeking here is the right to bear as many arms as he desires.

MR. STAMBOULIEH: Right. To acquire the arms that he desires, yes, Your Honor.

THE COURT: Well, and that's -- I think that may be -- and I don't want to get too far down the road of wordsmithing, but I do think that some wordsmithing may be appropriate here when we're talking about the Constitution.

And as the court in *Bruen* indicated, the Second Amendment right is abridged because you have a right to bear arms. That's what it says. It seems to me that Mr. Benton's arguments and the organizational arguments are the right to buy unfettered.

Don't you agree there's a little bit of a difference here when someone already has arms and, therefore, his right to bear arms has not been abridged? What you're arguing is his

right to bear as many arms as he wants and/or, as you indicated, your words, "his right to buy," when that's not what the Constitution says. It says, "right to bear."

And the denial of his right to bear arms has not been established here. He has arms. So if you will, engage me a little bit on that.

MR. STAMBOULIEH: Sure. Well, the Second Amendment says "the right to keep and bear arms." So when you have something that's necessary for the exercise of a right -- so if none of us had any arms and we all say we want to keep and bear arms, and the government comes in and says, well, you can't buy any, then we would obviously say, well then the Second Amendment must cover something. And we would think -- I think agree with the Ninth Circuit and the district court in the District of Columbia that says that the right to acquire is protected by the Second Amendment because it's an ancillary right that's protected. Because in order to keep and bear, you have to buy, you have to acquire or we have to make --

THE COURT: And that applies if, under your scenario, we didn't have any. Right? You started, your predicate was so when you -- right to keep and bear. And you know, I always keep my Constitution here with me when people talk about it. And it says, so if none of us "had" any arms and we say want to keep and bear. Yes, I agree, but that's not your plaintiffs

here. Those are not your plaintiffs.

Your plaintiffs in this case keep and bear. They're seeking to continue to purchase more unfettered.

MR. STAMBOULIEH: The Court is right, they're seeking -- the first part of what the Court just said is right. They're seeking to acquire more, but not unfettered. They're not challenging the background check process that the federal government requires all FFLs to conduct when you buy a gun. None of that is being challenged here.

We're challenging the things that are unnecessary under New Jersey law. And I can tell Your Honor why they're unnecessary. The permit to purchase, it allows Chief Olivo to take his time when he's dealing with constitutional rights.

Do a background check, sure. We're not challenging background checks here. Because when Mr. Benton goes to the FFL, he's going to have to do a background check. Why? Because federal law requires it. Okay?

So then the one gun a month, let's say Mr. Benton goes crazy today and wants to buy five handguns --

THE COURT: Well, let's not use that word because mental health is a precursor to getting a weapon.

MR. STAMBOULIEH: I understand.

THE COURT: So if he went crazy today, he probably couldn't get one.

MR. STAMBOULIEH: Well, if he decided to spend his

money how he saw fit and buy five guns today, guess what, that FFL has to submit a report to the ATF, a multiple handgun purchase, and alert the federal government this guy just bought five handguns, if you want to go talk to him, here's his 4473 that he filled out. That's the form you fill out when you go to buy a handgun.

So now -- I don't know if New Jersey has a separate handgun reporting form. It's just not something that is at issue here. But both of the things that New Jersey is saying, we have to have this and we have to have that, the federal government takes care of. And if New Jersey wanted to copy what the federal government does and have a multiple sales form, okay, I mean, that's not what we're here for either.

The Court's question is predicated that if we don't have any guns, it's okay to buy one and then the Second Amendment has to cover it. I'm just paraphrasing what the Court's said.

THE COURT: Understood.

MR. STAMBOULIEH: But as soon as we have one, then my right is diminished somehow, and I don't think that's how the Second Amendment reads. And I certainly understand that's not how the First Amendment is. Just because I spoke yesterday doesn't mean I can't speak again today. And if you look at my Twitter, I'll probably have 10,000 tweets, maybe less. But it

doesn't matter. The government can't come in and sensor me saying, well, Mr. Stamboulieh, you've spoken too much, you've already used your First Amendment today.

Or on my way back to Philadelphia Airport, if I get pulled over and the cops want to search my car and I'm like, sorry, officer, I already used my "I don't want to talk to you" and you can't search my car under the Fourth Amendment because you don't have a warrant but I already said that in Philadelphia on my way here -- I get pulled over a lot, right? The cop is not going to say that. He's required to get a warrant every time unless there's some exigent circumstances.

So I don't know --

THE COURT: But there is, in fact, no case that I've at least found that equates the Second and First Amendments. They are different rights. Right?

The Second Amendment is the right to bear arms. And so your analogy of if I exercise my First Amendment rights I can do that continuously unchecked, I'll call it, but that's different. That's speech, association.

The right to bear arms is actually something that can be completed and fulfilled certainly, meaning once an individual has gone through a process and has a handgun, long gun, how many ever they want, they actually are exercising their Second Amendment rights. They have it. The right to keep and bear, it's there being exercised.

And so this argument I thought was interesting, but then on closer inspection when I tried to find a Second Amendment case analogous where it employed First Amendment analysis, I was unable to locate such a case.

Did you find any?

MR. STAMBOULIEH: The courts are weary of incorporating First Amendment doctrine into the Second Amendment. But the United States Supreme Court in the majority, not in a concurrence or a dissent, said that the Second Amendment is not -- is not subject to an entirely different body of law than the other amendments.

So I think that if we look to First Amendment law, there could be some good fits for, like, as counsel for Defendant Platkin said about the chilling effect. I'm not aware of any court that's come out and said we adopt the chilling effect in Second Amendment; it might be a good fit, it might not be a good fit, I haven't really thought about it that much. But I do know that all I can go off of is what the Supreme Court says.

The Second Amendment is not a second-class right; it's not the constitutional orphan, like Justice Thomas likes to keep saying that it's not, so it's still not a constitutional orphan; and it's not limited to where you have one gun, can't buy any more, or you can get so many regulations put on it because the government of New Jersey thinks that you can or

thinks that they can.

THE COURT: Thank you.

MR. STAMBOULIEH: Yes, ma'am, thank you.

THE COURT: Mr. Miles, I see you pushing from the desk. That means you want to speak.

MR. MILES: Thank you, Your Honor. And I'll be brief.

There's been discussion about the relationship, if any, between First Amendment and Second Amendment rights, and you know, certainly counsel is accurate in his representations that the Second Amendment is not an orphaned constitutional right, but it's not unfettered in the same way that the First Amendment is unfettered. And we know our Supreme Court has counseled that your First Amendment right does not protect you from shouting "fire" in a crowded theater. We know that content-neutral time, place, and manner of restrictions are appropriate and have been upheld in the First Amendment constitutional context.

In the same way, the Supreme Court in *Heller* has told us that the Second Amendment right to keep and bear arms is not unlimited. And *Bruen* explains that "shall issue" regulatory schemes, which is what New Jersey employs here, are likely to be constitutional and views them as designed to ensure that firearms are kept and borne by law-abiding, responsible citizens.

So we know that the Supreme Court approves of these type of regulations and, by extension, the type of delay that they sometimes require. Where *Bruen*, in footnote 9 of its opinion, cautioned is that there may be circumstances where lengthy delays could be "put towards abusive ends."

And that's really what we're talking about here, are the delays that exist in the record in this matter, are they being used to abusive ends? Are they really a mask somehow to deny a right, as opposed to delay it, so that appropriate gatekeeping functions can take place, functions that the Supreme Court has recognized are appropriate?

So we think that's kind of where the analogy between First and Second Amendment comes to fruition in this case.

And my last point is, there is a difference that our Supreme Court has recognized between an injury-at-law and an injury-at-fact. And when we're talking about this Court's subject matter jurisdiction, *TransUnion v. Ramirez* requires that we focus on that injury-in-fact, and that's where respectfully we feel that the plaintiffs fall short in triggering this Court's subject matter jurisdiction.

THE COURT: Thank you.

Mr. Piccinini, anything? I'm missing one of the syllables.

MR. PICCININI: Piccinini, Your Honor, yes.

THE COURT: Piccinini?

MR. PICCININI: Yes. Thank you. Just a few points, Your Honor.

First, I just want to reiterate Chief Olivo's points that injury-in-fact and injury-at-law are different inquiries. This is a 12(b)(1) motion with respect to the State, so we're looking at cognizable injury-in-fact. We reiterate that --

(Court reporter interruption.)

MR. PICCININI: So we're looking at whether the plaintiffs have alleged a cognizable injury-in-fact under the Second Amendment, as opposed to and in distinction to an actual merits injury for the purposes of the merits determination.

And just on that point, no courts in this district, no court in the State of New Jersey and no court in this circuit, including the Third Circuit, has found that the Second Amendment facially protects a right to purchase arms, let alone to purchase them immediately.

And in fact, the Third Circuit's decision in *Drummond* counsels against finding such a right because in that case the court declined to find the right to sell in the text of the Second Amendment.

And furthermore, Your Honor, the Third Circuit's recent decision in *Delaware State Sportsmen Authority*

disaggregates First Amendment injuries -- granted, that's a pre-enforcement case on a preliminary injunction -- disaggregates First Amendment injuries from Second Amendment injuries. First Amendment injuries being presumptively irreparable, Second Amendment injuries are not.

So I think that further underscores the fact that the Third Circuit, since 2018 and as recently as last year, have treated First and Second Amendment injuries distinctly.

But again, plaintiffs have not alleged a First Amendment injury here and for that reason there's no need for this Court to follow *Antonyuk* over this Court's own decisions in *Kendrick* and *Koons.*

And finally, Your Honor, plaintiffs' counsel intimates that he need not explain the reason why Mr. Benton seeks more than one handgun within a period of a month beyond the fact that he wishes to exercise his Second Amendment right to self-defense, and I'll just point the Court to 2C:58-3.4(a)(2), which does include in the definition of collector an individual who "for defensive purposes may seek an exemption statute," and so it would seem that Mr. Benton could have applied for that exemption permit and did not do so. Certainly there's no allegation that he did so on the face of the complaint.

And given this Court's ongoing obligation to ensure

its own jurisdiction at all points of the litigation, this Court in light of that clarification could reach the --

(Court reporter interruption.)

MR. PICCININI: In light of plaintiffs' clarification, the Court could reach the 58-3i standing issue as well.

THE COURT: So your cadence is a little tough to follow.

MR. PICCININI: I had two expressos this morning. I apologize, Your Honor. Long drive from Newark.

THE COURT: Understood. Just to let you know. Because I'm listening and your cadence -- after a couple days, Sharon would get you completely, but it's the newness of your cadence as you speak.

MR. PICCININI: Understood. Unless the Court has any other questions.

THE COURT: I do not.

MR. PICCININI: Thank you, Your Honor.

THE COURT: Mr. Stamboulieh?

MR. STAMBOULIEH: Just briefly, very briefly. It sounded to me that he's asking the Court to look at a motion that he hasn't filed yet on the one-gun-a-month standard, so I would just like to leave the Court with this.

This is a concurring opinion from Justices Thomas and Alito from *Wilson v. Hawaii*, 145 S.ct. 18 at 20-21:

The Second Amendment is "self-executing, and a

State transgresses it as soon as the State implements a licensing regime that is inconsistent with this 'nation's historical tradition of firearm regulations.'" And they cite to *Bruen*.

"Judicial review of a license denial may be one way that an individual can challenge State overreach. But, because of the constitutional violation occurs as soon as an individual's right to bear arms is inhibited, States cannot mandate that would-be gun owners go through an unconstitutional licensing process before they may invoke their Second Amendment rights. Any other rule would impermissibly demote the Second Amendment to the State 'to the status of a poor relation' among constitutional rights."

THE COURT: So I agree that goes to the one-gun-a-month provisions, which are not before us today.

MR. STAMBOULIEH: Correct. That's the only thing that kind of gave me a little bit of pause.

THE COURT: Yes. I think the arguments just went there because of the initial argument on behalf of the State, then you responded and now you've responding again.

But I understand, the one-gun-a-month regulation is not before the Court today.

MR. STAMBOULIEH: Okay. Thank you, Your Honor.

THE COURT: All right. Hearing nothing further, let

me pronounce my decision here. And I'll start by saying I hold oral argument because I do find it beneficial, especially in a case like this, where the Court does have some questions about what is really before it and what it's being asked to do in these particular circumstances.

And I will say that the arguments of counsel are very helpful in helping me to discern what the Court must address by these motions.

And I think in the briefing there was some back-and-forth with respect to whether this is a motion under 12(b)(1) or 12(b)(6). The Court has addressed this motion pursuant to 12(b)(1) and is dealing with it as one implicating the Court's jurisdiction to decide this case.

"At issue in a Rule 12(b)(1) motion, the court's 'very power to hear the case.'" Citing *Petruska vs. Gannon University*, 462 F.3d 294, 302 (3d Cir. 2006); quoting *Mortensen vs. First Federal Savings & Loan Association*, 549 F.2d 884, 891 (3d Cir. 1977).

"Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Bender vs. Williamsport Area School District*, 475 U.S. 534, 541 (1986); citing *Marbury vs. Madison*, 5 U.S. 137, 1 (1803).

When considering a Rule 12(b)(1) motion challenging

subject matter jurisdiction, "a district court has to first determine...whether the motion presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed." *Constitutional Party of Pennsylvania vs. Aichele*, 757 F.3d 347, 357-58 (3d Cir. 2014); citing *In re Schering Plough Corp.*, 678 F.3d 235, 243 (3d Cir. 2012).

Here, the defendants assert a factual challenge, which attacks "the factual allegations underlying the complaint's assertion of jurisdiction, either through the filing of an answer or 'otherwise presenting competing facts.'" *Davis vs. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016).

A factual attack pursuant to Federal Rule of Civil Procedure 12(b)(1) allows the court to weigh and consider evidence outside of the pleadings. When the defendant pursues a factual attack, "the plaintiff will have the burden of proof that jurisdiction does in fact exist," and the court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Quoting *Mortensen,* 549 F.2d at 891.

Therefore, there is no presumption of truthfulness to a plaintiffs' allegation. Again, quoting *Mortensen*.

The main issue of contention here is standing. General standing doctrine: "The standing doctrine limits the category of litigants empowered to maintain a lawsuit in

federal court and has developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood. To maintain a suit, a plaintiff must show:

"(1) an injury-in-fact; (2) a sufficient causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision.

"A plaintiff must allege facts that affirmatively and plausibly suggest that it has standing to sue. Speculative or conjectural assertions are not sufficient. The burden of establishing standing rests with the plaintiffs.

"The first element, injury-in-fact, requires the plaintiff to show an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.

"To be concrete, the injury must be real and not abstract. An injury is sufficiently particularized if it affects the plaintiff in a personal and individual way. A harm is actual or imminent where it is presently or actually occurring, or is sufficiently imminent." *Kendrick vs. Bruck*, 586 F. Supp. 3d 300, 308 (D.N.J 2022).

First, the Court will address the issue of nominal damages. To have standing, a plaintiff must have a concrete, (here, constitutional) injury.

A statutory violation, such as alleged here, of delay, is not sufficient to grant standing in accordance with *TransUnion vs. Ramirez*, 141 S. Ct. 2190, 2205 (2021). *TransUnion* requires that there be an "actual" injury and not just a statutory violation to sustain standing.

Next, failure to meet a statutory deadline does not automatically equal a constitutional violation in Second Amendment jurisprudence. See *Rachlin vs. Baumann*, 22 U.S. Dist. LEXIS 174215 at *56 (D.N.J. February 22, 2022).

In addition, the Superior Court of New Jersey, Appellate Division, has held no statutory violation occurs when an issuing authority takes longer than 30 days to process an application due to delays in completing application requirements, as the delays provide "good cause" for withholding a permit until the investigation is complete. That's *Rachlin*, citing *Adler vs. Livak*, 308 N.J. Super. 219, 223-225 (App. Div. 1998).

Further, what's at issue here is Third Circuit standing regarding firearm statutes, and thankfully, over the past several years we have a few cases that elucidate what the Court is to do and the standard the Court is to apply with respect to standing in firearms statutes.

So there are four ways to achieve standing under a firearms statute: (1) Able and Ready Doctrine; (2) Apply & Was Denied; (3) Futility; and (4) "First Amendment Analogy" or

"Impaired Interest."

First, the Able and Ready Doctrine. A plaintiff has standing to challenge a law denying a benefit or opportunity that he or she did not actually apply for by showing that he or she is "able and ready to apply." *Koons vs. Platkin*, 673 F. Supp. 3d 515, 558-560 (D.N.J. 2023); and that was quoting *Ellison vs. American Board of Orthopaedic Surgery*, 11 F.4th 200, 206 (3d Cir. 2021).

*Ellison* requires a fact-sensitive inquiry. Plaintiff must show that he or she took some steps evidencing "a real interest in seeking the alleged benefit," to the extent that at the time the lawsuit started he or she was "able and ready" to apply in the "reasonably foreseeable future."

In the *Koons* case, the woman who was found to have standing satisfied the precondition of taking a firearm safety course.

"Intends to apply" or "imminently intends to apply" for more permits is not sufficient. In other words, as this Court has gleaned, no timeframe equals no standing. See *Koons* at 560.

The descriptions of desire and intent to apply for more permits in this case are more similar to the *Siegel* plaintiffs, Jason Cook, Kim Henry, and Aaron Siegel, who "qualified for and immediately intended to apply for a firearms identification, FID, and one or more purchase permits," where

the Court did not find standing for their challenge to the permit process.

Second, Applied & Was Denied. In *Kendrick vs. Bruck*, the court there held that plaintiffs lacked standing to challenge the FID and Purchase Permit laws because plaintiffs never applied for the permits. In this case, none of the proposed plaintiffs or Benton himself has been denied a permit.

Third, Futility. The general exception where plaintiff does not need to apply and be denied occurs if a plaintiff makes a "substantial showing" that submitting to the government policy would be futile. Here, plaintiffs do not argue that it would be futile to apply here because the applications have all been granted.

Fourth, First Amendment Analogy or Impaired Interest. First, the First Amendment Analogy found in *Kendrick vs. Bruck* and *Parker vs. District of Columbia*, which is 478 F.3d 370, 399 (D.C. Cir. 2007) regarding restrictions on the right, is not standing.

*Kendrick* notes that "the individual plaintiffs have cited an instance of Second Amendment case law referencing First Amendment case law on reasonable restrictions, but they have not indicated an instance of Second Amendment case law adopting First Amendment case law on standing, the issue that is here at present.

While First Amendment cases have permitted standing

for plaintiffs who have not sought permits, Second Amendment cases have not. See, for example, *Libertarian Party of Erie County vs. Cuomo*, 970 F.3d 106, 121-22 (2d Cir. 2020). In that case, the individual who has not applied for a permit lacks standing to challenge the firearm permitting scheme. See also *United States vs. DeCastro*, 682 F.3d 160 (2d Cir. 2012).

Moreover, the *Association of New Jersey Rifle & Pistol Clubs vs. AG of New Jersey*, 910 F.3d 106, 122, *28, the Third Circuit declines to import First Amendment case law wholesale when the Third Circuit has expressly refused to do so. *Kendrick*, 586 F. Supp. 3d at 309.

It is argued that the Impaired Interest is analogous to the Chilled Speech argument under the First Amendment. Because jurisprudence is clear that a denial would be harm -- see, for example, *Rachlin*, 22 U.S. Dist. LEXIS 174215 at *24 -- the barrier here is that no denial has happened here. Benton and the other proposed plaintiffs were never denied a firearm permit. Benton and the other proposed plaintiffs had firearms before, during, and after the contested permits were approved.

Plaintiffs argue being forced to comply with the statute itself is the harm because it "impairs" plaintiffs' interest in acquiring weapons. For example, as evidenced by the oral argument today, Benton asserts that he would acquire more than one gun per month if the statute did not exist, therefore, it can be said that he desires to own weapons

unimpaired. He points to *Antonyuk* to suggest that plaintiffs' interest in obtaining firearms is "impaired" by the statute, therefore, chilled.

However, the plaintiff in *Antonyuk* is very different than the plaintiffs here. The facts there and why it's distinguishable from the plaintiffs here is that plaintiff was "deterred from seeking, and thereby prevented, from obtaining a concealed carry license. He is injured by the consequent inability to exercise his Second Amendment right." That inability just simply does not exist in this case.

Mr. Benton, as well as the other individuals who information has been provided for, have all sought and received firearms permits. They are all, as this Court can glean from what is before it, currently exercising their Second Amendment right to keep and bear arms.

*Antonyuk* is just very different. There, the injury was cognizable because Mr. *Antonyuk* was being required to disclose information about his family members, and very clearly, the social media accounts which exposes them, as we all know, to public purview. None of those disclosures or barriers to applying are presented here.

As this Court gleans, and I think intimated as such during the course of the arguments, the way that I have digested this information and plaintiffs' challenge to Olivo and the State with respect to Mr. Benton's Second Amendment

right for purposes of this motion is that he has or that the Second Amendment provides an unfettered, unimpeded right to access guns and/or purchase guns according to his personal desires.

This Court does not find that that is a cognizable claim for a couple of reasons. No constitutional right is unfettered, all have some restrictions. Most recently, in the case *Bondi vs. Vanderstok*, 605 U.S. -- so recent, no page number -- at *2 (2025), noting that the Gun Control Act of 1968 has restrictions on firearms relating to the background check requirements and the licensing, recordkeeping, and serialization requirements, serving to "keep guns out of the hands of criminals" and to "help law enforcement investigate serious crimes," acknowledging that the right to bear arms is not unfettered.

Make no mistake, the Court does not view Mr. Benton or any of the members of the organizational plaintiffs as criminals or having engaged in any criminal behavior, but the Court does note that the investigation process that is employed by this State -- and I quote this from Olivo's motion to dismiss, Document No. 19-1, page 15 of 37. "The investigation here includes the following: Fingerprint results, New Jersey criminal name check, NCIC III criminal master name index check, mental health check, reference feedback, residence verification, identification check, municipal court system

check, prosecutor and Superior Court check, juvenile central registry check, domestic violence central registry check, immigration alien check, local police database check, LEO, law enforcement officer verification, suspicious activity reports check, multiple handgun exemption, and photograph check."

I listed all of those things to underscore the susceptibility of some of this information changing daily, weekly, and perhaps even within 30 days.

For further support for the notion that the Constitution does not confer an unimpeded right to gun access, see *Rachlin*, which the Court has cited, quoting *Heller*. And as plaintiff counsel has noted, courts throughout the country, the circuits and district courts, have been struggling with the process of this time frame. I say "struggling" to indicate some courts have drawn conclusions around time frames. What we know is that somewhere between three days, as plaintiffs' counsel argues was the time frame at issue in the *Sedita* case, and *Heller*, where the time frame was never, the right to gun access is not unfettered.

Some process has to be in place, some time frame has to be permitted. Good cause to investigate and qualify the application process is, as I construe the cases, required in a society where we live in community. *Rachlin* points this out, so does *Heller*, "the right to keep and bear arms is not

unlimited...*Heller* identifies such prohibitions, such as possession by felons and the mentally ill, as presumptively lawful because they affect classes of individuals who, historically, have not had the right to keep and bear arms."

Also see, for example, *Lara vs. Commissioner of Pennsylvania State Police*, 125 F.4th 428, 431 (3d Cir. 2025), stating that the Supreme Court in the *United States vs. Rahimi*, 602 U.S. 680 (2024) "upheld the constitutionality of federal firearms regulations."

Finally, in *Parker vs. District of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007), in that case the court stated, "the protections of the Second Amendment are subject to the same sort of reasonable restrictions that have been recognized as limiting, for instance, the First Amendment."

These limitations do not make the Second Amendment a second-class right, it makes it on par with all other rights established for the citizens of the United States in the Bill of Rights.

For these reasons, the Court is granting the motion to dismiss filed on behalf of Olivo and the government, but that dismissal is without prejudice, particularly in light of the affidavits that were submitted that perhaps suggest that others who are members of the organizational plaintiffs may in fact not possess any firearms at all and may be in a position to establish standing.

The Court did not accept the affidavits because I think everyone knows you cannot amend the complaint by way of opposition to a motion to dismiss. That is the ruling of the Court.

Anything further on behalf of the plaintiff?

MR. STAMBOULIEH: Briefly, Your Honor, is this the entire case, 12(b)(1), dismiss the entire case on a 12(b)(1)?

THE COURT: Yes.

MR. STAMBOULIEH: Perfect.

THE COURT: Anything further on behalf of the government?

MR. PICCININI: Nothing from the State, Your Honor. Thank you.

THE COURT: On behalf of Defendant Olivo?

MR. MILES: No. Thank you, Your Honor.

THE COURT: Thank you. And the Court will note for the record that there is a motion to consolidate pending. I plan on reaching that very soon.

MR. PICCININI: Thank you, Your Honor.

THE COURT: To consolidate with Struck.

MR. STAMBOULIEH: And this order will be a written order?

THE COURT: I will prepare an order and will enter that order likely today. The rationale and basis for the Court's decision will be available through the transcript.

MR. STAMBOULIEH: Perfect. Thank you so much.

THE COURT: You're welcome. Hearing nothing further, this matter is adjourned.

THE COURTROOM DEPUTY: All rise.

(Matter adjourned at 12:20 p.m.)

\- - - - - - - - - - - - - - -

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/S/ Sharon Ricci, RMR, CRR*
*Official Court Reporter*

*March 31, 2025*
*Date*