**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MATTHEW STRUCK, DANIEL FRANCISCO, FIREARMS POLICY COALITION, INC., and NATIONAL RIFLE ASSOCIATION OF AMERICA,<br><br>Plaintiffs,<br><br>v.<br><br>JENNIFER DAVENPORT, in her official capacity as Attorney General of New Jersey, and JEANNE HENGEMUHLE, in her official capacity as Superintendent of the New Jersey State Police,[1]<br><br>Defendants. | Civil Action No.: 1:24-cv-7098<br>Consolidated Case: 3:24-cv-9479<br><br>Hon. Karen M. Williams, U.S.D.J.<br>Hon. Matthew J. Skahill, U.S.M.J.<br><br>Motion Date: December 15, 2026 |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Bradley A. Benbrook*
Stephen M. Duvernay*
**Benbrook Law Group, PC**
701 University Avenue, Suite 106
Sacramento, CA 95825
(916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

**Pro Hac Vice*

Bradley P. Lehman
**Whiteford, Taylor & Preston, LLC**
600 North King Street, Suite 300
Wilmington, DE 19801
(302) 353-4144
blehman@whitefordlaw.com

*Attorneys for Plaintiffs*

[1] Substituted as Defendants in accordance with Fed. R. Civ. P. 25(d).

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ 1

INTRODUCTION ........ 1

BACKGROUND ........ 3

A. Statutory and Regulatory Background ........ 3

B. Procedural History ........ 4

STANDARD OF REVIEW ........ 4

ARGUMENT ........ 5

A. The Second Amendment's Plain Text Covers Plaintiffs' Conduct ........ 7

B. New Jersey Cannot Show That Its One-Gun-A-Month Ban Is Consistent With The Nation's Historical Tradition Of Firearm Regulation ........ 8

1. The Supreme Court Has Provided Extensive Direction Governing Lower Courts' Consideration Of The Government's Effort To Meet Its Burden ........ 9

a. Historical Evidence At And Around The Founding Controls ........ 9

b. Establishing A Historical Tradition Requires Identifying A Widely Representative Regulatory Analogue ........ 11

c. Purported Analogues Must Be Relevantly Similar ........ 12

2. There Is No Comparable Historical Tradition Of Regulation That Could Justify New Jersey's OGM Ban ........ 13

CONCLUSION ........ 19

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ....................................................................................5

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*,
183 F.4th 211 (3d Cir. 2026) ............................................................... passim

*Bouriez v. Carnegie Mellon Univ.*,
585 F.3d 765 (3d Cir. 2009) ........................................................................5

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ....................................................................................5

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................................1, 5

*Drummond v. Robinson Township*,
9 F.4th 217 (3d Cir. 2021) ...........................................................................7

*Espinoza v. Mont. Dep't of Revenue*,
591 U.S. 464 (2020) ..................................................................................10

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) .......................................................................7

*Gazzola v. Hochul*,
88 F.4th 186 (2d Cir. 2023) .........................................................................7

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) .................................................................10

*Heller v. District of Columbia*,
801 F.3d 264 (D.C. Cir. 2015) ................................................................2, 8

*Lara v. Comm'r Penn. State Police*,
125 F.4th 428 (3d Cir. 2025) .......................................................................9

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ....................................................................................5

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ..................................................................................... passim

*Nguyen v. Bonta*,
140 F.4th 1237 (9th Cir. 2025) .......................................................... 2, 8, 14

*Ortega v. Grisham*,
148 F.4th 1134 (10th Cir. 2025) ...................................................................7

*Ramos v. Louisiana*,
590 U.S. 83 (2020) ....................................................................................10

*Reese v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*,
127 F.4th 583 (5th Cir. 2025) .......................................................................7

*Teixeira v. Cnty. of Alameda*,
873 F.3d 670 (9th Cir. 2017) .......................................................................7

*Timbs v. Indiana*,
586 U.S. 146 (2019) ..................................................................................10

*United States v. Allam*,
140 F.4th 289 (5th Cir. 2025) .......... 11

*United States v. Gore*,
118 F.4th 808 (6th Cir. 2024) .......... 7

*United States v. Hemani*,
146 S. Ct. 1677 (2026) .......... 6, 16

*United States v. Rahimi*,
602 U.S. 680 (2024) .......... 8, 11, 12, 13

*Virginia v. Moore*,
553 U.S. 164 (2008) .......... 10

*Wolford v. Lopez*,
146 S. Ct. 2032 (2026) .......... 6, 8, 11, 17

**Statutes**

2004 S.C. Acts 242 .......... 3

Cal. Stat. 2025, ch. 570, § 16 .......... 3

Md. Pub. Safety Code § 5-128(b) .......... 3

N.J.S.A. § 2C:58-3(i) .......... 1, 3

Va. Code § 18.2-308.2:2(R) .......... 3

**Other Authorities**

McWilliam, *Second Amendment Principles*, 33 Wm. & Mary Bill Rts. J. 1127 (2025) .......... 16

Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, 2022 HARV. J.L. & PUB. POL'Y PER CURIAM No. 31, 5 .......... 9

**Regulations**

N.J.A.C. § 13:54-1.9 .......... 1, 3

## INTRODUCTION

This case presents a simple question of law. The Second Amendment guarantees "the right of the people to keep and bear Arms"—*plural*—and commands that the right "shall not be infringed." U.S. CONST. amend. II. The plain language of the Second Amendment "'extends, prima facie, to all instruments that constitute bearable arms.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 28 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). As the Supreme Court found in *Heller* and reiterated in *Bruen*, handguns "are indisputably in 'common use.'" *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 629). Plaintiffs wish to engage in constitutionally protected conduct by acquiring more than one handgun in a 30-day period for lawful purposes. But N.J.S.A. § 2C:58-3(i), N.J.A.C. § 13:54-1.9, and Defendants' policies and enforcement practices (hereinafter, the "one-gun-a-month," or "OGM Ban"), prohibit and criminalize this conduct.

There is no question that the text of the Second Amendment covers the conduct the Plaintiffs wish to engage in and the arms they wish to acquire and possess. And "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government … must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Under this test, the government "must affirmatively prove that its firearms regulation is part of the

historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

New Jersey cannot carry its burden because there is no constitutionally relevant history that supports the OGM Ban. Other courts to consider laws similar to New Jersey's OGM Ban have found them to be unconstitutional. *See Nguyen v. Bonta*, 140 F.4th 1237 (9th Cir. 2025) (holding that California's "one gun a month" law was unconstitutional under *Bruen*); *see also Heller v. District of Columbia*, 801 F.3d 264, 280 (D.C. Cir. 2015) ("*Heller III*") (finding the District of Columbia's "one gun a month" law unconstitutional in a pre-*Bruen* interest-balancing analysis). As, the Ninth Circuit summed it up, one-gun-a-month laws like New Jersey's are "facially unconstitutional because possession of multiple firearms and the ability to acquire firearms through purchase without meaningful constraints are protected by the Second Amendment and [such laws are] not supported by our nation's tradition of firearms regulation." *Nguyen*, 140 F.4th at 1239–40.

New Jersey's OGM Ban violates the Second Amendment. The Court should enter a judgment that declares New Jersey's OGM Ban unconstitutional and enjoins the Defendants (and all those acting in concert with them) from enforcing it.

## BACKGROUND

### A. Statutory and Regulatory Background.

The purchase limitation Plaintiffs challenge is relatively novel and relatively rare. The first handgun-rationing law was not passed until 1975. Only five states—California (1999), Maryland (2003), New Jersey (2009), South Carolina (1975), and Virginia (1993)—have ever enacted similar laws, and only three states' laws remain in force today (New Jersey, Maryland, and Virginia).[2]

The statutory scheme here is straightforward. Subject to limited exceptions not applicable here, New Jersey's OGM Ban generally prohibits individuals from purchasing more than one handgun within any 30-day period. This ban is laid out in two statutes: N.J.SA. § 2C:58-3(i) provides, in pertinent part: "Only one handgun shall be purchased or delivered on each permit and no more than one handgun shall be purchased within any 30-day period…." And N.J.A.C. § 13:54-1.9 provides, in pertinent part: "Only one handgun may be purchased or delivered on each permit to purchase."

---

[2] Md. Pub. Safety Code § 5-128(b); Va. Code § 18.2-308.2:2(R). California's one-gun-a-month law was held unconstitutional in *Nguyen v. Bonta*, 140 F.4th 1237, but the State has since enacted legislation that imposes a three-gun-a-month limit effective April 1, 2026. Cal. Stat. 2025, ch. 570, § 16 (enacting Cal. Penal Code § 27535). South Carolina repealed its monthly purchase limit in 2004. 2004 S.C. Acts 242.

## B. Procedural History.

Plaintiffs Matthew Struck and Daniel Francisco (collectively, the "Individual Plaintiffs") are law-abiding, responsible gun owners who are not prohibited under state or federal law from acquiring or possessing firearms or ammunition. Each of the Individual Plaintiffs holds a firearms purchaser identification card. Plaintiffs desire and intend to purchase two or more handguns in common use for lawful purposes from a licensed dealer within a 30-day period and would do so but for Defendants' enforcement of the OGM Ban. Struck Decl., ¶¶ 2–4; Francisco Decl., ¶¶ 2–4. The Individual Plaintiffs are members of Plaintiffs Firearms Policy Coalition, Inc. and the National Rifle Association of America. Struck Decl., ¶ 5; Francisco Decl., ¶ 5; *see* Combs Decl., ¶¶ 4–5; Commerford Decl., ¶¶ 3–4.

Plaintiffs filed this lawsuit on June 18, 2024, alleging that New Jersey's OGM Ban violates the Second Amendment. ECF 1, No-24-9479. On June 23, 2025, the Court granted a motion to consolidate this case with *Benton v. Platkin*, No. 24-7098, designating *Benton* as the lead case. ECF 55. On June 22, 2026, the Court granted Plaintiffs' motion for leave to amend their complaint to add the NRA as a plaintiff. ECF 79.

## STANDARD OF REVIEW

The Court must grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is only material if it could affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where, as here, "the non-moving party will bear the burden of proof at trial, the moving party's burden can be 'discharged by "showing" … that there is an absence of evidence to support the nonmoving party's case.'" *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 771 (3d Cir. 2009) (quoting *Celotex*, 477 U.S. at 325).

## ARGUMENT

The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. And it "'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 597 U.S. at 26. The Second Amendment applies to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

To determine whether a firearm regulation is constitutional under *Bruen*, the analysis begins with whether the Second Amendment's plain text covers an individual's conduct; if so, the Constitution presumptively protects that conduct. *See Bruen*, 597 U.S. at 22–24. If that requirement is satisfied, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. In other words, it is New Jersey's

burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19 (cleaned up); *see also id.* at 60 ("[W]e are not obliged to sift the historical materials for evidence to sustain [the State's] statute. That is respondents' burden.").

When considering a government's proffered historical analogues, courts must first look at "the number of jurisdictions in which they were adopted" and "the extent to which they were well-accepted." *Wolford v. Lopez*, 146 S. Ct. 2032, 2044 (2026). And because the Second Amendment analysis "seek[s] the general understanding of that codified right," it follows that "[a]n outlier legal rule adopted in a few locales is not enough." *Id.* at 2050. A historical analogue must be "widespread, well-known, and widely accepted," *id.* at 2053, but even then, it must also be sufficiently tailored to the modern conduct the government seeks to regulate: The analogue must be "relevantly similar" to a modern law based on "how" and "why" they restrict Second Amendment protected conduct. *Id.* at 2044; *see Bruen*, 597 U.S. at 29. "The more closely a contemporary law mirrors a well-established historical analogue in purpose and operation, the more likely it is to be upheld. Conversely, the more a modern law diverges from traditional laws in purpose and operation, the less likely it is to survive review." *United States v. Hemani*, 146 S. Ct. 1677, 1686 (2026).

New Jersey is unable to meet its burden here.

### A. The Second Amendment's Plain Text Covers Plaintiffs' Conduct.

The first step of the *Bruen* analysis is straightforward. Plaintiffs are among "the people" and the conduct that they wish to engage in—acquiring firearms to keep and bear for lawful purposes including immediate self-defense—is plainly covered by the text of the Second Amendment. Accordingly, "the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. As the Third Circuit has recognized, the Second Amendment's protection "'implies a corresponding right *to acquire* and maintain proficiency' with common weapons." *Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) (emphasis added; quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); *see also, e.g.*, *Ortega v. Grisham*, 148 F.4th 1134, 1143 (10th Cir. 2025) ("Common sense dictates that the right to bear arms requires a right to acquire arms"); *Reese v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 127 F.4th 583, 589–90 (5th Cir. 2025) ("[T]he right to 'keep and bear arms' surely implies the right to purchase them."); *United States v. Gore*, 118 F.4th 808, 813 (6th Cir. 2024) ("Receiving a firearm, of course, is protected because it is a logical antecedent to 'keep[ing]' a firearm."); *Gazzola v. Hochul*, 88 F.4th 186, 197 (2d Cir. 2023) ("The right to keep arms, necessarily involves the right to purchase them.") (quotation marks omitted); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) (the "core Second Amendment right … 'wouldn't mean much' without the ability to acquire arms.") (citation omitted).

In striking down California's substantively identical one-gun-a-month ban, the Ninth Circuit "easily conclude[d] that the plain text of the Second Amendment protects the right to possess multiple firearms" because a contrary conclusion "would mean that the Second Amendment only protects possession of a single weapon *of any kind*." *Nguyen*, 140 F.4th at 1243. That court noted that the D.C. Circuit reached a similar conclusion in holding "that limiting the number of firearms an individual can purchase or register within a 30-day period interferes with 'an individual's undoubted constitutional right to keep arms (plural) in his or her home.'" *Id.* (quoting *Heller III*, 801 F.3d at 280).

Therefore, the Second Amendment "presumptively protects" Plaintiffs' proposed course of conduct. *Bruen*, 597 U.S. at 24. Stated another way, New Jersey's OGM Ban is "presumptively unconstitutional." *Wolford*, 146 S. Ct. at 2044.

**B. New Jersey Cannot Show That Its One-Gun-A-Month Ban Is Consistent With The Nation's Historical Tradition Of Firearm Regulation.**

Under *Bruen*, the burden now shifts to New Jersey. It must show that its one-gun-a-month ban is "consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 24. "[W]hen the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" *United States v. Rahimi*, 602 U.S. 680, 691 (2024) (quoting *Bruen*, 597 U.S. at 24). And it must do so by offering persuasive legal

history. *See Bruen*, 597 U.S. at 25; *id.* at 25 n.6 (courts "decide a case based on the historical record compiled by the parties").

### 1. The Supreme Court Has Provided Extensive Direction Governing Lower Courts' Consideration Of The Government's Effort To Meet Its Burden.

Under Supreme Court precedent, three methodological considerations must guide New Jersey's presentation (and the Court's consideration) of the State's historical evidence.

#### a. Historical Evidence At And Around The Founding Controls.

First, any proffered historical analogue must be from at or around the Founding, centering on 1791, when the Second Amendment was ratified. *See Bruen*, 597 U.S. at 34–35; *see, e.g.*, *Lara v. Comm'r Penn. State Police*, 125 F.4th 428, 441 (3d Cir. 2025) (holding "that the constitutional right to keep and bear arms should be understood according to its public meaning in 1791"); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 183 F.4th 211, 232 (3d Cir. 2026) (following *Lara* and focusing on Founding-era firearms regulations "based on the Supreme Court's guidance that the Second Amendment's 'meaning is fixed according to the understandings of those who ratified it'"); Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, 2022 HARV. J.L. & PUB. POL'Y PER CURIAM No. 31, 5.

*Bruen* also stressed that courts "must … guard against giving postenactment history more weight than it can rightly bear." 597 U.S. at 35. So, while it is

*permissible* for courts to consider post-Founding-Era historical regulations, that review is limited to determining whether such regulations *confirm* a Founding Era tradition. *Id*. at 36–37. Put simply, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id*. at 36 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (emphasis in original), and citing *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020)). Accordingly, the Court's task is to "consider historical examples from 'before, during, and even after the founding,' while 'guard[ing] against giving postenactment history more weight than it can rightly bear.'" *Ass'n of New Jersey Rifle & Pistol Clubs*, 183 F.4th at 232.

*Bruen* thus reaffirmed the Court's practice of focusing on the Founding Era when analyzing other enumerated rights. *See, e.g.*, *Espinoza*, 591 U.S. at 482 (finding unpersuasive "more than 30" provisions of state law from the "second half of the 19th Century" because they were not grounded in Founding Era practices regarding the Free Exercise Clause); *Ramos v. Louisiana*, 590 U.S. 83, 90–91 (2020) (discussing history of unanimous jury right by referencing "backdrop" of Bill of Rights' ratification in 1791); *Timbs v. Indiana*, 586 U.S. 146, 152 (2019) (discussing "colonial-era provisions" and "constitutions of eight States" when analyzing Eighth Amendment excessive fines clause); *Virginia v. Moore*, 553 U.S. 164, 168 (2008)

(“[w]e look to the statutes and common law of the founding era to determine [Fourth Amendment] norms”).

**b. Establishing A Historical Tradition Requires Identifying A Widely Representative Regulatory Analogue.**

Second, *Bruen* held that forming a historical tradition requires proof of representative, relevantly similar analogues. As *Rahimi* explained, such historical laws must evidence the “principles that underpin our regulatory tradition” and that “underl[ie] the Second Amendment.” 602 U.S. at 692. Analogues are representative, therefore, if they are broadly applicable and widely accepted. But a handful of state laws that are unconnected, in principle, to earlier or later enactments is not a “historical tradition” that informs the original public meaning of the right at the Founding. Thus, historical analogues must be “well-established and representative,” not “outliers.” *Bruen*, 597 U.S. at 30. “[S]poradic regulations, in only a few jurisdictions, likely are insufficient to substantiate a ‘regulatory tradition.’” *United States v. Allam*, 140 F.4th 289, 297 (5th Cir. 2025). *Wolford* reaffirmed that historical analogues must be “widespread, well-known, and widely accepted,” 146 S. Ct. at 2053, and therefore “[a]n outlier legal rule adopted in a few locales is not enough,” *id.* at 2050. In *Bruen*, the Supreme Court rejected a set of three regulations as insufficient “to show a tradition of public-carry regulation.” 597 U.S. at 46. Similarly, laws in the territories or discrete localized jurisdictions have limited utility

in the analogical inquiry. *Bruen* explained that territorial laws are afforded "little weight" because they were "localized," "rarely subject to judicial scrutiny," and "short lived." *Bruen*, 597 U.S. at 67–69; *see also Ass'n of N.J. Rifle & Pistol Clubs*, 183 F.4th at 245 (declining to stake "interpretation on a handful of temporary territorial laws").

**c. Purported Analogues Must Be Relevantly Similar.**

Third, any analogues must be "relevantly similar" based on "how and why [they] burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. This means that the modern regulation must impose a "comparable burden on the right of armed self-defense" as the historical regulation, and for a similar reason. *Id*. Analyzing this relevant similarity yields, under *Rahimi*, the sort of "principles" that are applied to assess a modern enactment. 602 U.S. at 692. Accordingly, Founding-Era laws arising in different contexts, or for different reasons, are inapt comparators to a modern law since they are not motivated by the same underlying principles.

Consider the approach in *Rahimi*: when directing courts to consider "the principles that underpin our regulatory tradition," the Court offered direction on determining the right level of generality for extracting those principles. *Id.* On the one hand, courts need not identify a "dead ringer" or "historical twin" to the challenged law. *Id.* But on the other, "a court must be careful not to read a principle

at such a high level of generality that it waters down the right." *Id.* at 740 (Barrett, J., concurring).

Thus, the *Rahimi* Court examined surety and going-armed laws and concluded that they stood for the principle that "[w]hen an individual poses a clear threat of physical violence to another" (justification), "the threatening individual may be disarmed" (burden). 602 U.S. at 698. The "principle," therefore, must satisfy both factors. Any purported principle that disregards the "how" or the "why"—or both—is taken at too high a level of generality. *See id.* at 692 (a law would be incompatible with the Second Amendment if it imposes a more severe burden, even if it shares a "permissible reason").

### 2. There Is No Comparable Historical Tradition Of Regulation That Could Justify New Jersey's OGM Ban.

Start with an undisputed point: Handgun-rationing laws are a distinctly modern invention that date to the mid-1970s, and New Jersey is among the exceedingly small minority of states that have ever adopted such regulations. The Ninth Circuit's analysis in *Nguyen* confirms that New Jersey's OGM Ban is facially unconstitutional and cannot withstand scrutiny under *Bruen*.

In *Nguyen*, California attempted to justify its one-gun-a-month law by pointing to various licensing regulations, carry restrictions, gunpowder laws, and taxation schemes to advance a purported tradition of "controlling and tracing the sale of firearms" and an alleged history of "limiting the immediate availability and use

of weapons and ammunition for private, everyday purposes." 140 F.4th at 1246–48. The Court held that this hodgepodge of regulations did not satisfy *Bruen*'s test: It "easily conclude[d]" that California's one-gun-a-month law was not "'relevantly similar' to the historical landscape" the State put forward. *Id.* at 1248. It reviewed each of the regulations and concluded that they did not impose similar burdens on the Second Amendment protected right "to acquire, keep, or bear arms," such that "the historical record makes clear that California's one-gun-a-month law is not relevantly similar to our tradition in *how* it regulates firearms." *Id.* at 1248–49. The Court concluded:

> The Second Amendment expressly protects the right to possess multiple arms. It also protects against meaningful constraints on the right to acquire arms because otherwise the right to "keep and bear" would be hollow. And while *Bruen* does not require a "historical twin" for a modern firearm regulation to pass muster, 597 U.S. at 30, here the historical record does not even establish a historical cousin for California's one-gun-a-month law.

*Id.* at 1249. So too here.

Although it remains to be seen precisely how New Jersey will attempt to meet its burden, its expert reports confirm that the State cannot justify its OGM ban.

The State has offered two declarations, from Dr. Brennan Rivas and Dr. Robert J. Spitzer. Both declarations focus heavily on general societal concerns about gun violence and the lethality of firearms, and how evolving social conditions now justify the OGM Ban. Rivas highlights advances in firearms technology throughout

the 19th century, Rivas Decl., ¶¶ 14–23; social and political changes through the modern era, ¶¶ 37–49; and shifts in market dynamics, ¶¶ 50–55. Spitzer focuses on gun trafficking to explain why gun rationing laws "did not meaningfully appear until recent decades." Spitzer Decl., ¶ 2. He concludes that cheap guns, modern channels of firearms commerce, the Interstate system, and the State's evolving regulatory capacity justify the OGM Ban as a means to combat straw purchases and trafficking. Spitzer Decl., ¶¶ 1–11. These arguments claiming that gun-rationing laws are directed at addressing unprecedented societal concerns or dramatic technological changes are akin to those that the Ninth Circuit swiftly rejected in *Nguyen*: "arms trafficking is not a new problem." 140 F.4th at 1244.

Rivas and Spitzer then stitch together a true hodgepodge of miscellaneous restrictions to try and justify the OGM Ban; Spitzer, in particular, appears to claim that every firearm regulation of any kind is analogous to the Ban. But none establish a historical tradition sufficient to support New Jersey's strict prohibition on purchasing more than one handgun in a month.

Rivas identifies laws taxing or prohibiting the sale of certain weapons, as well as Reconstruction Era laws requiring dealer registries and prohibiting sales to mentally unfit individuals. Rivas Decl., ¶¶ 25–35. Many of these laws are too isolated or late in time to establish any sort of tradition. *See Ass'n of N.J. Rifle & Pistol Clubs*, 183 F.4th at 232 ("[W]e must look to Founding-era laws for analogies

to modern-day regulations.”). And the burdens each of these sets of laws imposed were incomparable to the burden of the OGM Ban. Taxes on weapons or dealers incrementally burdened individual purchases; bans on the sale of certain weapons limited the types of weapons available to those in common use; targeted sales prohibitions affected only a narrow subset of the population. None came close to *prohibiting* an entire population of law-abiding citizens from buying additional handguns within a period of time. And so none could justify New Jersey’s stringent OGM Ban.

Spitzer’s kitchen-sink approach does not fare any better. He draws together regulations on Indian trade, gunpowder regulations, and disparate licensing regimes in support of a broad power to regulate firearms. Spitzer Decl., ¶¶ 12–83. But none of these are analogous to the OGM Ban as they “targeted different kinds of people, did so for different reasons, and operated in different ways.” *Hemani*, 146 S. Ct. at 1694. Early laws regulating trade with Native Americans were based on the idea that colonists should not have been affirmatively arming potential combatants, McWilliam, *Second Amendment Principles*, 33 Wm. & Mary Bill Rts. J. 1127, 1158 (2025), and imposed no limitation on colonists exercising their own right to armed defense. Gunpowder storage laws were—as Spitzer himself explains—focused heavily on “safe storage, transport, and use” to mitigate the significant fire dangers associated with gunpowder at the time, Spitzer Decl., ¶ 13, and had only an

incidental effect on the ability to acquire or use weapons. These fail both *Bruen*'s "how" and "why" metrics. They do not comparably burden the right of armed self-defense.

Spitzer then lumps together a string of licensing requirements directly or tangentially related to weapons: carrying or possessing weapons; discharging firearms; hunting; commercial sales; gunpowder and explosives; seller registries; and targeted licenses for "specified marginalized groups." Spitzer Decl., ¶¶ 33–83. Generally speaking, licensing requirements were intended to ensure that weapons would be used safely and did not significantly limit law-abiding citizens' ability to acquire weapons necessary for self-defense—they therefore share neither the "how" nor the "why" of the OGM Ban. *See Bruen*, 597 U.S. at 38 n.9 (explaining how differences in licensing requirements impact whether they "prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry"). Hunting and commercial licenses in particular governed ancillary activities related to arms, but not the weapons themselves. Gunpowder rules were aimed primarily at fire safety. In short, "the gap between [licensing laws] and [the OGM Ban] is just too wide" to draw an inference of constitutionality. *Wolford*, 146 S. Ct. at 2052. Beyond this fundamental point, many of the licensing laws Spitzer identifies came from the late 19th century or well into the 20th century, which "are far too late

in time to suggest, on their own, a tradition dating back to the Founding." *Ass'n of N.J. Rifle & Pistol Clubs*, 183 F.4th at 246 n.45.

With all this stacked against them, the State's experts rightfully concede that laws like the OGM Ban "did not exist early in the country's history." Spitzer Decl., ¶ 1; *see also* Rivas Decl., ¶ 37 (excusing this because "Nineteenth-century Americans … faced limitations in their ability to conceive of solutions to their problems"). This inconvenient fact leads them to throw seemingly every American gun law they can find—from the colonial period to the 20th century, addressing topics as disparate as taxes and gunpowder storage—at the wall in the hope that one sticks. But sheer quantity is irrelevant if the historical laws are neither analogous to the OGM Ban nor early and widespread enough to form a representative tradition.

In sum, New Jersey's OGM Ban violates the constitutional right to keep and bear arms.

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' motion for summary judgment. The Court should declare New Jersey's OGM Ban unconstitutional, enjoin its enforcement, and enter judgment in Plaintiffs' favor.

Respectfully submitted,

*/s/ Bradley P. Lehman*

Bradley P. Lehman
Attorney for Plaintiffs