Steven J. Harfenist
Harfenist Kraut & Perlstein, LLP
3000 Marcus Avenue, Suite 2E1
Lake Success, New York 11042
T: (516) 355-9600
F: (516) 355-9601
E: sharfenist@hkplaw.com
*Attorneys for Plaintiffs*

Oliver M. Krawczyk*
Ambler Law Offices, LLC
115 South Hanover Street, Suite 100
Carlisle, PA 17013
T: (717) 525-5822
E: oliver@amblerlawoffices.com
PA Bar No. 334423
*Admitted Pro Hac Vice

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---------------------------------------------------------------X

CHRISTIAN BENTON, COALITION OF NEW JERSEY FIREARM OWNERS, GUN OWNERS OF AMERICA, INC., and GUN OWNERS FOUNDATION,

Plaintiffs,

-against-

JENNIFER DAVENPORT, in her Official Capacity as the Attorney General of New Jersey,

Defendants.

---------------------------------------------------------------X

**Civil Action No.: 24-CV-07098(KMW)(MJS)**

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT**

# TABLE OF CONTENTS

***Page***

TABLE OF AUTHORITIES . . . . ii

INTRODUCTION . . . . 1

PROCEDURAL HISTORY . . . . 6

LEGAL STANDARD . . . . 7

ARGUMENT . . . . 7

I. PLAINTIFFS HAVE STANDING . . . . 7

II. NEW JERSEY'S HANDGUN RATIONING SCHEME VIOLATES THE SECOND AND FOURTEENTH AMENDMENTS . . . . 12

A. Second Amendment Methodology . . . . 12

B. The Second Amendment Obviously Protects the Right to Purchase and Acquire Arms . . . . 20

C. The Challenged Laws Unquestionably Implicate the Second Amendment's Plain Text, So They Are "Presumptively Unconstitutional" . . . . 22

D. There Is No Historical Tradition of Handgun Rationing, and So the Challenged Laws Are Conclusively Unconstitutional . . . . 24

E. The Historical Record Evinces a Contrary Tradition of Multiple Handgun Purchases . . . . 26

CONCLUSION . . . . 29

## TABLE OF AUTHORITIES

***Page***

**U.S. Constitution**

Amendment I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Amendment II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Amendment XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

**Cases**

*Andrews v. State*,50 Tenn. 165 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*ANJRPC, Inc. v. Att'y Gen. N.J.*, 183 F.4th 211 (3d Cir. 2026) . . . . . . . . . . .16, 24, 25

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Babbitt v. UFW Nat'l Union*, 442 U.S. 289 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*District of Columbia v. Heller*, 554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . . .*passim*

*Drummond v. Robinson Township*, 9 F.4th 217 (3d Cir. 2021) . . . . . . . . . . . . . . . .21

*Duncan v. Becerra*, 265 F. Supp. 3d 1106 (S.D. Cal. 2017), *aff'd*,
742 F. App'x 218 (9th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . 21

*Greenberg v. Lehocky*, 81 F.4th 376 (3d Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . .12

*Hernandez-Morales v. Att'y Gen.*, 977 F.3d 247 (3d Cir. 2020) . . . . . . . . . . . . . . . . .7

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) . . . . . . . . . . . . . . 11

*Lara v. Comm'r Pa. State Police*, 125 F.4th 428 (3d Cir. 2025) . . . . . . . . . .7, 16, 18

*Lara v. Comm'r Pa. State Police*, 130 F.4th 65 (3d Cir. 2025) . . . . . . . . . . . . . . . .16

*League of Women Voters of the U.S. v. Newby*, 838 F.3d 1
(D.C. Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Luis v. United States*, 578 U.S. 5 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) . . . . . . . . . . . . . . . . . . . .8

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) . . . . . . . . . . . . . . . . . . . . . . . . 13

*Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353 (3d Cir. 2015) . . . . . . . . . . . . . .10

*Nguyen v. Bonta*, 140 F.4th 1237 (9th Cir. 2025) . . . . . . . . . . . . . . . . . . 4, 23, 25, 26

*Nitkin v. Main Line Health*, 67 F.4th 565 (3d Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . 7

*NRA v. Bondi*, 133 F.4th 1108 (11th Cir. 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) . . . . . . . . . . . . . . . .*passim*

*Ortega v. Grisham*, 148 F.4th 1134 (10th Cir. 2025) . . . . . . . . . . . . . . . . . . . . . . . . .21

*Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . .9

*Pipito v. Lower Bucks Cnty. Joint Mun. Auth.*, 822 F. App'x 161
(3d Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Reese v. BATFE*, 127 F.4th 583 (5th Cir. 2025) . . . . . . . . . . . . . . . . . . . . . .16, 21, 27

*Rigby v. Jennings*, No. 1:21-cv-01523-MN (D. Del. Sept. 10, 2026),
ECF No. 81 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 22, 23

*Sec'y U.S. Dep't of Labor v. Kwasny*, 853 F.3d 87 (3d Cir. 2017) . . . . . . . . . . . . . . .7

*Silencer Shop Found. v. BATFE*, 2026 U.S. Dist. LEXIS 174125
(N.D. Tex. Aug. 5, 2026) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*Tait v. City of Philadelphia*, 639 F. Supp. 2d 582 (E.D. Pa. 2009) . . . . . . . . . . . . .8, 9

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) . . . . . . . . . . . . . . . . .21

*Texas v. BATFE*, 737 F. Supp. 3d 426 (N.D. Tex. 2024) . . . . . . . . . . . . . . . . . . . . .11

*Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131 (3d Cir. 2009) . . . . . . . . .8

*United States v. Carbajal-Flores*, 143 F.4th 877 (7th Cir. 2025) . . . . . . . . . . . . . . .24

*United States v. Clerfe*, 2026 U.S. App. LEXIS 24094
(3d Cir. Aug. 10, 2026) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 21

*United States v. Hemani*, 146 S. Ct. 1677 (2026) . . . . . . . . . . . . . . . . . . . . . . . . 2, 14

*United States v. Hicks*, 649 F. Supp. 3d 357, 360 (W.D. Tex. 2023),
*rev'd on other grounds*, 2025 U.S. App. LEXIS 18297
(5th Cir. July 23, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . .14

*United States v. Miller*, 307 U.S. 174 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

*United States v. Quailes*, 126 F.4th 215 (3d Cir. 2025) . . . . . . . . . . . . . . . . . . . . . .16

*United States v. Quinones*, 313 F.3d 49 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . .7

*United States v. Rahimi*, 602 U.S. 680 (2024) . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) . . . . . . . . . . . . . . . . . . . .18

*United States v. Williams*, 113 F.4th 637 (6th Cir. 2024) . . . . . . . . . . . . . . . . . . . .16

*Wolford v. Lopez*, 146 S. Ct. 2032 (2026) . . . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

*Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . . .16

**Statutes**

Md. Code Ann., Pub. Safety § 5-128(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

N.J.S.A. § 2C:39-10(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

N.J.S.A. § 2C:43-3(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

N.J.S.A. § 2C:43-6(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

N.J.S.A. § 2C:58-3(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

N.J.S.A. § 2C:58-3.4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5, 9

N.J.S.A. § 52:17B-4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

N.J.S.A. § 52:17B-98 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

Va. Code § 18.2-308.2:2(R) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

**Regulations**

N.J.A.C. § 13:54-1.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**Other Authorities**

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 22

Ashley Halsey, Jr., *Rarities of the Revolution*, *in* The SAR Magazine,

vol. LXVII, no. 2 (Fall 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

2 Backgrounds of Selective Service: Military Obligation: The American Tradition (Arthur Vollmer ed., 1947) . . . . . . . . . . . . . . . 27, 28

The Federalist No. 44 (James Madison) (Clinton Rossiter ed., 1961) . . . . . . . . . . .22

*Flintlock Pistol*, George Washington's Mount Vernon, (last visited Sept. 13, 2026) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Gazette of the United States, and Philadelphia Daily Advertiser (Dec. 5, 1799) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

Michael Rispoli, *Gov. Corzine Signs New Law Limiting N.J. Gun Purchases*, NJ.com (Aug. 6, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Stephen P. Halbrook, *Rationing Firearms Purchases and the Right to Keep Arms: Reflections on the Bills of Rights of Virginia, West Virginia, and the United States*, 96 W. Va. L. Rev. 1 (1993) . . . . . . . .26

**Rules**

Fed. R. Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## INTRODUCTION

This case involves a constitutional challenge to N.J.S.A. § 2C:58-3(i) and N.J.A.C. § 13:54-1.9 (the "Challenged Laws"), which generally prohibit ordinary Americans from purchasing more than one handgun per "30-day period." Dating only to 2009,[1] this "one-gun-a-month" restriction is an extreme outlier, both historically and nationally. Indeed, the Framers never imposed rationing schemes on the acquisition of handguns – or on any other type of weapon, for that matter. The same is true of the Reconstruction generation, even though their gun-control efforts largely "aimed to perpetuate the subjugation of blacks" following the Civil War. *Wolford v. Lopez*, 146 S. Ct. 2032, 2053 (2026). And, consistent with this dearth of historical regulation, the vast majority of the country today – 47 states and the District of Columbia, accounting for some 92.8 percent of the population – is not subject to any sort of "one-gun-a-month" law.[2] The Challenged Laws violate the Second Amendment, and they should be declared unconstitutional, and their continued enforcement should be enjoined. One court has already done just that with respect to California's similar statute.

---

[1] *See* Michael Rispoli, *Gov. Corzine Signs New Law Limiting N.J. Gun Purchases*, NJ.com (Aug. 6, 2009), https://tinyurl.com/bzn6wwmm.

[2] Only New Jersey, Maryland, and Virginia currently have "one-gun-a-month" laws. *See* Md. Code Ann., Pub. Safety § 5-128(b); Va. Code § 18.2-308.2:2(R).

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the U.S. Supreme Court unambiguously held that the Second Amendment protects the individual right to "keep and bear Arms," meaning "to 'have weapons'" and "to 'carry'" them in public. *Id.* at 582, 584. The Court explained that this guarantee protects, among other things, "the inherent right of self-defense," and to that end, "handguns are the most popular weapon chosen by Americans for self-defense...." *Id.* at 628, 629. Then, in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Court instructed that challenges to "firearms regulation[s]" "demand[] a test rooted in the Second Amendment's text, as informed by history." *Id.* at 19. Thus, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and "the government must demonstrate that [its] regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. Following *Bruen*, the Court's most recent Second Amendment decisions have reaffirmed this textual and historical approach, focusing on Founding-era understandings. *See United States v. Rahimi*, 602 U.S. 680, 692 (2024); *United States v. Hemani*, 146 S. Ct. 1677, 1687 (2026); *Wolford*, 146 S. Ct. at 2050.

Rejecting those principles, New Jersey's handgun rationing scheme bottlenecks the acquisition of the "quintessential self-defense weapon." *Heller*, 554 U.S. at 629. Such a restriction fails to clear the textual starting gate. It is black-

letter law that, "when a text authorizes a certain act, it implicitly authorizes whatever is a necessary predicate of that act." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 96 (2012). Thus, as another district court in this circuit recently explained, "the Second Amendment protects acquiring firearms," because acquisition is "[a] predicate act necessary to keeping and bearing...." Memorandum Opinion at 19, *Rigby v. Jennings*, No. 1:21-cv-01523-MN (D. Del. Sept. 10, 2026), ECF No. 81; *see also United States v. Clerfe*, 2026 U.S. App. LEXIS 24094, at *8 (3d Cir. Aug. 10, 2026) ("agree[ing]" that "'[t]he right to keep arms[] necessarily involves the right to purchase them'"). Moreover, the Second Amendment's plain text does not contain any numerical limitation on how many "Arms" one may purchase, or how often. Indeed, the Second Amendment protects the right to keep and bear "Arms" – *plural* – not just one per month.

In addition to defying constitutional text, the Challenged Laws are also ahistorical. Although handguns are no modern invention, and in fact predate the existence of this country, *see Bruen*, 597 U.S. at 47-48, the Framers never rationed their acquisition. New Jersey's 2009 restriction is therefore an outlier unmoored from any analogous historical practice. Of course, if "20th-century evidence … does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence," *Bruen*, 597 U.S. at 66 n.28, certainly *21st-century* evidence fares no better.

Unsurprisingly, then, New Jersey's patently unconstitutional scheme represents an extreme minority view nationwide. California's "one-gun-a-month" law was recently struck down by a panel of the Ninth Circuit on Second and Fourteenth Amendment grounds. *Nguyen v. Bonta*, 140 F.4th 1237 (9th Cir. 2025). Notably, neither the notoriously anti-gun State of California nor the en banc Ninth Circuit sought to disturb the *Nguyen* panel's ruling, allowing its invalidation of the California law to take effect. Thus, only Maryland and Virginia now impose rationing schemes similar to New Jersey's. *See* Md. Code Ann., Pub. Safety § 5-128(b); Va. Code § 18.2-308.2:2(R). Even so, Virginia's scheme is less restrictive than New Jersey's, as Virginia exempts its concealed carry licensees from handgun rationing. *See* Va. Code § 18.2-308.2:2(R)(2)(h).

The Challenged Laws are also onerous. N.J.S.A. § 2C:58-3(i) broadly decrees that "no more than one handgun shall be purchased within any 30-day period," irrespective of one's licensure to purchase, own, or carry firearms generally. N.J.A.C. § 13:54-1.9 likewise provides that "[o]nly one handgun may be purchased or delivered on each permit to purchase," while "[t]here shall be no restriction on the number of rifles, shotguns and antique cannons that may be purchased...." A violation of these "regulatory provisions relating to … permits to purchase certain firearms" is a "crime of the fourth degree," N.J.S.A. § 2C:39-10(a)(1), punishable

by up to 18 months' imprisonment and a fine of up to $10,000. *Id.* §§ 2C:43-6(a)(4), 2C:43-3(b)(2).

Although the Challenged Laws contain some limited exceptions, none applies here. For instance, the Challenged Laws' prohibition lifts for state and federal officers and agencies, collectors of "curios or relics," licensed business entities, a subsequent handgun purchase following a retail return, and "any transaction where the superintendent issues an exemption," in his discretion. N.J.S.A. § 2C:58-3(i). And as to that final exception, New Jersey law only recognizes three possible "exemption[s]": multiple handgun purchases relating to (1) "inheritance or intestacy," (2) a collection, provided sufficient "need,"[3] or (3) imminent competition use. *Id.* § 2C:58-3.4(a).

However, there is no exception for ordinary Americans to purchase more than one handgun per month for self-defense, or simply because they *want to*. Of course, no other constitutional right works that way. There is no limit on how many books one may purchase, or how often one may post on "X," attend religious services, or invoke the right to counsel. The Second Amendment "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 597 U.S. at 70. It should be treated no differently here.

---

[3] *But see Bruen*, 597 U.S. at 70 (rejecting New York's "special need" requirement to exercise Second Amendment rights).

Plaintiffs include a New Jersey gun owner and three Second Amendment advocacy organizations that collectively represent thousands of similarly situated members and supporters within this district. Plaintiffs are law-abiding Americans who wish to purchase more than one handgun per month, free from detention, arrest, and prosecution under the Challenged Laws.

Because the Challenged Laws are inconsistent with Founding-era historical tradition, they violate the Second and Fourteenth Amendments. Plaintiffs therefore request permanent injunctive relief, as well as declaratory and other relief, to rectify and prevent further violation of their rights.

**PROCEDURAL HISTORY**

Plaintiffs Christian Benton, Coalition of New Jersey Firearm Owners, Gun Owners of America, Inc., and Gun Owners Foundation ("Plaintiffs") originally filed their Complaint on June 18, 2024, challenging New Jersey's handgun permit-to-purchase and "one-gun-a-month" schemes under the Second and Fourteenth Amendments. *See* ECF No. 1. On March 31, 2025, this Court dismissed Plaintiffs' permit-to-purchase challenge and all claims against Defendant Olivo, a local licensing official (ECF No. 39), while "specifically preserving" Plaintiffs' "one-gun-a-month" challenge against the New Jersey Attorney General (ECF No. 46 at 2). Thereafter, on June 23, 2025, this Court consolidated Plaintiffs' challenge with *Struck v. Platkin*, No. 24-cv-9479, designating Plaintiffs' challenge as the lead case

and allowing all plaintiffs to "fil[e] their own briefings and present their own arguments to the Court" in future proceedings. ECF No. 55.

## LEGAL STANDARD

Summary judgment "is appropriate when, construing the evidence in the light most favorable to the nonmoving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Nitkin v. Main Line Health*, 67 F.4th 565, 570 n.2 (3d Cir. 2023) (quoting *Sec'y U.S. Dep't of Labor v. Kwasny*, 853 F.3d 87, 90 (3d Cir. 2017)); *see also* Fed. R. Civ. P. 56(a). And "[w]hether the Second Amendment conflicts with the statutory scheme at issue here is a question of law...." *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 433 n.7 (3d Cir. 2025) (citing *Hernandez-Morales v. Att'y Gen.*, 977 F.3d 247, 249 (3d Cir. 2020)); *see also United States v. Quinones*, 313 F.3d 49, 59 (2d Cir. 2002) (The "constitutionality of a criminal statute," and indeed the textual and historical analysis required by *Bruen*, 597 U.S. 1, present "pure question[s] of law.").

## ARGUMENT

### I. PLAINTIFFS HAVE STANDING

To demonstrate standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). But a "plaintiff need not 'first expose himself to actual arrest

or prosecution to be entitled to challenge [the] statute'" when "fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative," even if a "criminal penalty provision has not yet been applied...." *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 302 (1979); *see also id.* at 303 (standing lies when statute "authorizes imposition of criminal sanctions against" violators). Thus, "Damocles's sword does not have to actually fall … before the court will issue an injunction," *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016), and "where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit...." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) (emphasis removed). Traceability and redressability are "closely related" and typically "overlap" when a plaintiff challenges government action. *Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131, 143 (3d Cir. 2009).

With respect to the first standing prong, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Pipito v. Lower Bucks Cnty. Joint Mun. Auth.*, 822 F. App'x 161, 164 (3d Cir. 2020). And "[i]n the absence of an equivalent express disavowal, the Third Circuit generally concludes that there is a threat of enforcement and that the dispute is ripe for adjudication." *Tait v. City of*

*Philadelphia*, 639 F. Supp. 2d 582, 594 (E.D. Pa. 2009) (citing *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1299 (3d Cir. 1996)). It is undisputed that N.J.S.A. § 2C:58-3(i) and N.J.A.C. § 13:54-1.9 prohibit Plaintiffs from purchasing more than one handgun per "30-day period." None of the Challenged Laws' exceptions applies to the general desire to purchase more than one handgun per 30-day period, such as for self-defense. *See* N.J.S.A. §§ 2C:58-3(i), 2C:58-3.4(a).

Plaintiffs have alleged an intention to purchase more than one handgun per 30-day period. Plaintiff Christian Benton ("Benton") is a citizen of the United States and of the State of New Jersey, and he resides in Pennsauken Township, Camden County, New Jersey. Plaintiffs' Statement of Undisputed Material Facts ("SUMF") ¶3. Benton is a member of Plaintiff Coalition of New Jersey Firearm Owners ("CNJFO") and a member of Plaintiff Gun Owners of America, Inc. ("GOA"). *Id.* ¶4. Benton is a law-abiding person, eligible to purchase and possess firearms under both New Jersey and federal law, and he possesses a valid New Jersey Permit to Carry a Handgun. *Id.* ¶5.

Benton is an avid gun owner and supporter of the Second Amendment who desires and intends to purchase more than one handgun per 30-day period. SUMF ¶6. In the past, Benton has not been able to acquire "Arms" when he desires, being forced to stagger his handgun purchases across several months so as not to violate the Challenged Laws. *Id.* ¶7. But for the Challenged Laws, Benton would purchase

handguns in the plural, at any time of his choosing, and certainly more than once per 30-day period. *Id.* ¶8.

The same is true for many of the members and supporters of Plaintiffs CNJFO and GOA who live throughout New Jersey. SUMF ¶¶9-10, 12-13. For example, CNJFO's members have questioned why they can only purchase one handgun per month, and why the Challenged Laws' handgun rationing applies not only to an initial purchase, but also to all subsequent handgun purchases. *Id.* ¶11. Likewise, one GOA member, an honorably discharged U.S. Army veteran residing in New Jersey, explained that they are legally eligible to possess firearms and would purchase more than one handgun per month, but cannot do so under the Challenged Laws. *Id.* ¶14.

Next, Plaintiffs CNJFO and GOA have representational standing to bring suit on behalf of their members because "(a) [their] members would otherwise have standing to sue in their own right; (b) the interests [they] seek[] to protect are germane to the organization[s'] purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 365 (3d Cir. 2015). First, at least one of Plaintiffs CNJFO and GOA's members, Plaintiff Benton, has standing to sue in his own right. Second, challenging the enforcement of an unconstitutional firearm regulation is relevant to Plaintiffs CNJFO and GOA's organizational purposes of

preserving and defending the Second Amendment rights of gun owners. *See* SUMF ¶¶9, 12. Third, neither the claims asserted nor the relief requested requires the participation of individual members of Plaintiffs CNJFO or GOA, because Plaintiffs "seek[] a declaration, injunction, or some other form of prospective relief" which, "if granted, will inure to the benefit of those members." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Plaintiff Gun Owners Foundation ("GOF") has standing through its supporters too, because it has the indicia of membership sufficient to confer associational standing. GOF is a nonprofit legal defense and educational foundation that is supported by gun owners across the country, including within New Jersey. SUMF ¶15. GOF receives all of its funding from its supporters, who voluntarily fund its activities. *Id.* ¶16. GOF litigates cases on behalf of its supporters. *Id.* ¶17. GOF's supporters receive information about its activities through a quarterly newsletter and regular emails about its activities. *Id.* ¶18. And GOF's supporters regularly communicate their views to GOF about issues on which GOF should focus. *Id.* ¶19. Thus, "[t]he foregoing, together, suffice for GOF's associational standing."). *Texas v. BATFE*, 737 F. Supp. 3d 426, 438 (N.D. Tex. 2024); *accord Silencer Shop Found. v. BATFE*, 2026 U.S. Dist. LEXIS 174125, at *23 (N.D. Tex. Aug. 5, 2026).

Next, there exists a credible threat of prosecution by Defendant, which also satisfies the traceability prong. Defendant Jennifer Davenport is the Attorney

General of New Jersey and is the "chief law enforcement officer" responsible for "general supervision of criminal justice," including enforcement of the Challenged Laws. N.J.S.A. § 52:17B-98. Moreover, Defendant has "general responsibility for the … operations" of the Department of Law and Public Safety, *id.* § 52:17B-4(b), which promulgated N.J.A.C. § 13:54-1.9, the regulatory counterpart of the statute challenged here. Finally, Defendant has not disclaimed enforcement of the Challenged Laws. Courts "often determine there is a credible threat of prosecution where the government refuses to make such a representation." *Greenberg v. Lehocky*, 81 F.4th 376, 386 (3d Cir. 2023).

Finally, a favorable ruling declaring the Challenged Laws unconstitutional, and enjoining Defendant from enforcing it, would redress Plaintiffs' injury. Accordingly, all Plaintiffs have standing.

## II. NEW JERSEY'S HANDGUN RATIONING SCHEME VIOLATES THE SECOND AND FOURTEENTH AMENDMENTS

### A. Second Amendment Methodology

The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In its landmark decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court rejected the nearly uniform opinions reached by the courts of appeals, which for years had claimed that the Second Amendment protects only a communal right of a state to maintain an

organized militia. *Id.* at 581. Setting the record straight, *Heller* explained that the Second Amendment recognizes, enumerates, and guarantees to *individuals* the preexisting right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *Id.* at 592.

Two years later in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court explained that the Second Amendment is fully applicable to the states through operation of the Fourteenth Amendment. *Id.* at 791. And in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), the Court reaffirmed its conclusion in *Heller* that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," and that this "Second Amendment right is fully applicable to the States." *Id.* at 411.

As the Supreme Court further explained in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" firearms in their homes, but also the right to "bear Arms," meaning "to carry a handgun for self-defense outside the home" free from infringement by either federal or state governments. *Id.* at 10.

Finally, the Supreme Court's latest pronouncements on the Second Amendment reaffirm the textual and historical framework from *Heller* and *Bruen*. *See United States v. Rahimi*, 602 U.S. 680, 692 (2024) (explaining that *Bruen*

reiterates "the appropriate analysis"); *see also id.* at 714 (Gorsuch, J., concurring) ("reinforc[ing] the focus on text, history, and tradition, following exactly the path we described in *Bruen*"); *accord United States v. Hemani*, 146 S. Ct. 1677 (2026); *Wolford v. Lopez*, 146 S. Ct. 2032 (2026).

In addition to recognizing the right of "'law-abiding, responsible citizens' … to public carry," *Bruen* also rejected outright the methodology used within this Circuit and other circuits to judge Second Amendment challenges. *Bruen*, 597 U.S. at 38 n.9. Prior to *Bruen*, the Third Circuit had adopted a two-part test for analyzing Second Amendment cases: "First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) (citation omitted). Other circuit courts adopted and used a substantially similar formula, which invariably utilized the very same "judge-empowering 'interest-balancing inquiry'" that *Heller* had rejected. *See Heller*, 554 U.S. at 634; *see also Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1117 (S.D. Cal. 2017) ("the Ninth Circuit uses what might be called a tripartite binary test with a sliding scale and a reasonable fit"), *aff'd*, 742 F. App'x 218 (9th Cir. 2018).

Rejecting this widespread atextual, "judge-empowering" interest-balancing approach as "one step too many," *Bruen* directed (again) the federal courts to first

principles: to assess the text of the Second Amendment, informed by the historical tradition. *Bruen*, 597 U.S. at 19, 22. First, the Supreme Court "decline[d] to adopt that two-part approach" used in this and other circuits, and reiterated that, "[i]n keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17.

Second, the Supreme Court held that, "[t]o justify [a] regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 17; *see also Rahimi*, 602 U.S. at 692 ("As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition.").

Third, in reviewing the historical evidence, the *Bruen* Court cabined review of relevant history to a narrow time period, because "not all history is created equal," focusing on the period around the ratification of the Second Amendment, and *perhaps* the Fourteenth Amendment, but only to the extent that it "mere[ly]

confirm[s]" a Founding-era tradition. *Bruen*, 597 U.S. at 37. Indeed, the Court noted that "post-ratification" interpretations "cannot overcome or alter th[e] text," and "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 36, 37; *see also id.* at 37-60 (discussing the lack of relevant historical prohibitions on concealed carry in public).

Following the Supreme Court's instruction, the Third Circuit has explained that "the constitutional right to keep and bear arms should be understood according to its public meaning in 1791," and that "laws enacted in the late-19th century" or later "'do not provide as much insight into' the original meaning of the right to keep and bear arms as do earlier sources."[4] *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 441 (3d Cir.), *reh'g en banc denied*, 130 F.4th 65 (3d Cir. 2025), *followed by United States v. Quailes*, 126 F.4th 215, 222 (3d Cir. 2025) (alteration in original) ("Practices into the 19th century provide 'confirmation of [what the Founding-era laws] established.'"); *see also ANJRPC, Inc. v. Att'y Gen. N.J.*, 183 F.4th 211, 232 (3d Cir. 2026) ("we must look to Founding-era laws for analogies to modern-day regulations").[5]

---

[4] *Accord Reese v. BATFE*, 127 F.4th 583, 594 (5th Cir. 2025); *United States v. Williams*, 113 F.4th 637, 648 (6th Cir. 2024); *Worth v. Jacobson*, 108 F.4th 677, 692, 696 (8th Cir. 2024); *NRA v. Bondi*, 133 F.4th 1108, 1115 (11th Cir. 2025).

[5] To be sure, some courts outside the Third Circuit have disagreed with the Supreme Court's Founding-era focus. *See, e.g.*, *Antonyuk v. James*, 120 F.4th 941, 972 (2d Cir. 2024) ("1868 and 1791 are both focal points of our analysis"). But this Court must follow the Third Circuit, not the

At bottom, according to the Second Amendment's text, and as elucidated by the Court in *Bruen*, if a member of "the people" wishes to "keep" or "bear" an "Arm[]," then the ability to do so "shall not be infringed." It does not matter at all how important, significant, compelling, or overriding the government's interest is in infringing the right. Nor does it matter whether a government restriction "minimally" versus "severely" burdens (infringes) the Second Amendment. There are no relevant statistical studies to be consulted. There are no sociological arguments to be considered. The ubiquitous problems of crime or the density of population do not affect the equation. *See Wolford*, 146 S. Ct. at 2050 ("the Second Amendment has the same meaning in all parts of the United States"). The only appropriate inquiry then, according to *Bruen*, is what the "public understanding of the right to keep and bear arms" was during the ratification of the Second Amendment in 1791. *Bruen*, 597 U.S. at 46-47.

In addition to providing the proper analytical framework, the Supreme Court also has instructed as to the scope of the persons, conduct, and arms covered by the Second Amendment.

---

ahistorical views of other circuits. Plus, not even Reconstruction-era evidence can support the Challenged Laws here, because handgun rationing has *never* been a majority view in *any* historical time period, and it continues to be an extreme minority view even today. Thus, with respect to the right to acquire handguns, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same...." *Bruen*, 597 U.S. at 38.

**First, the people.** *Heller* noted that, "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. *Heller* cited to *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), which explained that "'the people' … refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *See also Heller*, 554 U.S. at 581 (Second Amendment "is exercised individually and belongs to all Americans."). Thus, as the Third Circuit recently explained, "[t]he Second Amendment's reference to 'the people' covers all adult Americans," and the term "cast[s] a wide net" to include 18-to-20-year-olds and even felons as a presumptive matter. *Lara*, 125 F.4th at 435, 436. It is indisputable that Plaintiffs, being law-abiding American citizens, are members of "the people."

**Second, the protected arms.** With respect to the term "Arms," the Court explained that such term includes "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," and at the Founding, "all firearms constituted 'arms.'" *Heller*, 554 U.S. at 581. Thus, because not only those items in "existence in the 18th century are protected" by the Constitution, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the

founding," *id.* at 582, and "that general definition covers modern instruments that" so much as "*facilitate* armed self-defense." *Bruen*, 597 U.S. at 28 (emphasis added); *see also Rahimi*, 602 U.S. at 691-92 ("As we explained in *Heller* … the reach of the Second Amendment is not limited only to those arms that were in existence at the founding. … Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers."). There is no question as to handguns' protection under the Second Amendment. Indeed, "the Second Amendment protects the possession and use of weapons that are 'in common use at the time,'" and there is no "dispute that handguns are weapons 'in common use' today for self-defense." *Bruen*, 597 U.S. at 21, 32 (cleaned up).

**Third, the protected conduct.** In its analysis, *Heller* turned to the "substance of the right: 'to keep and bear Arms.'" *Heller*, 554 U.S. at 581. The Court explained that "'[k]eep arms' was simply a common way of referring to possessing arms, for militiamen *and everyone else*." *Id.* at 583. Next, the Court instructed that the "natural meaning" of "bear arms" was "wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 584. And "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Id.* *Bruen,* in fact, was more explicit, explaining that the "definition of 'bear' naturally encompasses *public* carry." *Bruen*, 597 U.S. at 32 (emphasis added).

At bottom, the Second Amendment's plain text presumptively applies to "all Americans," presumptively extends to all "bearable arms," and presumptively covers the ownership and carrying of firearms. Any "firearm regulation" (*Bruen*, 597 U.S. at 17) governing those activities is presumptively unconstitutional, and Defendant bears the burden of showing that any such regulation comports with a broad and enduring historical tradition demonstrating that certain persons, activities, or arms were never considered within the scope of the Second Amendment in the first place. Defendant will be unable to make that showing.

### B. The Second Amendment Obviously Protects the Right to Purchase and Acquire Arms

At the outset, the Challenged Laws' restriction on the *acquisition* of handguns falls well within the Second Amendment's textual scope. The Second Amendment protects not only the literal "keep[ing]" (ownership and possession) and "bear[ing]" (carrying) of existing "Arms," but also their acquisition as a necessary predicate act. Otherwise, there would be no firearms to "keep" or "bear" in the first place. "What a marvelous, Second Amendment loophole!" *United States v. Hicks*, 649 F. Supp. 3d 357, 360 (W.D. Tex. 2023), *rev'd on other grounds*, 2025 U.S. App. LEXIS 18297 (5th Cir. July 23, 2025).

Fortunately, courts across the country have rejected any such "loophole," both within the Third Circuit and without. Indeed, even prior to *Bruen*, the Third Circuit recognized that the Second Amendment "'implies a corresponding right to acquire

and maintain proficiency' with common weapons." *Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)). So did the Ninth Circuit. *See Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms"). And so have courts historically. *See, e.g.*, *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms[] necessarily involves the right to purchase them....").

Post-*Bruen*, an overwhelming consensus of courts are in accord, once again including the Third Circuit. *See, e.g.*, *United States v. Clerfe*, 2026 U.S. App. LEXIS 24094, at *8 (3d Cir. Aug. 10, 2026) ("agree[ing]" that "'[t]he right to keep arms[] necessarily involves the right to purchase them'"); *Reese v. BATFE*, 127 F.4th 583, 590 (5th Cir. 2025) ("the right to 'keep and bear arms' surely implies the right to purchase them"); *Ortega v. Grisham*, 148 F.4th 1134, 1143 (10th Cir. 2025) ("Common sense dictates that the right to bear arms requires a right to acquire arms...."). And as another district court in this circuit recently explained, "the Second Amendment protects acquiring firearms," including by 3-D printing. Memorandum Opinion at 19, *Rigby v. Jennings*, No. 1:21-cv-01523-MN (D. Del. Sept. 10, 2026), ECF No. 81.

These decisions reflect the basic interpretive principle that, "when a text authorizes a certain act, it implicitly authorizes whatever is a necessary predicate of that act." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 96 (2012); *see also* The Federalist No. 44, at 282 (James Madison) (Clinton Rossiter ed., 1961) ("No axiom is more clearly established in law, or in reason, than that wherever the end is required, the means are authorized; wherever a general power to do a thing is given, every particular power necessary for doing it is included."). Thus, "[c]onstitutional rights … implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). The Second Amendment protects the right to purchase handguns, and the Challenged Laws infringe that right.

### C. The Challenged Laws Unquestionably Implicate the Second Amendment's Plain Text, So They Are "Presumptively Unconstitutional"

Recently in *Wolford*, the Supreme Court reiterated that *Bruen*'s threshold textual analysis "entails three subsidiary questions" as to whether a challenged law regulates people, arms, and conduct within the Second Amendment's scope. *Wolford*, 146 S. Ct. at 2043. Importantly here, the Court instructed that "any restrictions on either the 'keep[ing]' (*i.e.*, possession) or the 'bear[ing]' (*i.e.*, carrying) of arms" are "presumptively unconstitutional." *Id.* at 2043, 2044. The Challenged Laws clearly fit that bill. They prevent Plaintiffs, and indeed all ordinary

New Jerseyans, from acquiring more than one handgun per 30-day period. That is "any restriction[]" on the "possession" of "arms."

Nor does it matter whether Plaintiffs already have one handgun, or even several. Just as how "[i]t is no answer to say … that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed," *Heller*, 554 U.S. at 629, so too is it "no answer to say" that handgun rationing evades review simply because Plaintiffs might have *other* options for exercising their Second Amendment rights. *See Nguyen v. Bonta*, 140 F.4th 1237, 1242-43 (9th Cir. 2025) (rejecting California's 'no harm, no foul' argument that "restricting citizens from purchasing only one firearm in a 30-day period does not prohibit them from possessing multiple firearms" generally); *see also Rigby*, Memorandum Opinion at 21 (emphasis added) ("the [challenged law] places restrictions on possessing firearms because it prevents law-abiding citizens from acquiring their self-defense firearm *of choice*"). To hold otherwise would be akin to concluding the First Amendment does not protect the acquisition of *additional* books once a person already owns *one*, or that a person may not purchase a Koran because he already owns a Bible. But just as how different books serve different purposes, so too do handguns – from self-defense to sport shooting, and from hunting to collecting. The Second Amendment protects them all. *See Bruen*, 597 U.S. at 70

("The [Second Amendment] is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'").

### D. There Is No Historical Tradition of Handgun Rationing, and So the Challenged Laws Are Conclusively Unconstitutional

Should Defendant attempt to make a historical showing under *Bruen*, one analytical precept bears emphasis. The relevant inquiry is whether the Framers ever restricted the acquisition of handguns by *rationing their purchase*. It does not matter whether they enacted *other* firearm regulations, such as restrictions on the sale of firearms to Native Americans (who were not members of "the people"[6]), requirements for the storage of gunpowder (which were "enacted as fire-safety measures"[7]), or limitations on the *discharge* of firearms, but not the *frequency* of their acquisition.[8] Those regulations all had a different "how and why," *Bruen*, 597 U.S. at 29, rendering them disanalogous to the Challenged Laws' broader restrictions on purchase.

Of course, handguns existed at the Founding, and so "the lack of a distinctly similar historical regulation … is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. Defendant cannot reframe the historical inquiry as one of licensing or regulation generally, as

---

[6] *See United States v. Carbajal-Flores*, 143 F.4th 877, 885 (7th Cir. 2025).

[7] *See ANJRPC*, 183 F.4th at 243.

[8] *See Rahimi*, 602 U.S. at 691 (citing "restrictions on gun use by drunken New Year's Eve revelers").

that would "read a principle at such a high level of generality that it waters down the right." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring). Nor is this case even about licensing – at least, not anymore. *See* ECF Nos. 39, 46. Indeed, Plaintiffs still must obtain New Jersey permits to purchase handguns prior to acquiring additional handguns. Nor can Defendant "employ a 'nuanced approach' to analogical reasoning about New Jersey's" handgun rationing. *ANJRPC*, 183 F.4th at 250. No amount of "nuance" can "overcome the dearth of relevantly similar Founding-era restrictions" dealing with items and social issues that have existed since the Founding and before. *Id.*

And there is a dearth of Founding-era restrictions indeed. Recently rejecting California's "one-gun-a-month" law in *Nguyen v. Bonta*, 140 F.4th 1237 (9th Cir. 2025), the Ninth Circuit could only identify colonial restrictions "'making it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians.'" *Id.* at 1246. Those completely irrelevant comparators were the *closest* possible regulations to the Founding, and they obviously left intact Americans' ability to *acquire* any number of firearms they pleased. The remainder of California's historical record included scattershot 19th-century "licensing regimes" for *public* "carry," restrictions on firearm acquisition by "intoxicated individuals," requirements that "dealers … register and track firearm sales," outlier "categorical bans" on pistols and knives, and "various licensing and taxing regulations...." *Id.* at 1247. As the Ninth Circuit

explained, "[m]any of California's proposed historical analogues impose[d] no burden on an individual's ability to acquire, keep, or bear arms," and none "limit[ed] the number of firearms a law-abiding citizen could acquire." *Id.* at 1248.

All told, there is no historical tradition of analogous regulation to the Challenged Laws. Indeed, the *first* "one-gun-a-month" law appears to have been enacted in South Carolina in 1975, and it is no longer in effect.[9] And as the Supreme Court already cautioned, "20th-century evidence … does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66 n.28. The "earlier evidence" is clear – Americans always have been free to purchase as many "Arms" as they wish.

### E. The Historical Record Evinces a Contrary Tradition of Multiple Handgun Purchases

Further demonstrating the Challenged Laws' unconstitutionality, the Founding-era record is replete with examples of early Americans being *required* to purchase multiple firearms at a time. Thus, it cannot be that history supports *prohibiting* precisely the same conduct today.

Indeed, in *United States v. Miller*, 307 U.S. 174 (1939), the Supreme Court collected and discussed various state militia laws from Massachusetts, New York,

[9] *See* Stephen P. Halbrook, *Rationing Firearms Purchases and the Right to Keep Arms: Reflections on the Bills of Rights of Virginia, West Virginia, and the United States*, 96 W. Va. L. Rev. 1, 3 n.1 (1993).

and Virginia, enacted between 1784 and 1786, which required individuals periodically to train, in public, with firearms "'provide[d] himself, at his own Expense....'" *Id.* at 181. As *Heller* later explained, the Second Amendment's prefatory militia clause "does not limit" the Amendment's operative "right of the people" clause, "but rather announces a purpose" that serves a "clarifying function...." *Heller*, 554 U.S. at 577, 578. Thus, the Second Amendment must protect, at a minimum, those persons, arms, and activities contemplated by its militia clause. *See Reese*, 127 F.4th at 594 ("the prefatory clause, in establishing the Amendment's purpose, describes those who, at a minimum, must have been covered by it"). Were it otherwise, there would be no "link between the stated purpose and the command" of the operative clause. *Heller*, 554 U.S. at 577.

Accordingly, it is highly probative that early militiamen were required to purchase and muster with *cases* of pistols. Indeed, as early as 1687 and through 1784, Connecticut required militia horsemen to keep and bear a "case of good pistols." 2 Backgrounds of Selective Service: Military Obligation: The American Tradition, pt. 2, at 46, 256 (Arthur Vollmer ed., 1947). The same was true in 1687 New Hampshire, 1693 Massachusetts, 1746 and 1777 New Jersey, 1798 Rhode Island, and in other jurisdictions. *See id.* pt. 7, at 13, pt. 6, at 139, pt. 8, at 30, 45, pt. 12, at 219. In fact, "virtually all cavalry or 'horse' pistols" of the era "were originally issued in pairs...." Ashley Halsey, Jr., *Rarities of the Revolution*, *in* The SAR

Magazine, vol. LXVII, no. 2 (Fall 1972).[10] Dozens – if not hundreds – of other historical sources show the Founding generation purchasing more than one handgun at the same time.[11] Indeed, George Washington "acquired several pairs of pistols through purchase, capture, and gift."[12] If New Jersey's 2009 rationing scheme were in effect at the Founding, it would have criminalized the widespread practices of the Framers. That is evidence enough that the Challenged Laws are atextual, ahistorical, and therefore unconstitutional.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[10] https://www.sar.org/wp-content/uploads/2020/01/LXVII-NO.2_FALL-1972.pdf?utm.

[11] *See, e.g.*, Gazette of the United States, and Philadelphia Daily Advertiser (Dec. 5, 1799), https://tinyurl.com/2nz43p3e (Thomas and John Ketland offering for sale newly imported "[f]owling pieces and pistols in cases").

[12] *Flintlock Pistol*, George Washington's Mount Vernon, https://tinyurl.com/22kjabhj (last visited Sept. 13, 2026).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment should be granted.

Dated: Lake Success, New York
September 14, 2026

HARFENIST KRAUT & PERLSTEIN, LLP

By: *Steven J. Harfenist*

Steven J. Harfenist
*Attorneys for Plaintiffs*
3000 Marcus Avenue, Suite 2E1
Lake Success, New York 11042
T: (516) 355-9600
F: (516) 355-9601
E: SHarfenist@hkplaw.com

Oliver M. Krawczyk*
Ambler Law Offices, LLC
115 South Hanover Street, Suite 100
Carlisle, PA 17013
T: (717) 525-5822
E: oliver@amblerlawoffices.com
**Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I, Steven J. Harfenist, hereby certify that I have filed a true and correct copy of the foregoing document or pleading with this Court's CM/ECF system, which generated a Notice of Electronic Filing, and provided a copy of the above to all counsel of record.

Dated: September 14, 2026

*Steven J. Harfenist*
Steven J. Harfenist