**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CHRISTIAN BENTON, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>JENNIFER DAVENPORT,*<br><br>Defendant. | Hon. Karen M. Williams, U.S.D.J.<br>Hon. Matthew J. Skahill, U.S.M.J.<br><br>Civil Action<br><br>Docket No. 1:24-cv-7098<br>Docket No. 3:24-cv-9479<br>(Consolidated) |
| MATTHEW STRUCK, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>JENNIFER DAVENPORT, *et al.*,<br><br>Defendants. | |

**STATE DEFENDANTS' COMBINED BRIEF IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

* The captions have been revised to reflect the present Attorney General of New Jersey Jennifer Davenport. *See* Fed. R. Civ. P. 25(d).

JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
P.O. Box 116
Trenton, New Jersey 08625
PHONE NUMBER
EMAIL
*Attorneys for State Defendants*

Stephen Ehrlich
*Deputy Solicitor General*

David E. Leit
*Assistant Attorney General*

Justine M. Longa
Amanda I. Morejón
Andrew H. Yang
*Deputy Attorneys General*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT....1
BACKGROUND....4
A. Statutory Background....4
B. Procedural Background....9
C. Plaintiffs' Background....10
STANDARD OF REVIEW....12
ARGUMENT....12
I. PLAINTIFFS LACK ARTICLE III STANDING....12
A. By Failing to Apply for Exemption Permits, Plaintiffs Have Failed to Establish Injury in Fact....14
B. Plaintiffs Have Not Established That Their Alleged Injury Is Traceable To The Challenged Law And Redressable By Their Requested Relief....20
II. THE BULK GUN PURCHASE LAW IS CONSTITUTIONAL....22
A. The Bulk Gun Purchase Law Is Constitutional At Step One....22
1. The Bulk Gun Purchase Law Is A Presumptively Constitutional Shall-Issue Regulation....23
2. The Bulk Gun Purchase Law Is A Presumptively Constitutional Commercial Regulation....28
B. The Bulk Gun Purchase Law Is Consistent With The Nation's Regulatory Tradition At Step Two....37
1. There Is A Longstanding National Regulatory Tradition Of Quantity Limits And Licensure Requirements On Firearms....40
2. There Is A Longstanding National Regulatory Tradition Of Preventing The Criminal Trafficking Of Firearms....45
CONCLUSION....50

# TABLE OF AUTHORITIES

**Cases**

*Andrews v. State*,
50 Tenn. 165 (1871) ....................................................................................36

*Artway v. Att'y Gen. of N.J.*,
81 F.3d 1235 (3d Cir. 1996) ........................................................................14

*Ass'n New Jersey Rifle & Pistol Clubs v. Governor of New Jersey*,
707 F.3d 238 (3d Cir. 2013) ........................................................................29

*Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*,
835 F.3d 388 (3d Cir. 2016) ........................................................................12

*B & L Prods., Inc. v. Newsom*,
104 F.4th 108 (9th Cir. 2024)................................................................ 27, 32

*Beckwith v. Frey*,
171 F.4th 560 (1st Cir. 2026) ................................................................ 23, 24

*Blunt v. Lower Merion Sch. Dist.*,
767 F.3d 247 (3d Cir. 2014) ........................................................................18

*Carney v. Adams*,
592 U.S. 53 (2020)........................................................................................17

*Christian v. James*,
176 F.4th 189 (2d Cir. 2026) ........................................................................39

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)................................................................................ 13, 20

*Comité de Apoyo a los Trabajadores Agrícolas v. Perez*,
148 F. Supp. 3d 361 (D.N.J. 2015) ..............................................................19

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006)........................................................................................13

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ........................................................................ passim

*Drummond v. Robinson Township*,
9 F.4th 217 (3d Cir. 2021) ........................................................................ 33, 34

*Ellison v. Am. Bd. of Orthopaedic Surgery*,
11 F.4th 200 (3d Cir. 2021) ........................................................................ 15, 16, 17

*Ezell v. City of Chicago*,
651 F.3d 684, 691 (7th Cir. 2011) ........................................................................34

*Finkelman v. Nat'l Football League*,
810 F.3d 187 (3d Cir. 2016) ........................................................................ 16, 20

*Fischer v. Gov. of N.J.*,
842 F. App'x 741 (3d Cir. 2021) ........................................................................ 19, 21

*Gamble v. United States*,
587 U.S. 678 (2019) ........................................................................39

*Gazzola v. Hochul*,
88 F.4th 186 (2d Cir. 2023) ........................................................................29

*Goode v. City of Philadelphia*,
539 F.3d 311 (3d Cir. 2008) ........................................................................19

*Greenberg v. Lehocky*,
81 F.4th 376 (3d Cir. 2023) ........................................................................ 12, 13, 18, 19

*Heller v. District of Columbia*,
801 F.3d 264 (D.C. Cir. 2015) ........................................................................44

*Hightower v. City of Bos.*,
693 F.3d 61 (1st Cir. 2012) ........................................................................16

*In re BPS Direct, LLC; Cabela's, LLC Wiretapping Litig.*,
175 F.4th 423 (3d Cir. 2026) ........................................................................13

*Jacobs v. Geisinger Wyo. Med. Ctr.*,
No. 21-3362, 2022 WL 1564193 (3d Cir. May 18, 2022) ....................................30

*Kanter v. Barr*,
919 F.3d 437 (7th Cir. 2019) ............................................................................ 46, 47

*Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*,
909 F.3d 446 (D.C. Cir. 2018)..................................................................................22

*Kendrick v. Bruck*,
586 F. Supp. 3d 300 (D.N.J. 2022) .............................................................. 16, 18, 19

*Knight v. City of New York*,
164 F.4th 173 (2d Cir. 2026) ......................................................................................32

*Knight v. City of New York*,
2024 WL 1096991 (S.D.N.Y. Mar. 13, 2024)...........................................................32

*Knight v. City of New York*,
No. 22-3215, 2024 WL 1126309 (S.D.N.Y. Jan. 17, 2024)......................................32

*Koons v. Att'y Gen. New Jersey*,
156 F.4th 210 (3d Cir. 2025) ......................................................................................47

*Koons v. Att'y Gen. New Jersey*,
162 F.4th 100 (3d Cir. 2025) ......................................................................................47

*Koons v. Platkin*,
673 F. Supp. 3d 51 (D.N.J. 2023) ................................................................... 46, 48

*Lara v. Comm'r Pa. State Police*,
125 F.4th 428 (3d Cir. 2025) ............................................................................ 38, 46

*Libertarian Party of Erie Cnty. v. Cuomo*,
970 F.3d 106 (2d Cir. 2020) ........................................................................................16

*Maryland Shall Issue, Inc. v. Moore*,
116 F.4th 211 (4th Cir. 2024) ......................................................................................24

*McConnell v. Fed. Election Comm'n*,
540 U.S. 93 (2003)....................................................................................21

*McCoy v. BATFE*,
140 F.4th 568 (4th Cir. 2025)...........................................................................38

*McDonald v. City of Chicago, Ill.*,
561 U.S. 742 (2010)............................................................................ 22, 23

*Mejia-Castanon v. Att'y Gen. of U.S.*,
931 F.3d 224 (3d Cir. 2019)............................................................................30

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022).................................................................................. passim

*Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.*,
80 F.4th 215 (3d Cir. 2023)...................................................... 13, 14, 19

*Nationwide Ins. Independent Contractors Ass'n, Inc. v. Nationwide Mut. Ins. Co.*,
518 Fed. Appx. 58 (3rd Cir. 2013)...................................................................18

*New Jersey Physicians, Inc. v. President of U.S.*,
653 F.3d 234 (3d Cir. 2011)............................................................................19

*Nguyen v. Bonta*,
140 F.4th 1237 (9th Cir. 2024).......................................................... passim

*Ortega v. Grisham*,
148 F. 4th 1134 (10th Cir. 2025)........................................................ 35, 36

*Pennsylvania v. New Jersey*,
426 U.S. 660 (1976)..................................................................................20

*Phila. Fed'n of Tchrs., Am. Fed'n of Tchrs., Loc. 3, AFL-CIO v. Ridge*,
150 F.3d 319 (3d Cir. 1998)............................................................................13

*Pitsilides v. Barr*,
128 F.4th 203 (3d Cir. 2025)................................................................ 39, 47

*Plains All Am. Pipeline L.P. v. Cook*,

866 F.3d 534 (3d Cir. 2017) ....................................................................13

*Reading v. N. Hanover Twp., New Jersey*,
124 F.4th 189 (3d Cir. 2024) ....................................................................15

*Reese v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*,
127 F.4th 583 (5th Cir. 2025) .................................................................. 36, 37

Rigby v. Jennings ,
No. 21-1523, 2026 WL 2664371 (D. Del. Sept. 10, 2026)..................................34

*Rocky Mountain Gun Owners v. Polis*,
121 F.4th 96 (10th Cir. 2024) ............................................................ 24, 28, 32

*Rocky Mountain Gun Owners v. Polis*,
701 F. Supp. 3d 1121 (D. Colo. 2023) ....................................................33

*Rocky Mountain Gun Owners v. Polis*,
No. 23-1380, 2024 WL 5010820 (10th Cir. 2024) .........................................33

*Schoenthal v. Raoul*,
150 F.4th 889 (7th Cir. 2025)....................................................................38

*State v. A.M.*,
286 A.3d 660 (N.J. 2023)..............................................................................7

*State v. Wade*,
301 A.3d 393 (N.J. Super. Ct. App. Div. 2023) .....................................4, 23

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998)......................................................................................21

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009)....................................................................................18

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)....................................................................................14

*Teixeira v. Cnty. of Alameda,*
873 F.3d 670 (9th Cir. 2017) ....................................................................29

*Timbs v. Indiana*,
586 U.S. 146 (2019) .......... 39

*Trump v. New York*,
592 U.S. 125 (2020) .......... 14

*United States v. Berger*,
189 F.4th 333 (3d Cir. 2026) .......... passim

*United States v. Clerfe*,
186 F.4th 141 (3d Cir. 2026) .......... 34, 35

*United States v. Decastro*,
682 F.3d 160 (2d Cir. 2012) .......... 16

*United States v. Giglio*,
126 F.4th 1039 (5th Cir. 2025) .......... 42

*United States v. Gore*,
118 F.4th 808 (6th Cir. 2024) .......... 36, 37

*United States v. Hemani*,
608 U.S. 772 (2026) .......... 37, 38, 49

*United States v. Jackson*,
110 F.4th 1120 (8th Cir. 2024) .......... 49

*United States v. James*,
677 F. Supp. 3d 329 (D.V.I. 2023) .......... 28

*United States v. Rahimi*,
602 U.S. 680 (2024) .......... passim

*United States v. VanDyke*,
157 F.4th 1082 (9th Cir. 2025) .......... 46, 49

*United States v. Williams*,
113 F.4th 637 (6th Cir. 2024) .......... 46

*Voisine v. United States*,
579 U.S. 686 (2016) ........ 40

*We the Patriots, Inc. v. Grisham*,
119 F.4th 1253 (10th Cir. 2024) ........ 21

*Westfall v. Miller*,
77 F.3d 868 (5th Cir. 1996) ........ 16, 17

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021) ........ 14

*Wolford v. Lopez*,
609 U.S. 185 (2026) ........ passim

*Yukutake v. Lopez*,
--- F.4th ----, 2026 WL 2834831 (9th Cir. Sept. 22, 2026) ........ 5, 25, 27

*Zherka v. Bondi*,
140 F.4th 68 (2d Cir. 2025) ........ 39

**Statutes**

18 U.S.C. § 922 ........ 37

N.J. Stat. Ann. § 2C:58-2 ........ 2, 21

N.J. Stat. Ann. § 2C:58-3 ........ passim

N.J. Stat. Ann. § 2C:58-3.4 ........ passim

P.L. 2009, c. 186 (C.2C:58-3.4) ........ 30

**Other Authorities**

Press Release, New Jersey Office of the Governor, Governor
Corzine Signs One-Gun-A-Month Handgun Legislation (Aug. 9, 2009),
https://tinyurl.com/3zzxwmfz ........ 47

**Rules**

Fed. R. Civ. P. 56(a) ....................................................................................12

**Regulations**

N.J. Admin. Code § 13:54-1.9 ...........................................................................1, 6

**Constitutional Provisions**

U.S. Const. art. III, § 2, cl. 1 ..........................................................................13

## PRELIMINARY STATEMENT

The undisputed record establishes that Plaintiffs'[1] Second Amendment challenge to N.J. Stat. Ann. § 2C:58-3(i) and N.J. Admin. Code § 13:54-1.9 ("Bulk Gun Purchase Law") should be rejected for two independent reasons. First, Plaintiffs lack Article III standing. Second, the Bulk Gun Purchase Law is constitutional.

On standing, Plaintiffs (three individuals and five associations) claim that the Bulk Gun Purchase Law prohibits them (or their members) from being able to purchase more than one handgun in a single thirty-day period. But they disregard the fact that they very well could purchase multiple handguns in New Jersey each month—they just need to obtain the appropriate permit first. Indeed, the Bulk Gun Purchase Law is part of New Jersey's "shall-issue" firearms licensing regime, which allows a person to purchase one handgun in any single thirty-day period with a basic Firearms Purchaser ID Card ("FPIC"), and to purchase multiple handguns in any single thirty-day period with an "exemption" permit available under N.J. Stat. Ann. § 2C:58-3.4. While Plaintiffs admit that they (or their members) could have applied for such a permit, they did not do so nor did they identify any member who tried and failed. Having not even applied for, let alone been denied, an exemption permit,

[1] Christian Benton, Matthew Struck, and Daniel Francisco, as well as similarly situated members of Plaintiffs Coalition of New Jersey Firearm Owners ("CNJFO"), Gun Owners of America ("GOA"), Gun Owners Foundation ("GOF"), Firearms Policy Coalition ("FPC"), and National Rifle Association ("NRA").

Plaintiffs lack Article III standing to challenge the constitutionality of the Bulk Gun Purchase Law. Plaintiffs have not suffered an injury in fact, cannot show that the Bulk Gun Purchase Law (as opposed to Plaintiffs' own inaction) is the fairly traceable cause of any injury, and do not at this stage face a credible risk of enforcement. And a separate statute, *see* N.J. Stat. Ann. § 2C:58-2(a)(7), prohibits firearm retailers from *selling* more than one handgun in a single thirty-day period to persons without an exemption permit who otherwise do not satisfy one of the automatic exceptions. So invalidating the Bulk Gun Purchase Law would not redress Plaintiffs' alleged injuries because that separate statute prohibiting retailers from selling multiple handguns to Plaintiffs absent a permit would independently cause their alleged injury.

On the merits, Plaintiffs' Second Amendment challenge to the Bulk Gun Purchase Law fails at both steps under the Supreme Court's framework: (1) the Amendment's plain text does not protect the individual conduct at issue here, and (2) even if protected, the restriction imposed is in accord with this Nation's historical tradition of firearm regulation. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 32–34 (2022).

Start with step one. Plaintiffs' desired conduct—purchasing an unlimited number of firearms via commercial sale without having to take the minimal step to apply for the necessary permit—is not protected by the Second Amendment's plain

text. The Supreme Court has long recognized that there are "presumptively lawful regulatory measures" that may "impos[e] conditions and qualifications on the commercial sale of arms" but do not rise to the level of an infringement on the Second Amendment right. *District of Columbia v. Heller*, 554 U.S. 570, 626–27, 627 n.26 (2008). The Third Circuit has likewise recognized that "not every gun law counts as an infringement. Conditions and qualifications on the commercial sale of arms are presumptively lawful; they do not necessarily rise to the level of infringements." *United States v. Berger*, 189 F.4th 333, 339 (3d Cir. 2026) (citation modified). Here, the Bulk Gun Purchase Law does not illegitimately restrict Plaintiffs' right to keep and bear arms for self-defense. The Bulk Gun Purchase Law is presumptively constitutional—and Plaintiffs have failed to rebut that presumption—because it is a shall-issue permitting regime that is a "minimal, objective buying-and-selling regulation[]" and therefore does not infringe the Second Amendment. *Id.* at 340.

Plaintiffs' challenge also fails at step two because the Bulk Gun Purchase Law simply imposes quantity limits and licensing requirements, both of which are time-honored regulatory measures that existed before, during, and after ratification of the Second Amendment. Unlike in *Nguyen v. Bonta*, where the Ninth Circuit enjoined a California law that "establishe[d] no exemption or pathway by which a law-abiding citizen c[ould] purchase more than one firearm within a 30-day period," 140 F.4th

1237, 1248 (9th Cir. 2024), the permit requirements here are designed to mitigate the risk of bulk purchasing for the purpose of illegal gun trafficking, without "prevent[ing] 'law-abiding, responsible citizens' from exercising their Second Amendment right" to possess and carry firearms. *Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635). History is replete with examples of analogous laws, including laws designed to prevent certain persons from possessing firearms to avert downstream criminal misuse and danger, as well as laws that regulate gun trafficking by criminals. Those laws demonstrate that the Bulk Gun Purchase Law accords with historical tradition and provides ample reason to reject Plaintiffs' challenge on the merits.

## **BACKGROUND**[2]

### A. Statutory Background

People can obtain a handgun in New Jersey under a "shall-issue"[3] permitting regime codified in N.J. Stat. Ann. § 2C:58-3. Shall-issue laws generally require applicants to satisfy standard criteria or steps, such as "requir[ing] applicants to

---

[2] State Defendants incorporate by reference all facts recited and supported by competent record evidence in State Defendants' Counter-Statement of Material Facts ("State SOMF").

[3] New Jersey courts have recognized that post-*Bruen* amendments by the New Jersey Legislature to the State's firearms laws "revised New Jersey's gun-permitting scheme to become a shall-issue regime." *State v. Wade*, 301 A.3d 393, 405 (N.J. Super. Ct. App. Div. 2023).

undergo a background check or pass a firearms safety course," to ensure that those bearing arms "are, in fact, 'law-abiding, responsible citizens'"—and such laws are presumptively constitutional. *See Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635); *accord Yukutake v. Lopez*, --- F.4th ----, 2026 WL 2834831, at *5 (9th Cir. Sept. 22, 2026) ("Unless a shall-issue law is put toward abusive ends, such as through lengthy processing delays or exorbitant fees that effectively deny ordinary citizens their Second Amendment rights, it is presumptively constitutional." (citation modified)).

To obtain a permit to purchase a handgun in New Jersey, an individual must first complete an application. N.J. Stat. Ann. § 2C:58-3(e). The chief police officer of the municipality in which the individual resides then runs a background check to confirm that the individual is not "known in the community in which the person lives as someone who has engaged in acts or made statements suggesting the person is likely to engage in conduct, other than justified self-defense, that would pose a danger to self or others," nor is "subject to any of the disabilities set forth in" N.J. Stat. Ann. § 2C:58-3(c)(1)–(15). N.J. Stat. Ann. §§ 2C:58-3(c), (d). If the individual is not subject to any disqualifying statutory criteria, the permit to purchase a handgun "shall" be granted to the applicant. N.J. Stat. Ann. § 2C:58-3(f).

The Bulk Purchase Gun Law allows permit holders to purchase one handgun in a single transaction from a licensed retail dealer within a 30-day period. N.J. Stat.

Ann. § 2C:58-3(i); *see also* N.J. Admin. Code § 13:54-1.9(a). Certain categories of persons are automatically entitled to an exemption to purchase multiple handguns, including (1) "a federal, State, or local law enforcement officer or agency purchasing handguns for use by officers in the actual performance of their law enforcement duties"; (2) "a collector of handguns as curios or relics as defined in [federal law] who has in the collector's possession a valid Collector of Curios and Relics License issued by the federal Bureau of Alcohol, Tobacco, Firearms and Explosives"; (3) "transfers of handguns among licensed retail dealers, registered wholesale dealers and registered manufacturers"; (4) "transfers of handguns from any person to a licensed retail dealer or a registered wholesale dealer or registered manufacturer"; and (5) "any transaction where the person has purchased a handgun from a licensed retail dealer and has returned that handgun to the dealer in exchange for another handgun within 30 days of the original transaction, provided the retail dealer reports the exchange transaction to the superintendent." N.J. Stat. Ann. § 2C:58-3(i)(1)–(5).

For persons who do not fall into one of the automatic exemptions, they may purchase multiple handguns in "any transaction where the [New Jersey State Police] [S]uperintendent issues an exemption" permit under N.J. Stat. Ann. § 2C:58-3.4.[4]

[4] "[A]nyone" seeking an exemption permit from the Superintendent may do so through the State Police's online application portal. State SOMF ¶ 2.

*See* N.J. Stat. Ann. § 2C:58-3(i)(6). New Jersey law, in turn, directs that "[t]he [S]uperintendent may grant an exemption … if the applicant demonstrates" that its "request meets one of … [three] conditions." [5] N.J. Stat. Ann. § 2C:58-3.4(a). Two of the conditions are relatively narrow: (i) "[t]he application is to purchase multiple handguns from a person who obtained the handguns through inheritance or intestacy," and (ii) "[t]he applicant participates in sanctioned handgun shooting competitions and needs to purchase or otherwise receive multiple handguns in a single transaction or within a 30-day period, and the need is related to the applicant's competitive shooting activities, including use in or training for sanctioned competitions." N.J. Stat. Ann. §§ 2C:58-3.4(a)(1), (a)(3).

The last condition is broad. It directs the Superintendent to grant an exemption permit where "[t]he applicant is a collector of handguns and has a need to purchase or otherwise receive multiple handguns in the same transaction or within a 30-day period in furtherance of the applicant's collecting activities." N.J. Stat. Ann. § 2C:58-3.4(a)(2). "[C]ollector" is defined quite broadly to "include *any person* who

[5] The term "may" denotes only that authority over processing applications for exemption permits is reposed in the Superintendent. *Cf. State v. A.M.*, 286 A.3d 660, 671 (N.J. 2023) (concluding that the term "may" denotes "the *authority* to decide petitions for compassionate release" where authority over such petitions was previously reposed elsewhere (emphasis added)). Like in *A.M.*, here the term "may" in N.J. Stat. Ann. § 2C:58-3.4(a) denotes that the Superintendent is vested with authority to process and grant exemption permit applications, whereas permits to purchase a handgun are typically processed by the chief police officer of the municipality in which the applicant resides. *See* N.J. Stat. Ann. §§ 2C:58-3(d), (f).

devotes time and attention to acquiring firearms for the enhancement of the person's collection," which includes for "recreational" purposes, "defensive purposes," "or any other lawful related purpose." *Id.* (emphasis added). "[N]eed" is also broadly defined in a non-exhaustive manner to "include, but not be limited to, situations where there is a reasonable likelihood that the additional handguns sought to be purchased would not be readily available after the 30-day period, that it would not be feasible or practical to purchase the handguns separately, or that prohibiting the purchase of more than one handgun within a 30-day period would have a materially adverse impact on the applicant's ability to enhance his collection." *Id.* And where "an applicant is a member of an organized gun club … or any other organization dedicated to the acquisition, preservation, or use of firearms for … recreational … or defensive purposes, or any other lawful related purpose, such membership shall be considered" by the Superintendent as to "whether the applicant qualifies as a collector." *Id.*

"[I]n determining whether the applicant meets the requirements for an exemption," the statute requires that the Superintendent "shall consider" objective criteria: "the veracity, accuracy, and completeness of the information provided." *Id.* § 2C:58-3.4(b). The statute expressly disavows subjective criteria, commanding that "[i]n considering whether an applicant qualifies as a collector" for an exemption, the Superintendent "shall *not* consider the number of guns in the applicant's collection"

or "the merit or validity of the applicant's collecting activities." *Id.* (emphasis added). Ultimately, the Superintendent is authorized to "not grant an exemption" only "if he finds a reasonable likelihood that the public safety would be endangered by granting the exemption, including … where the applicant may be purchasing a handgun to give, sell or distribute to a person who would not qualify to purchase or otherwise acquire a handgun." *Id.* So, the law mitigates the risks of both straw purchasing (people who buy guns for someone who would not be able to lawfully buy a gun, such as a felon), and bulk purchasing of guns for illegal gun trafficking. In contrast, so long as the applicant seeks the exemption for a "lawful" purpose, the Superintendent "will approve" the permit. State SOMF ¶¶ 4, 5. A lawful purpose is any purpose that is "not illegal." *Id*. ¶ 6.

A person with an exemption permit may lawfully purchase up to 99 handguns in a single transaction, *id*. ¶ 9, and a person may obtain an unlimited number of exemption permits in any 30-day period, *id*. ¶ 8. In the past five years alone, the Superintendent has granted the overwhelming majority of applications and issued no fewer than 2,347 exemption permits. *Id*. ¶ 3.

**B. Procedural Background**

On June 18, 2024, Plaintiff Christian Benton and three associations—CNJFO, GOA, and GOF—filed a one-count complaint against the New Jersey Attorney General challenging the Bulk Gun Purchase Law and other aspects of New Jersey's

firearms permitting laws. *See* No. 24-7098, *Benton* ECF 1 (D.N.J. June 18, 2024). The Attorney General moved to dismiss for lack of standing as to all aspects of the suit except the specific challenge to the Bulk Gun Purchase Law. *Benton* ECF 20, 20-1 at 2–3. That motion was granted in full by the Court. *Benton* ECF 39, 46.

On September 26, 2024, Plaintiffs Matthew Struck and Daniel Francisco as well as FPC filed a one-count complaint against the New Jersey Attorney General and Superintendent of the New Jersey State Police challenging the Bulk Gun Purchase Law. *See* No. 24-9479, *Struck* ECF 1 (D.N.J. Sept. 26, 2024). The State Defendants moved pursuant to Rule 42(a) to consolidate the two cases on November 4, 2024. *See Benton* ECF 29.[6] The Court granted consolidation on June 23, 2025, with the *Benton* matter, No. 24-7098, serving as the lead case. ECF 55. The NRA was added as a Plaintiff on June 22, 2026. ECF 79 at 1. All Plaintiffs moved for summary judgment on September 14, 2026. ECF 91, 92.

**C. Plaintiffs' Background**

Plaintiffs consist of three individuals and five associations.

Mr. Benton describes himself to be "a law-abiding person," "an avid gun owner and supporter of the Second Amendment," and a member of CNJFO and GOA. ECF 92-3 ¶¶ 4–6. Mr. Benton says that he wants "to purchase more than one

[6] All subsequent citations to docket entries refer to the *Benton* docket, as the matters have been consolidated.

handgun per 30-day period," *id.* ¶ 6, but he did not assert that he has applied for an exemption permit, even though he admitted that he "may" apply. State SOMF ¶ 10.

Mr. Francisco and Mr. Struck describe themselves as "not prohibited under state or federal law from acquiring or possessing firearms or ammunition" and as "members of" FPC and the NRA. ECF 91-2 ¶¶ 2–4. They say that they want "to purchase two or more handguns … for lawful purposes … within a 30-day period, *id.* ¶¶ 2–3, but they did not assert that they have applied for an exemption permit either, even though they admitted that they are "capable of submitting an application" for a permit. State SOMF ¶¶ 14–15.

CNJFO "is a Second Amendment advocacy organization." ECF 92-3 ¶ 9. GOA "is a nonprofit Second Amendment advocacy organization." *Id.* ¶ 12. GOF "is a nonprofit legal defense and educational foundation." *Id.* ¶ 15. FPC "is a nonprofit membership organization" that "seeks to protect … [the] individual right to keep and bear arms." ECF 91-2 ¶ 5. The NRA is "America's leading provider of firearms marksmanship and safety training." *Id.* ¶ 6. All five associations admitted that they have members or supporters who "could" or are "capable of submitting an application" for an exemption permit, but did not assert that any member has done so. State SOMF ¶¶ 11–13, 16–17.

## STANDARD OF REVIEW

Under Rule 56, summary judgment is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact "is material" only "if—taken as true—it would affect the outcome of the case under governing law." *M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020). "And a factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation modified). The standard is the same in the context of cross-motions, with the court required to determine, "for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016).

## ARGUMENT

### I. PLAINTIFFS LACK ARTICLE III STANDING.

Plaintiffs' challenge to the Bulk Gun Purchase Law fails at the threshold because they have not proved that they have Article III standing. *See Greenberg v. Lehocky*, 81 F.4th 376, 384 (3d Cir. 2023) ("At summary judgment, a plaintiff can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts establishing standing." (citation modified)). Article III of the Constitution limits the jurisdiction of the federal courts to actual cases or controversies. U.S. Const. art. III, § 2, cl. 1. "This case-or-controversy limitation …

is crucial in 'ensuring that the Federal Judiciary respects the proper—and properly limited—role of the courts in a democratic society.'" *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 539 (3d Cir. 2017) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)). The existence of a case or controversy is therefore "a prerequisite to all federal actions, including those for declaratory or injunctive relief." *Phila. Fed'n of Tchrs., Am. Fed'n of Tchrs., Loc. 3, AFL-CIO v. Ridge*, 150 F.3d 319, 322–23 (3d Cir. 1998).

"One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." *Lehocky*, 81 F.4th at 384 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)). For standing, "a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *In re BPS Direct, LLC; Cabela's, LLC Wiretapping Litig.*, 175 F.4th 423, 429 (3d Cir. 2026) (citation modified). Each plaintiff in a multi-plaintiff action "bear[s] the burden of establishing these elements." *Id.* "[C]losely related, the case must be ripe. It must not 'depend[] on contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.*, 80 F.4th 215, 219 (3d Cir. 2023) ("*NSSF*") (quoting *Trump v. New York*, 592 U.S. 125, 131 (2020)). Both "[s]tanding and ripeness demand certainty and immediacy." *Id.*

As the Third Circuit has recognized, "[p]re-enforcement challenges fit oddly with these requirements" and are therefore "the exception rather than the rule." *Id.* (citation modified); *see also Artway v. Att'y Gen. of N.J.*, 81 F.3d 1235, 1247 (3d Cir. 1996) ("[P]reenforcement review is the exception rather than the rule[.]"). Indeed, even for constitutional claims, there is no "unqualified right to pre-enforcement review," regardless of "whether the challenged law in question is said to chill the free exercise of religion, the freedom of speech, the right to bear arms, or any other right." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 49–50 (2021). So, those seeking pre-enforcement review must demonstrate "circumstances that render the threatened enforcement sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Such circumstances exist where persons "(1) intend to take action that is (2) 'arguably affected with a constitutional interest' but is (3) arguably forbidden by the Law, and (4) the threat of enforcement against them is substantial." *NSSF*, 80 F.4th at 219 (quoting *Driehaus*, 573 U.S. at 159). Here, Plaintiffs have failed to establish every element of standing.

**A. By Failing to Apply for Exemption Permits, Plaintiffs Have Failed to Establish Injury in Fact.**

Plaintiffs first lack an injury in fact because they have not provided any evidence to suggest that the Bulk Gun Purchase Law has caused or will imminently cause them harm. *See Reading v. N. Hanover Twp., New Jersey*, 124 F.4th 189, 196 (3d Cir. 2024) ("Where … the plaintiff seeks prospective relief to address future

harm, she must show that 'the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'"). Plaintiffs claim that "[b]ut for" the Bulk Gun Purchase Law" they "would purchase handguns in the plural, at any time of [their] choosing, and certainly more than once per 30-day period." ECF 92-4 at 9–10. But there is no indication that they have tried to obtain an exemption permit that would allow them to lawfully achieve precisely what they claim to want to do: "purchase more than one handgun per month." *Id.* This failure to even attempt to obtain multiple handguns under the law is conspicuous because Plaintiffs have roundly admitted that they (or their members) are fully "capable of submitting an application" for an exemption permit but have not done so. *See* State SOMF ¶¶ 10–17.

Courts have routinely found a lack of standing where, as here, plaintiffs failed to apply for permits or otherwise meaningfully pursue avenues that would provide them what they desire. *See, e.g.*, *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 207 (3d Cir. 2021) (dismissing plaintiff's antitrust claim for lack of standing he "neither applied for medical staff privileges nor alleged that he ha[d] taken any specific steps that would otherwise position him to practice at [certain New Jersey] hospitals, such as obtaining a license to practice medicine in New Jersey"); *Finkelman v. Nat'l Football League*, 810 F.3d 187, 195 (3d Cir. 2016) (no standing where plaintiff "took no meaningful action to pursue the 'opportunity'"); *Libertarian*

*Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 121–22 (2d Cir. 2020) (affirming dismissal for lack of standing whether plaintiffs "were not alleged to have applied for a New York State firearm license" or "received a license" because they had not showed that "they suffered injury-in-fact"); *Hightower v. City of Bos.*, 693 F.3d 61, 70 (1st Cir. 2012) ("[Plaintiff] lacks standing to raise a claim as to a Class B license; she has never applied for such a license, been denied one, or had such a license revoked."); *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012) ("[B]ecause [plaintiff] failed to apply for a gun license in New York, he lack[ed] standing to challenge the licensing laws of the state."); *Westfall v. Miller*, 77 F.3d 868, 872 (5th Cir. 1996) ("[W]e find the completion of the statutory procedure necessary to establish [plaintiff's] injury."); *Kendrick v. Bruck*, 586 F. Supp. 3d 300, 308, 312 (D.N.J. 2022) (holding that "individuals who have failed to apply for a permit lack[ed] standing to challenge firearm permitting laws" and that associations "fail[ed] to adequately plead representational standing" where they did "not allege that their members ha[d] applied for a permit").

These holdings are rooted in common sense: to prove that a benefit has been unconstitutionally denied, a plaintiff must at the very least show that he or she took "actual steps that demonstrate a real interest in seeking the alleged benefit." *Ellison*, 11 F.4th at 207; *Carney v. Adams*, 592 U.S. 53, 61 (2020) (holding that lawyer lacked standing to challenge constitutionality of judicial appointments scheme where the

lawyer had "been eligible to apply for … vacancies, but he had not done so"). Otherwise, there is no way to know whether it is a plaintiff's inaction or the challenged regulation that is the cause of the alleged injury. *See Westfall*, 77 F.3d at 872 (concluding that the plaintiff's own "inaction has caused any injury he has suffered"). And that is true here. Because Plaintiffs (or their members) have not even attempted to apply for an exemption permit, any claim that they cannot obtain multiple handguns in a 30-day period is entirely speculative.

Even if there were an exception where a failure to apply for a benefit would be "futile," a plaintiff's mere "allegations of futility" do not "suffice to show a concrete, particularized, and actual or imminent injury." *Ellison*, 11 F.4th at 206. Again, that is true here. And there are particularly strong reasons to suggest that exemption permits for multiple handguns would be granted to Plaintiffs if they were to apply. For example, according to Mr. Benton's own statement of facts, he is an "avid gun owner," a member of multiple gun advocacy organizations, and seeks handguns for lawful purposes, such as self-defense. ECF 92-3 ¶¶ 4–6. Mr. Francisco and Mr. Struck assert nearly identical statements of facts. ECF 91-2 ¶¶ 2–4. These facts parallel the statutory elements, which authorize the Superintendent to issue an exemption permit to "any person who devotes time and attention to acquiring firearms for the enhancement of the person's collection," which includes for "recreational" purposes, "defensive purposes," "or any other lawful related

purpose." N.J. Stat. Ann. § 2C:58-3.4(a)(2). An application is strengthened where, as here, the "applicant is a member of an organized gun club … or any other organization dedicated to the acquisition, preservation, or use of firearms for … recreational, … defensive purposes." *Id.* And the statute expressly disavows consideration of "the number of guns in the applicant's collection" or "the merit or validity of the applicant's collecting activities." N.J. Stat. Ann. § 2C:58-3.4(b). So Plaintiffs' "belie[f]," State SOMF ¶ 18, about the law does not control over the law's actual text and operation.[7] *See Lehocky*, 81 F.4th at 384–87 (distinguishing between

---

[7] The Plaintiff associations, which rely almost exclusively on the individual Plaintiffs for their standing, lack standing for the same reasons. *See, e.g.*, *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 279 (3d Cir. 2014). For example, GOF, a non-membership organization, asserts standing through "indicia of membership," *see* ECF 92-4 at 11, but it establishes no fact regarding any member or supporter who has been or will be harmed. *See* ECF 92-3 ¶¶ 16–19. So it does not have standing. *See Nationwide Ins. Independent Contractors Ass'n, Inc. v. Nationwide Mut. Ins. Co.*, 518 Fed. Appx. 58, 63 (3rd Cir. 2013) (holding that the plaintiff association lacked associational standing because the only member it identified—its individual co-plaintiff—had himself failed to allege facts establishing standing); *Kendrick*, 586 F. Sup. 3d at 312 ("The Association Plaintiffs have not demonstrated standing on behalf of their members for the same reasons the Individual Plaintiffs lack standing."). That GOF may have been found to have standing by out of circuit courts in other unrelated lawsuits, *see* ECF 92-4 at 11, does not provide GOF standing here. Similarly, GOA references a veteran member but does not name them, much less give any factual information to establish standing (or explain whether they have applied for an exemption permit). ECF 92-3 ¶ 14. Courts have repeatedly rejected such generalized statements and required associations "to make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *see also New Jersey Physicians, Inc. v. President of U.S.*, 653 F.3d 234, 241 (3d Cir. 2011); *Goode v. City of Philadelphia*, 539 F.3d 311, 325 (3d Cir. 2008); *Kendrick*, 586 F. Supp. 3d at 312;

what a challenged rule said and what plaintiff believed it meant, holding the latter cannot supply injury-in-fact required for standing).

The pre-enforcement standing framework only reinforces their lack of standing because there is no credible or substantial risk of enforcement. That is, because Plaintiffs (or their members) could lawfully purchase multiple handguns in a 30-day period with an exemption permit and have not even attempted to obtain one, there is too much "uncertainty" to conclude that there is "a substantial risk of prosecution." *NSSF*, 80 F.4th at 222. Indeed, Plaintiffs cannot show that their conduct is "forbidden by the Law" because the law allows them to undertake their desired conduct if they received an exemption permit. *Id.* at 219. Plaintiffs have pointed to no evidence that any individual or organizational member has been subject to any enforcement action or has faced prosecution, nor have they shown a history of prior enforcement or prosecution. *Id.* at 220. So there is no basis for pre-enforcement review. *See, e.g.*, *Lehocky*, 81 F.4th at 384 ("no credible threat of enforcement" where planned conduct did "not arguably violate the Rule"); *Fischer v. Gov. of N.J.*, 842 F. App'x 741, 749 (3d Cir. 2021) ("The mere presence of a statute on the law books, standing alone, is insufficient to show a 'credible threat' that the statute will be enforced against a particular plaintiff.").

---

*Comité de Apoyo a los Trabajadores Agrícolas v. Perez*, 148 F. Supp. 3d 361, 372 (D.N.J. 2015).

Through any lens, Plaintiffs' failure to apply for exemption permits means they have failed to establish injury in fact sufficient for standing.

### B. Plaintiffs Have Not Established That Their Alleged Injury Is Traceable To The Challenged Law And Redressable By Their Requested Relief.

Plaintiffs also fail the traceability and redressability prongs of standing. For starters, Plaintiffs have failed to establish that Defendants' enforcement of the Bulk Gun Purchase Law—as opposed to Plaintiffs' (or their members') own inaction in failing to apply for exemption permits—is the cause of their alleged injury. *See, e.g.*, *Finkelman*, 810 F.3d at 198 ("[A]ny harm that [plaintiff] suffered is properly attributed not to the NFL, but rather to his own decision not to enter the ticket lottery[.]"); *see also Clapper*, 568 U.S. at 416 ("[R]espondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending…. Any ongoing injuries that respondents are suffering are not fairly traceable to § 1881a."); *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) ("No [party] can be heard to complain about damage inflicted by its own hand."). So the alleged injury is not fairly traceable to the challenged law.

Beyond that, Plaintiffs cannot establish that any alleged injury can be remedied by an order enjoining the Bulk Gun Purchase Law, so they fail redressability as well. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a

plaintiff into federal court; that is the very essence of the redressability requirement."). Separate from the Bulk Gun Purchase Law, New Jersey law mandates that a licensed firearms dealer "shall not knowingly deliver more than one handgun to any person within any 30-day period" who lacks an exemption permit. N.J. Stat. Ann. § 2C:58-2(a)(7). Plaintiffs have not challenged that statute, so even if Plaintiffs prevailed against the Bulk Gun Purchase Law and could *buy* multiple guns without a permit, New Jersey law would continue to bar firearms dealers from *selling* multiple handguns without a permit.

In such circumstances, "the redressability element is not satisfied if a favorable result would eliminate one of multiple causes of an injury without actually decreasing the injury at all." *Fischer*, 842 F. App'x at 750–51; *see also McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 229 (2003) (plaintiffs lacked standing to challenge one provision of a campaign finance statute because a separate, unchallenged provision independently imposed the same requirement plaintiffs complained about); *We the Patriots, Inc. v. Grisham*, 119 F.4th 1253, 1259–61 (10th Cir. 2024) (challenge to a state executive order would not redress plaintiffs' claimed injury where unchallenged city and county laws independently made it illegal for the plaintiffs to engage in their desired conduct); *Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*, 909 F.3d 446, 465 (D.C. Cir. 2018) (lawsuit failed on redressability grounds where invalidation of the challenged agency policy would do

nothing to relieve the plaintiff's plight so long as a statute prohibiting the same conduct remained in force).

## II. THE BULK GUN PURCHASE LAW IS CONSTITUTIONAL.

Even if the Court reaches the merits, Plaintiffs' claim fails. Under *Bruen*'s two-step test for resolving a Second Amendment challenge to a firearm regulation, Plaintiffs have not met their burden of demonstrating that the Bulk Gun Purchase Law either (i) "clashes with the 'plain text' of the Amendment's language" (*Wolford v. Lopez*, 609 U.S. 185, 195 (2026) (citing *Bruen*, 597 U.S. at 24)) or (ii) "infringe[s] the historical understanding of the codified right." *Id.* at 196 (citing *Bruen*, 597 U.S. at 24). Summary judgment should therefore be granted to Defendants.

### A. The Bulk Gun Purchase Law Is Constitutional At Step One.

At step one, courts examine "the Second Amendment's plain text." *Bruen*, 597 U.S. at 17, to determine whether "the law place[s] any restrictions on either the 'keeping' (*i.e.*, possession) or the 'bearing' (*i.e.*, carrying) of arms[.]" *Wolford*, 609 U.S. at 195 (citation modified). "If a challenged law falls within the plain text of the Second Amendment, it is presumptively unconstitutional." *Id.* But, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626; *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010); *Bruen*, 597 U.S. at 80–81 (Kavanaugh J., concurring); *United States v. Rahimi*, 602 U.S. 680, 690 (2024); *Wolford*, 609 U.S. at 193. The Supreme Court has recognized

that many types of gun regulations lie outside the bounds of the Second Amendment's plain text, such as "shall-issue" laws, *Bruen*, 597 U.S. at 38 n.9, and "laws imposing conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626–27; *McDonald*, 561 U.S. at 787; *Rahimi*, 602 U.S. at 735. The Third Circuit has recently reiterated that there is a "distinction between infringements and incidental burdens," and a regulation only becomes an infringement if it "destroys or illegitimately restricts the right." *Berger*, 189 F.4th at 340. "In short, minimal, objective regulations that are part of the process of buying and selling guns do not infringe. They comport with the 'normal rule' allowing 'incidental burden[s]' on constitutional rights." *Id.* (collecting cases). These laws, like the Bulk Gun Purchase Law, are "presumptively constitutional." *Rahimi*, 602 U.S. at 735 (Kavanaugh, J., concurring); *see also Heller*, 554 U.S. at 627 n.26; *Bruen*, 597 U.S. at 80–81 (Kavanaugh, J., concurring). Therefore, the analysis "should not proceed past step one of *Bruen*." *See Beckwith v. Frey*, 171 F.4th 560, 570 (1st Cir. 2026).

**1. The Bulk Gun Purchase Law Is A Presumptively Constitutional Shall-Issue Regulation.**

The Bulk Gun Purchase Law is a valid and presumptively constitutional component of New Jersey's shall-issue licensing regime. *See State v. Wade*, 301 A.3d 393, 405 (N.J. Super. Ct. App. Div. 2023) (confirming that "New Jersey's gun-permitting scheme" is "a shall-issue regime"). Plaintiffs do not proffer any evidence

otherwise and do not rebut the presumption of constitutionality. So summary judgment should be granted for Defendants.

A shall-issue licensing law exists "where authorities must issue … licenses whenever applicants satisfy certain threshold requirements." *Bruen*, 597 U.S. at 13. "May-issue" laws, in contrast, grant "licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Id.* The Supreme Court "has repeatedly endorsed shall-issue permitting rules" as presumptively constitutional "incidental burdens" at "*Bruen*'s step one." *Berger*, 189 F.4th at 339, 340; *see also Beckwith*, 171 F.4th at 570 (1st Cir. 2026) ("The Act resembles the 'shall-issue' licensing laws …. In our view, this likely renders the Act a burden on, but not an infringement of, the Second Amendment right to keep and bear arms. It also means that our analysis should not proceed past step one of *Bruen*."); *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 222 (4th Cir. 2024) ("'[S]hall-issue' licensing laws are presumptively constitutional and generally do not 'infringe' the Second Amendment right to keep and bear arms under step one of the *Bruen* framework."); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 114 (10th Cir. 2024) ("[S]elf-evidently, if the people, weapons, or conduct at issue are outside the Second Amendment's protection, then the government may regulate them without infringing upon the Second Amendment.").

Indeed, in *Bruen*, the Court emphasized that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of … 'shall-issue' licensing regimes," including required "background check[s] or … firearms safety course[s], which "do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right." 597 U.S. at 38 n.9 (citation modified). When such licensing regimes contain "narrow, objective, and definite standards," they are presumptively constitutional, and that presumption can only be overcome by showing "abusive ends … where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id.*; *see also id.* at 80 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice."); *Yukutake*, 2026 WL 2834831, at *4 ("[O]bjective, non-abusive 'shall-issue' licensing regimes are presumptively constitutional.").

Purchasing a handgun in New Jersey requires obtaining a permit in accordance with the State's permitting laws, and if an individual seeks to purchase multiple handguns in a 30-day period, obtaining an "exemption" permit (if a person does not fall into one of the automatic exceptions). *See* N.J. Stat. Ann. § 2C:58-3(i)(6). Just as the law governing a permit to purchase a handgun is a "shall-issue" licensing law, so too is the Bulk Gun Purchase Law's exemption permit. *Id.*

The Bulk Gun Purchase Law bears this out both in its text and in practice. The statute's text employs "narrow, objective, and definite standards" that apply only to persons seeking to purchase multiple handguns. *Bruen*, 597 U.S. at 38 n.9. The Superintendent "will approve" an application for an exemption permit if the applicant meets the statutory "lawful related purpose" criteria, *see* State SOMF ¶ 4–5, in the same way that a permit to purchase a handgun will be granted if an individual meets the applicable statutory criteria, *see* N.J. Stat. Ann. § 2C:58-3(f). In reviewing an application, that statute contemplates that the Superintendent will focus primarily on the "veracity, accuracy, and completeness of the information provided." N.J. Stat. Ann. § 2C:58-3.4(b). For that reason, if an applicant "satisfies the statutory criteria," N.J. State Police officials processing exemption permit applications have no "discretion to deny." *Bruen*, 597 U.S. at 14–15.

In fact, officials processing exemption permit applications "shall not consider the merit or validity of the applicant's collecting activities." N.J. Stat. Ann. § 2C:58-3.4(b). Officials are authorized to deny an exemption permit *only* if the application indicates "a reasonable likelihood that the public safety would be endangered by granting the exemption," because, for example, "the applicant may be purchasing a handgun to give, sell[,] or distribute to a person who would not qualify to purchase or otherwise acquire a handgun under the provisions of this chapter." *Id*. So long as the applicant seeks the exemption for a "lawful" purpose, the Superintendent must

grant the permit. N.J. Stat. Ann. § 2C:58-3.4(a)(2). That standard comports with *Bruen*'s standard for presumptively constitutional shall-issue licensing laws that "are designed to ensure only that those bearing arms in the jurisdiction are, in fact," 597 U.S. at 38 n.9, buying firearms for "lawful" purposes, *see* N.J. Stat. Ann. § 2C:58-3.4(a)(2); *see also Yukutake*, 2026 WL 2834831, a *2. The Bulk Gun Purchase Law thus qualifies as a presumptively constitutional shall-issue licensing law.

It does not matter that Plaintiffs think it would be more convenient to purchase multiple handguns without applying for an exemption permit. ECF 92-4 at 5, 23. The Constitution "does not elevate convenience and preference over all other considerations." *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024) (citation modified); *Berger*, 189 F.4th at 340 (similar). Plaintiffs may *prefer* to purchase as many handguns as they would like in a single 30-day period in a single transaction without needing to obtain a permit first, but the need to take the single additional step of obtaining an exemption permit does not "deny ordinary citizens" their right to keep and bear arms, *Bruen*, 597 U.S. at 38 n.9. Because the Bulk Gun Purchase Law expressly allows Plaintiffs to do exactly what they want—purchase multiple handguns—Plaintiffs cannot overcome the Bulk Gun Purchase Law's presumptive constitutionality.[8]

---

[8] The *Struck* Plaintiffs' outright failure to address this presumption is fatal to their step-one arguments.

### 2. The Bulk Gun Purchase Law Is A Presumptively Constitutional Commercial Regulation.

The Bulk Gun Purchase Law is also a presumptively constitutional regulation because it regulates the commercial "purchase[]" of a firearm from a licensed retailer and does not criminalize mere possession. *See Rocky Mountain Gun Owners*, 121 F.4th at 120 ("[A] presumption that laws imposing conditions and qualifications on the commercial *sale* of arms are lawful extends equally to laws imposing conditions and qualifications on the commercial *purchase* of arms."); *United States v. James*, 677 F. Supp. 3d 329, 342–43 (D.V.I. 2023) ("[A] commercial regulation" qualifies as presumptively lawful if "it targets the transfer of the firearm and does not criminalize mere possession."). Indeed, binding Third Circuit precedent and the Bulk Gun Purchase Law's text and application confirm that it is a "minimal, objective buying-and-selling regulation." *See Berger*, 189 F.4th at 340 (holding that "minimal, objective regulations that are part of the process of buying and selling guns do not infringe" on the Second Amendment but rather "comport with the normal rule allowing incidental burdens on constitutional rights" and thus "are outside the scope of the Second Amendment" (citation modified)).

The Third Circuit has already held that the Bulk Gun Purchase Law "allows applications for exemptions from [any] restriction," and it "is evident that this is not a complete prohibition" nor "so onerous as to be a *de facto* prohibition." *Ass'n New Jersey Rifle & Pistol Clubs v. Governor of New Jersey*, 707 F.3d 238, 240 (3d Cir.

2013). Much like the appellants in *Gazzola v. Hochul*, Plaintiffs here have not shown "that the [Bulk Gun Purchase Law] is so restrictive that it threatens a citizen's right to acquire firearms." 88 F.4th 186, 196–97 (2d Cir. 2023) (upholding New York commercial regulation that required sellers to make various changes to their business practices, *e.g.*, securing firearms in a locked fireproof safe or vault after hours and requiring security alarms, was not so burdensome that it infringed the Second Amendment). Nor have Plaintiffs demonstrated that the Bulk Gun Purchase Law "meaningfully inhibits [them] from acquiring firearms." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 679-80 (9th Cir. 2017) (finding California zoning law that required gun stores to be more than 500 feet away from certain establishments did not meaningfully restrict the Second Amendment because customers could still purchase freely within the county). Plaintiffs' reliance on these cases only highlights their failure to rebut the Bulk Gun Purchase Law's presumptive constitutionality.

The text of the law confirms that it does not threaten any citizen's right to acquire firearms. The Bulk Gun Purchase Law consists of two parts. N.J. Stat. Ann. § 2C:58-3(i) sets forth the main portion of the law (and automatic exemptions), and N.J. Stat. Ann. § 2C:58-3.4 sets forth the further exemptions to 3(i) that can be obtained by permit. *Compare Jacobs v. Geisinger Wyo. Med. Ctr.*, No. 21-3362, 2022 WL 1564193, at *2 (3d Cir. May 18, 2022) ("The words of a statute cannot be read in isolation, and instead 'must be read in their context and with a view to their place

in the overall statutory scheme.'" (quoting *Mejia-Castanon v. Att'y Gen. of U.S.*, 931 F.3d 224, 234 (3d Cir. 2019))), *with* N.J. Stat. Ann. § 2C:58-3(i)(6) (expressly exempting application of the Bulk Gun Purchase Law in "any transaction where the superintendent issues an exemption from the prohibition in this subsection pursuant to the provisions of section 4 of P.L. 2009, c. 186 (C.2C:58-3.4)."). Plaintiffs misunderstand N.J. Stat. Ann. § 2C:58-3.4, *see* ECF 91-1 at 3 and ECF 92-4 at 5, the very portion of New Jersey's law that *permits* the precise conduct they claim is prohibited.

In other words, the Bulk Gun Purchase Law quite simply does not prohibit Plaintiffs from purchasing multiple handguns for lawful purposes. As Mr. Benton admits, the Bulk Gun Purchase Law has not stopped him from becoming "an avid gun owner." ECF 1-3 ¶ 2. And Mr. Struck and Mr. Francisco both admit that, notwithstanding the Bulk Gun Purchase Law, they are "capable" of seeking an exemption permit to purchase multiple handguns but have decided not to do so. State SOMF ¶¶ 14–15. The same is true of all similarly situated members of all Organizational Plaintiffs. *See* State SOMF ¶¶ 11 (CNJFO), 12 (GOA), 16 (FPC), 17 (NRA). Plaintiffs' decision not to apply for an exemption permit is not the same as Defendants prohibiting them from purchasing firearms.

The law's application bears this out. Over the past five years, 3,065 exemption permit applications were submitted to the New Jersey State Police. State SOMF ¶ 3.

And 2,347 (76%) of those exemption permit applications were granted, *id.*, so the applicants can purchase multiple handguns for "lawful related purpose[s]," including "investment, training and competitive, recreational, educational, scientific, or defensive purposes," N.J. Stat. Ann. § 2C:58-3.4(a)(2). Of the remaining 24% of exemption permit applications that were submitted but not approved, some may have just been incomplete or the applicant may have failed to "follow through with it." State SOMF ¶ 3. Others may have been denied due to information revealing public safety concerns, such as "instances where the applicant may be purchasing a handgun to give, sell or distribute to a person who would not qualify to purchase or otherwise acquire a handgun under" the State's shall-issue licensing laws, N.J. Stat. Ann. § 2C:58-3.4(b). Just as importantly, the Bulk Gun Purchase Law does not limit the number of exemption permits a person can seek within a single thirty-day period. State SOMF ¶ 8. And each exemption permit can authorize the purchase of up to 99 handguns within a single thirty-day period. *Id.* at ¶ 9. So, in total, an applicant can obtain exemption permits to purchase 2,970 handguns every thirty days. The Bulk Gun Purchase Law does not prohibit bulk purchasing; it merely conditions it on obtaining a permit that Plaintiffs have chosen not to obtain. So it can hardly be understood as a ban or prohibition on keeping and bearing firearms.

Courts across the country agree that the Second Amendment's plain text does not invalidate commercial regulations that do not ban or prohibit the right to keep

and bear arms. *See Rocky Mountain Gun Owners*, 121 F.4th at 120 ("laws imposing conditions and qualifications on the sale and purchase of arms do not implicate the plain text of the Second Amendment"); *B & L Prods., Inc.*, 104 F.4th at 119 ("[C]ommercial restrictions presumptively do not implicate the plain text of the Second Amendment at the first step of the *Bruen* test."); *Knight v. City of New York*, No. 22-3215, 2024 WL 1126309, at *6 (S.D.N.Y. Jan. 17, 2024) (state law "requiring a 90-day waiting period after the purchase of one firearm before the purchase of a second firearm … does not concern the possession of a firearm in the home or in public for self-defense—the core conduct protected by the Second Amendment"), *adopted in part report and recommendation*, 2024 WL 1096991, at *3 (S.D.N.Y. Mar. 13, 2024), *affirmed in part*, 164 F.4th 173, 178 (2d Cir. 2026); *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 209 ("The Court finds that the relevant conduct—acquiring a firearm through a commercial transaction on-demand—is not covered by the plain text of the Second Amendment."); *accord Mills v. New York City*, 758 F. Supp. 3d 250, 264 (S.D.N.Y. 2024) (upholding the challenged rules because they permitted "anyone with a general desire to obtain a gun [to do so] upon fulfilling certain predominantly non-discretionary administrative requirements and paying a fee"); *Rocky Mountain Gun Owners v. Polis*, 701 F. Supp. 3d 1121, 1136 (D. Colo. 2023), *appeal dismissed*, No. 23-1380, 2024 WL 5010820, at *1 (10th Cir. 2024) ("Because it imposes a condition on the commercial sale of a

firearm, the Act is presumptively lawful under *Heller*" and upholding the Act because Plaintiffs failed to rebut the presumption of constitutionality "by demonstrating that the plain text of the Second Amendment covers the immediate receipt of a purchased firearm.").

None of the cases Plaintiffs cite have held that commercial regulations that only incidentally burden, but do not infringe, the Second Amendment are unconstitutional. Plaintiffs' reliance on the Third Circuit's pre-*Bruen* decision in *Drummond v. Robinson Township*, 9 F.4th 217 (3d Cir. 2021), is one example. In dicta, *Drummond* stated that "the Second Amendment's scope ... 'implies a corresponding right to acquire and maintain proficiency' with common weapons." *Id.* at 227. But *Drummond* relied on *Ezell v. City of Chicago*, a case in which plaintiffs challenged a local ordinance that required the completion of a firearm-safety and training course but prohibited *all* shooting ranges and "the discharge of any firearm within the city." 651 F.3d 684, 691 (7th Cir. 2011). So the Seventh Circuit invalidated the ordinance and held that "[t]he right to possess firearms for protection implies a corresponding right to *acquire and maintain proficiency* in their use; the core right wouldn't mean as much without the training and practice that make it effective." *Id.* at 704 (emphasis added). The Bulk Gun Purchase Law does not impose a burden that prevents the meaningful exercise of the core right to possess firearms for self-defense. *Drummond* itself recognized that "no court, modern or

otherwise, [has held] that the Second Amendment secures a standalone right to *sell* guns." 9 F.4th at 230. Indeed, the Third Circuit has recently clarified that *Drummond*'s "explicit lesson ... is that it matters whether a commercial regulation impinges upon the 'right to possess and carry weapons in case of confrontation.'" *United States v. Clerfe*, 186 F.4th 141, 147 (3d Cir. 2026) (quoting *Heller*, 554 U.S. at 592).

Nor does *Rigby v. Jennings* alter this conclusion. No. 21-1523, 2026 WL 2664371 (D. Del. Sept. 10, 2026). There, the court upheld Delaware's "Distribution Ban" as a presumptively valid commercial regulation that passed "under *Bruen*'s first step," *id.* at *8–9, but it found the "Possession Ban" and "Manufacturing and Assembly Ban" unconstitutional because they restricted "Arms" and "keeping and bearing," respectively, and failed *Bruen*'s first step, *id.* at *7–8, 9–10. Plaintiffs cite from the *Rigby* court's discussion of the "Manufacturing and Assembly Ban," but, the court noted that although Delaware's "Possession Ban" and "Manufacturing and Assembly Ban" regulations failed *Bruen*'s first step, the decision should not be interpreted to say that other regulations on these firearms would always fail at the first step. *See id*. at *11.

In addition, the out-of-circuit cases cited by Plaintiffs are not only non-binding but also fail to support Plaintiffs' claimed right to buy guns in bulk without a permit. Notably, in *Nguyen*, the Ninth Circuit struck down a California law that, unlike the

challenged Bulk Gun Purchase Law here, "establishe[d] no exemption or pathway by which a law-abiding citizen c[ould] purchase more than one firearm within a 30-day period." 140 F.4th at 1248. By contrast, the Bulk Gun Purchase Law *does* contain an exemption for "lawful purposes," which Plaintiffs declined to use. State SOMF ¶¶ 11–12, 14–17; *see also Clerfe*, 186 F.4th at 147 (holding that "[i]f there [were] a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms" (citation modified)). And in *Ortega v. Grisham*, the panel reversed an order declining to preliminarily enjoin a New Mexico law imposing a seven-day "cooling-off" period on all firearm transfers because the "blanket waiting period prevent[ed] citizens from possessing a firearm for a flat period [was] an infringement on the right to bear arms." 148 F. 4th 1134, 1144–45 (10th Cir. 2025). The Tenth Circuit further stated that "the government cannot delay the exercise of a right because it believes that citizens might misuse it without sufficient time to reflect beforehand." *Id.* at 1145. The Bulk Gun Purchase Law is fundamentally different: it *allows* individuals to purchase a handgun by obtaining a handgun purchase permit or multiple handguns by obtaining an exemption permit, unlike the law at issue in *Ortega* that *prohibited* keeping and bearing an arm during a defined period of time.

Plaintiffs also cite *Andrews v. State*, 50 Tenn. 165 (1871), a nineteenth century case from Tennessee state court, but ignore the court's overall holding. *Andrews* held

that a portion of a Tennessee law that criminalized the carrying of revolvers amounted "to a prohibition to keep and use such weapon for any and all purposes [and] violate[d] the constitutional right to keep arms." 50 Tenn. at 187. In dicta, the court acknowledged that the Second Amendment "necessarily involves the right to purchase," *id.* at 178, but ultimately held that the state can pass laws that ensure "public peace, and the protection and safety of the community from lawless violence," *id.* at 187–88. A Tennessee Supreme Court case from 1871 does not invalidate "presumptively lawful regulatory measures." *See Heller*, 554 U.S. at 627 n.26.[9]

In the end, Plaintiffs cannot rebut the presumptive constitutionality of the commercial purchase restrictions—which merely require a permit—at issue here.

[9] Plaintiffs also rely on *Reese v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 127 F.4th 583 (5th Cir. 2025), and *United States v. Gore*, 118 F.4th 808 (6th Cir. 2024), for the proposition that the Second Amendment protects a right to purchase guns. ECF 91-1 at 7; ECF 92-4 at 21 (citing to *Reese* only). But these cases are inapposite because the Fifth and Sixth Circuits did not consider whether the challenged laws at issue were presumptively constitutional commercial regulations like the Bulk Gun Purchase Law and, in any event, the provisions Plaintiffs cite are dicta. *See Reese*, 127 F.4th at 595–600 (finding 18 U.S.C. §§ 922(b)(1) and (c)(1) unconstitutional because 18 to 20 year olds are part of the "people" and defendants could not meet *Bruen* step two); *Gore*, 118 F.4th at 813–17 (holding that 18 U.S.C. § 922(n) survives a facial challenge even though the Second Amendment covered the conduct at issue because the law's limited prohibitions could be permissibly applied in specific instances in line with our Nation's history and tradition).

**B. The Bulk Gun Purchase Law Is Consistent With The Nation's Regulatory Tradition At Step Two.**

The Bulk Gun Purchase Law is also constitutional at *Bruen*'s step two because it is "consistent with the principles that underpin the Nation's regulatory tradition." *Rahimi*, 602 U.S. at 681; *see also United States v. Hemani*, 608 U.S. 772, 780 (2026) ("[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition.").

In determining whether a law is consistent with historical tradition, courts look to "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 681 (quoting *Bruen*, 597 U.S. at 29). There is no requirement that a modern law be a "dead ringer" in order "to pass constitutional muster." *Bruen*, 597 U.S. at 30. Instead, courts are tasked with "reasoning by analogy," which means determining "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 28–29. Assessing "[w]hy and how the regulation burdens the right are central to this inquiry." *Rahimi*, 602 U.S. at 692; *Hemani*, 608 U.S. at 773 ("The more closely a contemporary law mirrors a well-established historical analogue in purpose and operation, the more likely it is to be upheld." (citation modified)).

Contrary to Plaintiffs' arguments, *see* ECF 91-1 at 9, courts must discern "evidence of th[e] principles" that underpin our regulatory tradition from "not just

'those regulations … that could be found in 1791,'" but also from "laws 'through the end of the 19th century.'" *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 441 (3d Cir. 2025) (first quoting *Rahimi*, 602 U.S. at 692; and then quoting *Bruen*, 597 U.S. at 35). That is because nineteenth century laws "can be evidence of a historical tradition and shed important light on the meaning of the Amendment as it was originally understood." *Id.* Indeed, courts need not decide whether to rely on Founding-era or Reconstruction-era evidence if there is no direct conflict between them. *See Bruen*, 597 U.S. at 38. If English law, Founding-era law, and 19th-century law all point in the same direction, the court should consider them all. *See id.*; *Lara*, 125 F.4th at 441; *Schoenthal v. Raoul*, 150 F.4th 889, 913 (7th Cir. 2025) ("[W]e and other circuits concur that evidence stretching into the nineteenth century is useful to a *Bruen* inquiry."); *McCoy v. BATFE*, 140 F.4th 568, 574–75 (4th Cir. 2025).

Moreover, because courts cannot "'assume[] that founding-era legislatures maximally exercised their power to regulate' conduct," *Pitsilides v. Barr*, 128 F.4th 203, 209 (3d Cir. 2025) (quoting *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring)), an absence of Founding-era regulation does not mean such regulation is constitutionally prohibited, *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring) (rejecting "'use it or lose it' view of legislative authority"). To the contrary, courts regularly rely on evidence from the Reconstruction era if there is little Founding-era evidence on point. *See, e.g.*, *Christian v. James*, 176 F.4th 189, 195 (2d Cir. 2026)

(holding that "even where there is an absence of Founding-era evidence ... we may focus on later evidence, especially from the Reconstruction era, to ascertain the scope of the Second Amendment right" (citation modified)); *Gamble v. United States*, 587 U.S. 678, 685–86 (2019) (citing cases from 1847, 1850, and 1852 to construe the Double Jeopardy Clause); *Timbs v. Indiana*, 586 U.S. 146, 152 (2019) (citing evidence "in 1868 upon ratification of the Fourteenth Amendment" as evidence of understanding the Excessive Fines Clause).

The full breadth of the historical tradition is especially important to consider when applying that tradition to evolving technologies and social problems. *See Wolford*, 609 U.S. at 197–98; *Zherka v. Bondi*, 140 F.4th 68, 79 (2d Cir. 2025) ("[T]he modern concerns that [challenged laws] addressed, and continue to address, diminish the government's burden of drawing a tight historical analogy" to the challenged law). Since *Bruen*, the Supreme Court has emphasized that courts should identify historical principles at a higher level of generality when challenged regulations "implicat[e] unprecedented societal concerns or dramatic technological changes," because today's concerns are not "the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." 597 U.S. at 27. The need to examine historical regulations in that way arises not only when social or technological change presents a novel issue, but also when society's understanding of the problem has changed with time. For example, women have "feared [] domestic

violence" since the Founding, *Rahimi*, 602 U.S. at 763 (Thomas, J., dissenting), but it is not until relatively recently that legislatures intervened to handle the "potentially deadly combination" of "firearms and domestic strife." *Voisine v. United States*, 579 U.S. 686, 689 (2016).

As discussed in more detail below, *see infra* Roman II.B.1-2, the Bulk Gun Purchase Law fits neatly within the Nation's historical regulatory tradition. First, as to the "how," it uses quantity limits and licensure requirements to regulate arms sales. These types of regulation date back to the 1600s and have been present in every era since. Second, as to the "why," it prevents certain persons from possessing firearms obtained through secondary distributions to prevent downstream criminal trafficking and public danger. There is a long history of regulations being imposed and enforced for these reasons. In these ways, the Bulk Gun Purchase Law is "'relevantly similar' to laws that our tradition is understood to permit.'" *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29).

**1. There Is A Longstanding National Regulatory Tradition Of Quantity Limits And Licensure Requirements On Firearms.**

Firearms were not widely commercially available or feasible to purchase in bulk during the Founding Era due to high costs and the lack of large-scale retail enterprises, *see* State SOMF ¶ 26–33. Even with this practical limitation on "the number of firearms a buyer could purchase at a given time," *id.* ¶ 32, since at least the 1600s, States still imposed quantity restrictions and licensing requirements as a

means of regulating the purchase of firearms and secondary markets, *see id.* ¶¶ 48–60. For example, in 1676, the Virginia colony limited individual firearms possession to only "one gunn and tenn charges of powder and shott" in any geographic areas that the legislature deemed more susceptible to illegal trafficking. *Id.* ¶ 48. Likewise, in 1827, New Haven, Connecticut, limited the quantity of gunpowder a person could possess to "one pound." *Id.* ¶ 50. And in 1857, New Jersey similarly restricted the possession of gunpowder to no more than "two pounds" of gunpowder at a time, although persons could possess greater quantities if the powder was stored "in a magazine at least fifty feet distance from any building." *Id.* ¶ 50.

As a "minimal, objective buying-and-selling regulation[]," *Berger*, 189 F.4th at 340, the Bulk Gun Purchase Law is part of this history and tradition of limiting quantities of firearms and related materials. *Compare* State SOMF ¶¶ 48–59, *with* N.J. Stat. Ann. § 2C:58-3(i). The 1857 New Jersey law, in particular, imposed quantity limits with exceptions available if certain conditions were met, just as the Bulk Gun Purchase Law provides an exception for multiple handguns if any person obtains an exemption permit. *Compare* State SOMF ¶ 51, *with* N.J. Stat. Ann. § 2C:58-3(i)(6).

In addition to quantity limits, licensing of firearms purchases has a robust historical pedigree. "[L]icensing as a regulatory tool is an old policy technique, dating to the 1600s." State SOMF ¶ 52. It was historically used to regulate both the

possession and sale of arms, and to regulate secondary markets of goods. For example, in 1689, New Hampshire law prohibited commerce in arms without first obtaining a license. *Id.* ¶ 54. Licensing was also used to regulate commerce in arms. *Id.* ¶¶ 53, 55, 56. In 1642, the Connecticut colony required a license to engage in commerce in certain goods.[10] *Id.* ¶ 53. These laws underscore that licensing was an accepted method of regulating both possession and purchasing and selling of arms, from early colonial times into the mid-nineteenth Century. *See, e.g.*, *id.* ¶ 55 (1814 Illinois licensing law).

Licensing has also been used throughout history to regulate secondary markets and prevent unlawful trade. For example, in 1802, New York required a license for "pawn brokers, and dealers in sale of second hand" goods. *Id.* ¶ 56. Later, in 1812, New York included categorical restrictions on persons with whom a licensed secondary market proprietor could deal, to regulate unlawful trading, which Philadelphia adopted in 1821. *Id.* ¶¶ 57, 58. Comparable licensing laws regulating secondary markets also existed during and after the Civil War. *Id.* ¶¶ 59, 60.

---

[10] Courts interpret historical laws applicable to goods generally as also applicable to firearms specifically in the absence of any express exclusions of firearms. *Cf. United States v. Giglio*, 126 F.4th 1039, 1044 (5th Cir. 2025) (applying *Rahimi*'s "the greater-includes-the-lesser-argument" to historical forfeiture laws applicable to "all chattels" and finding them sufficient to "justify the narrower practice of prohibiting possession of *some* (*viz.*, firearms)").

Relying on the Ninth Circuit's analysis in *Nguyen*, Plaintiffs argue that State Defendants' historical analogues are inapplicable because there is no historical precedent for what Plaintiffs refer to as "[h]andgun-rationing laws."[11] ECF 91-1 at 13–18; ECF 92-4 at 25–26. But the Bulk Gun Purchase Law does not "ration" guns; it allows *anyone* to buy multiple handguns for lawful purposes with a license.[12] N.J. Stat. Ann. § 2C:58-3(i)(6). In *Nguyen*, in stark contrast, the California "law establishe[d] no exemption or pathway by which a law-abiding citizen can purchase more than one firearm within a 30-day period," 140 F.4th at 1248.[13] Here, the Bulk

[11] Plaintiffs also contend that an "exceedingly small minority of [S]tates [] have ever adopted" laws similar to New Jersey's Bulk Gun Purchase Law, ECF 91-1 at 13, and so it must be affirmatively unconstitutional. Besides the fact that Plaintiffs have offered no contrary evidence that such analogous licensing laws were struck down as unconstitutional, their arguments amount to the "'use it or lose it' view of legislative authority" that Justice Barrett warned against as a flawed "assumption[]" originalism does not "require." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring).

[12] Contrary to Plaintiffs' assertion, the Bulk Gun Purchase Law does not "*prohibit*[] an entire population of law-abiding citizens from buying additional handguns within a period of time." ECF 91-1 at 16. Rather, the challenged shall-issue licensing law permits individuals to purchase more than one handgun in a single thirty-day period but the purchaser must first obtain a basic FPIC and then apply and obtain an exemption permit. This "incidental burden," *see Berger*, 189 F.4th at 340, is a far cry from the blanket prohibition Plaintiffs claim.

[13] Plaintiffs also cite to the D.C. Circuit's pre-*Bruen* decision in *Heller v. District of Columbia ("Heller III")*, 801 F.3d 264, 280 (D.C. Cir. 2015), to support their argument that "[o]ther courts to consider laws similar to New Jersey's" Bulk Gun Purchase Law "have found them to be unconstitutional." *See* ECF 91-1 at 2. Besides predating the *Bruen* two-prong test that courts must apply in Second Amendment challenges, the challenged law in *Heller III* differs in an important way from the

Gun Purchase Law contains exactly such an exemption. *See* N.J. Stat. Ann. § 2C:58-3(i)(6). Plaintiffs have chosen not to obtain that exemption. No matter the reason for that choice, the fact remains that the law itself (i) is fully consistent with a rich history and tradition of licensing laws, and (ii) expressly permits Plaintiffs to purchase as many guns as they need for lawful purposes.

The Supreme Court has instructed courts to consider whether "any analogue or collection of analogues is relevantly similar to the modern law."[14] *Wolford*, 609

---

challenged law here. The challenged law in *Heller III* required the "*registration* of more than one pistol per person in any 30-day period," 801 F.3d at 270 (emphasis added), as compared the challenged law here, which allows individuals to *purchase* one handgun in any single thirty-day period with a basic FPIC, and to *purchase* multiple handguns in any single thirty-day period with an "exemption" permit available under N.J. Stat. Ann. § 2C:58-3.4. With that distinction in mind, the court in *Heller III* struck down the one-gun-a-month registration law, finding the "little expert testimony" the defendants offered indicated only "that limiting gun *purchases* in turn might limit trafficking in weapons," not that "limiting gun *registrations* would likewise reduce trafficking." *Id*. at 280 (emphasis added).

[14] While the Ninth Circuit has concluded that "arms trafficking is not a new problem," *Nguyen*, 140 F.4th at 1244, the commercial availability of firearms—as well as the ability to purchase firearms in bulk—is a feature that did not exist in 1791. *See* State SOMF ¶¶ 26–33. Moreover, both the governmental systems designed to track firearm purchases and criminal histories to prevent future criminal misuse of firearms, *see id.* ¶¶ 34–36, as well as the interstate transit infrastructure that facilitates nationwide secondary distributions of unlawful firearms to criminals via private modes of transit, *see id.* ¶¶ 43–47, likewise did not exist in 1791. So at the very least, while "arms trafficking" may not in fact be "a new problem," *Nguyen*, 140 F.4th at 1237, "technological changes," *Bruen*, 597 U.S. at 27, have made it a "distinctively modern," problem, *see Wolford*, 609 U.S. at 198, warranting a more nuanced approach today than at other points in American history.

U.S. at 196 (citation modified). Notwithstanding Plaintiffs' objections to the historical evidence State Defendants have proffered, ECF 91-1 at 14–18; ECF 92-4 at 25–28, the "putative analogue need not be a dead ringer or historical twin" to the modern law. *See Wolford*, 609 U.S. at 197 (citation modified). The government need only "identify a well-established and representative historical *analogue*." *Bruen*, 597 U.S. at 30. As discussed above, quantity limits on arms and shall-issue licensing are long-accepted means of combatting arms trafficking. *See supra* at 41-45. The multiplicity and diversity of these laws suggest, just as in *Rahimi*, that no single law reached the outer boundaries of acceptable state authority.[15] Instead, the varied means States employed—consistent with our federalist system—affirm that New Jersey's approach "fits neatly" within the regulatory tradition. *Rahimi*, 602 U.S. at 698; *cf. Lara*, 125 F.4th at 441; *see also Wolford*, 609 U.S. at 198 (noting that "*Heller*'s history-based methodology ... is not mechanical").

### 2. There Is A Longstanding National Regulatory Tradition Of Preventing The Criminal Trafficking Of Firearms.

Throughout the Nation's history, governments have enforced laws designed to stop criminal gun trafficking. That includes "a long historical tradition concerning

[15] The *Benton* Plaintiffs cite to laws from the 1600s in support of their argument that "the historical record evinces a contrary tradition of multiple handgun purchases." ECF 92-4 at 26–27. But the existence of these laws does not negate the evidence State Defendants put into the record of historical laws regulating secondary markets. *See, e.g.*, State SOMF ¶¶ 59–60. And again, the Bulk Gun Purchase Law *allows* multiple handgun purchases.

'categories of persons thought by a legislature to present a special danger of misuse.'" *United States v. VanDyke*, 157 F.4th 1082, 1083 (9th Cir. 2025) (quoting *Rahimi*, 602 U.S. at 698). Indeed, "governments in England and colonial America long disarmed groups that they deemed to be dangerous." *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024); *see also id.* at 653–54 (examining 17th-century English and Founding-era laws); *Kanter v. Barr*, 919 F.3d 437, 456–58 (7th Cir. 2019) (Barrett, J., dissenting) (same). Those categories historically included persons "perceived to be dangerous" if armed. *Koons v. Platkin*, 673 F. Supp. 3d 515, 563–69 (D.N.J. 2023) (examining English common law, medieval English decrees, colonial laws, state constitutional convention proposals, post-ratification laws, and Reconstruction-era laws), *aff'd in part*, *vacated in part*, *rev'd in part sub nom. Koons v. Att'y Gen. New Jersey*, 156 F.4th 210 (3d Cir. 2025), *as amended* (Sept. 17, 2025), *reh'g en banc granted*, *opinion vacated*, 162 F.4th 100 (3d Cir. 2025).

Historically, persons falling within these categories need not "have demonstrated a proclivity for violence" to be presumptively disarmed; the belief that their "possession of guns *would* otherwise threaten the public safety" was enough. *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (emphasis added). If someone "would likely pose a physical danger to others if armed," *Pitsilides*, 128 F.4th at 210 (citation modified), legislatures were historically free to use "present-day judgments about categories of people whose possession of guns would endanger the public

safety," *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting); *see Rahimi*, 602 U.S. at 697 (discussing historical laws that "provided a mechanism for preventing violence before it occurred").

The Bulk Gun Purchase Law is a shall-issue licensing law designed to screen out dangerous individuals who may engage in criminal gun trafficking, a problem often initiated by multi-gun purchases. *See* State SOMF ¶¶ 62–63; *see also* Press Release, New Jersey Office of the Governor, Governor Corzine Signs One-Gun-A-Month Handgun Legislation (Aug. 9, 2009), https://tinyurl.com/3zzxwmfz (Bulk Gun Purchase Law is designed "to prevent 'straw' gun purchasers and curtail the number of weapons in the hands of criminals"). New Jersey State Police look for signs of "straw purchasing" as a specific illegal purpose for purchasing multiple handguns in a single transaction that the exemption permit application process is designed to screen and prevent. *See* State SOMF ¶ 7. That is also why the Legislature expressly provided that an exemption permit will be denied if "the applicant may be purchasing a handgun to give, sell[,] or distribute to a person who would not qualify to purchase or otherwise acquire a handgun under the provisions of this chapter." N.J. Stat. Ann. § 2C:58-3.4. So long as Plaintiffs do not intend to purchase guns in bulk for the purpose of illegal trafficking, there is little reason they cannot apply for and obtain a permit to buy as many guns as they wish.

Laws designed to disarm certain groups believed to be dangerous if armed pre-exist, existed during, and have existed since the Founding-era. For example, in 1676, Virginia restricted arms trading with Natives, *see* State SOMF ¶ 61, based on the "fear of an armed insurrection" that also motivated later categorical prohibitions of arms possession by certain groups, *see Koons*, 673 F. Supp. 3d at 566 (citing eighteenth century Catholic allegiance and loyalist laws dating from 1713 to 1777, including one New Jersey law that categorically disarmed those presumed to be "dangerous"). These categorical prohibitions "show that the Founders did not hesitate to disarm individuals they found to be dangerous or a threat to the public safety." *Id.* at 566.

This tradition continued after ratification and the Civil War. *See, e.g.*, *id.* at 568–69 (identifying early 19th century surety laws and 1866 decree disarming "disorderly person[s], vagrant[s], and disturber[s] of the peace"). All this evinces "a historical tradition in this Nation of prohibiting … those who would endanger the public from having firearms" in order to "protect the public from a person who will misuse a firearm." *Id.* at 569. A common thread throughout these laws is that, as noted, legislatures often made predictive judgments about whether a certain group should be presumptively disarmed. *See Hemani*, 608 U.S. at 789 (discussing how surety laws "applied to those who posed some present or future danger" (citation modified)); *VanDyke*, 157 F.4th at 1088 ("Categorical disarmament is based on

legislatively presumed danger, rather than an individualized assessment of risk."); *United States v. Jackson*, 110 F.4th 1120, 1128 (8th Cir. 2024) ("Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed."). Here, the Legislature applied this principle to treat unlicensed bulk purchases of guns as a "red flag" indicating potential straw purchasing and/or trafficking likely to allow criminals to illegally acquire firearms.

The Bulk Gun Purchase Law also fits neatly within the Nation's history and tradition of preventing criminality associated with access to guns trafficked in unlawful secondary markets. That tradition existed for similar reasons: preventing and disrupting the "inherent connection to criminal activity" associated with secondary gun markets. State SOMF ¶ 65. Historically, secondary markets consisted of distribution points like pawn shops, secondhand stores, junk stores, scrap dealers, and auction houses, all of which were reputed sites for reselling and trading goods. *See id.* ¶¶ 66, 68. Close regulation of these markets traces back to at least 1802, which continued through to the antebellum and Civil War periods, and through to the post-bellum period as well. *See id.* ¶¶ 56–60. That sustained history of regulation of secondary markets underscores that secondary markets were closely regulated to prevent the criminality associated with unlawful secondary distributions of goods, *see id.* ¶¶ 64–68, which is precisely what the Bulk Gun Purchase Law does vis-à-vis

secondary distributions of firearms purchased in multi-gun sales and then privately trafficked.

The Bulk Gun Purchase Law's purpose is to prevent straw purchasing and illegal gun trafficking by prohibiting unrestricted bulk sales, while providing a means for law-abiding citizens to obtain a permit to buy as many guns as they like for lawful purposes pursuant to a permit. This purpose—this "why"—is fully consistent with that nation's historical regulatory tradition and therefore does not infringe upon the Second Amendment.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their cross-motion for summary judgment in full and deny Plaintiffs' motions.

Respectfully submitted,

Dated: October 26, 2026

JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY

By: */s/ Amanda I. Morejón*
Amanda I. Morejón
Deputy Attorney General