**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CHRISTIAN BENTON *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>JENNIFER DAVENPORT,*<br><br>*Defendants*. | Hon. Karen M. Williams, U.S.D.J.<br>Hon. Matthew J. Skahill, U.S.M.J.<br><br>Civil Action<br><br>Docket No. 1:24-cv-7098<br>Docket No. 3:24-cv-9479<br>(Consolidated) |
| MATTHEW STRUCK *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>JENNIFER DAVENPORT, *et al.*,<br><br>*Defendants*. | |

STATE DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

* The captions have been revised to reflect the present Attorney General of New Jersey Jennifer Davenport. *See* Fed. R. Civ. P. 25(d) ("The officer's successor is automatically substituted as a party.")

Pursuant to Federal Rule of Civil Procedure 56 and D.N.J. Local Civil Rule 56.1, State Defendants submit the following Statement of Material Facts Not in Dispute:

**Individuals Seeking to Purchase More Than One Handgun in a Thirty-day Period May Do So If They Apply for and Obtain an Exemption Permit.**

1. In New Jersey, applications for a "multi-handgun exemption" permit allowed pursuant to N.J. Stat. Ann. § 2C:58-3.4 are received and processed by the Firearms Regulatory Investigative Bureau and Firearms Dealer Investigation Unit of the N.J. State Police. *See* Decl. of Amanda Morejón Ex. A, Tr. of 30(b)(6) Dep. of Detective Sergeant First Class Matthew Daiello (hereafter "Daiello Dep.") at 14:8–9; 15:21–16:15.

2. "[A]nyone" seeking to purchase more than one handgun within a thirty-day period may do so if they first obtain an exemption permit, and anyone can apply for such a permit via an online "application portal" managed by N.J. State Police. *See* Daiello Dep. at 43:17–21; 46:4–7.

3. In the past five years, 3,065 exemption permit applications were submitted to the N.J. State Police. *See* Daiello Dep. at 23:16–18. Of those 3,065 applications, N.J. State Police granted 2,347 exemption permits. *See id.* at 22:9–15; 42:14–43:1. Of the exemption permit applications that were submitted but not approved, some may have just been incomplete or the applicant may have failed to "follow through with it." *Id.* at 22:14-24; 23:16–24:3.

4. An exemption permit is granted if the applicant satisfies the statutory criteria requiring that the multiple handguns sought to be purchased within a single thirty-day period are being purchased for a "lawful related purpose." *See* Daiello Dep. at 31:16–20.

5. If an individual applying for an exemption permit meets that standard, then N.J. State Police "will approve" the permit. *See* Daiello Dep. at 48:2–5; 47:11–21.

6. "Lawful purpose" means "not illegal." *See* Daiello Dep. at 47:15.

7. "[S]traw purchasing" is one example of an illegal purpose that does not qualify as a lawful purpose to obtain an exemption permit. *See* Daiello Dep. at 47:15–17.

8. There is no limit to the number of exemption permits a person can seek within a single thirty-day period. *See* Daiello Dep. at 45:8–17; 33:7–9.

9. On a single application for a single exemption permit, an individual may apply to purchase up to "99" handguns within a single thirty-day period. *See* Daiello Dep. at 44:7–23.

**<u>All Plaintiffs Admit That They Could Apply, But Have Not Applied, for Permits That Would Allow Them to Buy More Than One Handgun in a Thirty-day Period.</u>**

10. Plaintiff Christian Benton admitted that he "may" apply, pursuant to N.J. Stat. Ann. § 2C:58-3.4, for a permit granting an exemption from N.J. Stat. Ann.

§ 2C:58-3(i) ("Bulk Gun Purchase Law"), but does not assert that he has applied. *See* Decl. of Amanda Morejón Ex. B, Pl. Benton's Resps. to Defs.' First Set of Reqs. for Admis. No. 3.

11. Plaintiff Coalition of New Jersey Firearm Owners ("CNJFO") admitted that at least one CNJFO member "could" apply, pursuant to N.J. Stat. Ann. § 2C:58-3.4, for a permit granting an exemption from the Bulk Gun Purchase Law but does not assert that any member has applied. *See* Decl. of Amanda Morejón Ex. C, Pl. CNJFO's Resps. to Defs.' First Set of Reqs. for Admis. Nos. 3, 4.

12. Plaintiff Gun Owners of America ("GOA") admitted that at least one GOA member "could" apply, pursuant to N.J. Stat. Ann. § 2C:58-3.4, for a permit granting an exemption from the Bulk Gun Purchase Law but does not assert that any member has applied. *See* Decl. of Amanda Morejón Ex. D, Pl. GOA's Resps. to Defs.' First Set of Reqs. for Admis. Nos. 3, 4.

13. Plaintiff Gun Owners Foundation ("GOF") admitted that at least one GOF supporter "could" apply, pursuant to N.J. Stat. Ann. § 2C:58-3.4, for a permit granting an exemption from the Bulk Gun Purchase Law but does not assert that any supporter has applied. *See* Decl. of Amanda Morejón Ex. E, Pl. GOF's Resps. to Defs.' First Set of Reqs. for Admis. Nos. 3, 4.

14. Plaintiff Matthew Struck admitted that he is "capable of submitting an application" for a permit granting an exemption from the Bulk Gun Purchase Law

but does not assert that he has applied. *See* Decl. of Amanda Morejón Ex. F, Pl. Struck's Resps. to Defs.' First Set of Reqs. for Admis. No. 3.

15. Plaintiff Daniel Francisco admitted that he is "capable of submitting an application" for a permit granting an exemption from the Bulk Gun Purchase Law but does not assert that he has applied. *See* Decl. of Amanda Morejón Ex. G, Pl. Francisco's Resps. to Defs.' First Set of Reqs. for Admis. No. 3.

16. Plaintiff Firearm Policy Coalition ("FPC") admitted that at least one FPC member is "capable of submitting an application" for a permit granting an exemption from the Bulk Gun Purchase Law but does not assert that any member has applied. *See* Decl. of Amanda Morejón Ex. H, Pl. FPC's Resps. to Defs.' First Set of Reqs. for Admis. No. 3.

17. Plaintiff National Rifle Association of America ("NRA") admitted that at least one NRA member is "capable of submitting an application" for a permit granting an exemption from the Bulk Gun Purchase Law but does not assert that any member has applied. *See* Decl. of Amanda Morejón Ex. I, Pl. NRA's Resps. to Defs.' First Set of Reqs. for Admis. No. 3.

**All Plaintiffs Have Failed to Make a Substantial Showing That Applying for Permits That Would Allow Them to Buy More Than One Handgun in a Thirty-day Period Would be Futile.**

18. Plaintiff Benton has simply declared that he "does not believe" he "meet[s]" the requirements for obtaining a permit granting an exemption from the

Bulk Gun Purchase Law. *See* Decl. of Amanda Morejón Ex. B, Pl. Benton's Resps. to Defs.' First Set of Reqs. for Admis. Nos. 4, 5.

19. Plaintiff CNJFO has simply declared that it lacks "knowledge" as to whether at least one CNJFO member "satisfies" the requirements for obtaining a permit granting an exemption from the Bulk Gun Purchase Law. *See* Decl. of Amanda Morejón Ex. C, Pl. CNJFO's Resps. to Defs.' First Set of Reqs. for Admis. Nos. 4, 5.

20. Plaintiff GOA has simply declared that it lacks "knowledge" as to whether at least one GOA member "satisfies" the requirements for obtaining a permit granting an exemption from the Bulk Gun Purchase Law. *See* Decl. of Amanda Morejón Ex. D, Pl. GOA's Resps. to Defs.' First Set of Reqs. for Admis. Nos. 4, 5.

21. Plaintiff GOF has simply declared that it lacks "knowledge" as to whether at least one GOF supporter "satisfies" the requirements for obtaining a permit granting an exemption from the Bulk Gun Purchase Law. *See* Decl. of Amanda Morejón Ex. E, Pl. GOF's Resps. to Defs.' First Set of Reqs. for Admis. Nos. 4, 5.

22. Plaintiff Struck has simply declared that he does not think he is "eligible to receive" a permit granting an exemption from the Bulk Gun Purchase Law. *See* Decl. of Amanda Morejón Ex. F, Pl. Struck's Resps. to Defs.' First Set of Reqs. for Admis. No. 3.

23. Plaintiff Francisco has simply declared that he does not think he is "eligible to receive" a permit granting an exemption from the Bulk Gun Purchase Law. *See* Decl. of Amanda Morejón Ex. G, Pl. Francisco's Resps. to Defs.' First Set of Reqs. for Admis. No. 3.

24. Plaintiff FPC has simply declared that it does not think at least one FPC member is "eligible to receive" a permit granting an exemption from the Bulk Gun Purchase Law. *See* Decl. of Amanda Morejón Ex. H, Pl. FPC's Resps. to Defs.' First Set of Reqs. for Admis. No. 3.

25. Plaintiff NRA has simply declared that it does not think at least one NRA member is "eligible to receive" a permit granting an exemption from the Bulk Gun Purchase Law. *See* Decl. of Amanda Morejón Ex. I, Pl. NRA's Resps. to Defs.' First Set of Reqs. for Admis. No. 3.

**Firearms Were Not Widely Commercially Available or Feasible to Purchase in Bulk During the Founding Era.**

26. Historically, firearms were not widely commercially available, but rather sold discretely "in hardware stores, general stores, or pawn shops." *See* Decl. of Amanda Morejón Ex. J, Report of Dr. Brennan Rivas (hereafter "Rivas Rpt.") ¶ 46.

27. In fact, "large-scale retail enterprises that could afford to purchase and store more products than the independent shopkeeper" did not even exist until "the early twentieth century." *See* Rivas Rpt. ¶ 48.

28. "These market conditions naturally limited the number of firearms a buyer could purchase at a given time" in the pre-Civil War period. *See* Rivas Rpt. ¶ 49.

29. Cost likewise played a role in the relative dearth of bulk firearm sales because, even as late as 1875, "[m]any guns cost upwards of fifty dollars," which "would cost approximately $1,100.00 today. These high prices, particularly in conjunction with the relative cash- and credit-poverty of many Americans, mean[t] that the acquisition of numerous firearms was fairly cost-prohibitive." *See* Rivas Rpt. ¶ 45.

30. Similarly, "[r]apid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get." *See* Decl. of Amanda Morejón Ex. K, Rpt. of Dr. Robert Spitzer (hereafter "Spitzer Rpt.") ¶ 3.

31. That is, before the end of the nineteenth century, "[m]anufacturing and distribution networks for finished goods in the United States did not allow for the kinds of bulk purchases that are possible today." *See* Rivas Rpt. ¶ 44.

32. For those reasons, historic "market conditions naturally limited the number of firearms a buyer could purchase at a given time" and individuals living

in "cash-poor, credit-dependent non-urban areas" also "very likely lacked the resources to own numerous firearms." *See* Rivas Rpt. ¶ 49.

33. And "[w]hile general stores, sporting goods stores, and hardware stores across the country presented guns for sale, the scale of their holdings and size of their inventories remained a far cry from what we see at gun shows or big-box retailers today." *See* Rivas Rpt. ¶ 11.

**Government Systems Used to Track Firearm Purchases and Criminal Histories to Prevent Future Firearm Misuse Did Not Exist During the Founding Era.**

34. Founding Era governments likewise lacked centralized background check systems to address escalating episodes of crime involving a number of popular arms. *See* Rivas Rpt. ¶¶ 37–43, 32.

35. In fact, it was not until 1881 that at least one state, Illinois, developed systems that required every dealer of firearms to register all sales of deadly weapons. *See* Rivas Rpt. ¶ 32.

36. But "no organized system of gun purchase limitation laws could feasibly exist until the modern era, given that such a policy entails the interdiction of government in coordination with dealers in a comprehensive and coordinated effort to maintain comprehensive and detailed records of who was buying and selling guns, including the number of guns purchased over time. Such a system would (and does) require constant information collection, updating, and information

recirculation—tasks that were simply beyond the capabilities of governments until the modern era." *See* Spitzer Rpt. ¶ 6; *see also* Rivas Rpt. ¶ 43.

37. So one "widespread response" was instead "to restrict the sales of weapons and/or tax their retail dealers." *See* Rivas Rpt. ¶ 24.

38. These laws included "licensing, registration, and taxation systems." *See* Rivas Rpt. ¶ 36.

39. Examples of such sales laws include an 1838 Florida law that established a sales restriction that "placed a steep annual tax of $200 upon anyone who chose 'to vend dirks, pocket pistols, sword canes, or bowie knives.'" *See* Rivas Rpt. ¶ 25.

40. Likewise, an 1837 Alabama law imposed a tax on the sale of bowie knives "at $100 per instance (equivalent to approximately $3,195.27 today)." *See* Rivas Rpt. ¶ 25.

41. 1837 and 1838 Georgia and Tennessee laws, respectively, also similarly imposed "criminal sales restrictions" designed to "'guard and protect … citizens … against the unwarrantable and too prevalent use of deadly weapons.'" *See* Rivas Rpt. ¶ 26.

42. These laws were also oriented to "prohibit[ ] dealers from selling to particular groups of people" to prevent crimes by those believed to pose "a danger to the community when armed." *See* Rivas Rpt. ¶ 31.

**The Interstate Infrastructure Used to Facilitate Nationwide, Rapid Arms Trafficking Via Private Modes of Transit Did Not Exist During the Founding Era.**

43. "[O]ne significant impetus to the cultivation of illicit interstate gun trafficking was the construction of the interstate highway system, inaugurated with the enactment of the Federal-Aid Highway Act of 1956. As one study noted, 'a panel dataset spanning all 3,131 counties between 1960 and 1993' found that 'the opening of an interstate highway in a county led to an 8.1% rise in total index crime' and 'an increase in violent crime.'" *See* Spitzer Rpt. ¶ 4.

44. "[L]aws that limit gun purchases per month are a recent remedy to a contemporary problem, tied at least in part to an unintended consequence of the construction of the interstate highway system beginning in the 1950s. While convenient mass interstate travel existed before this time, mostly by railroad and buses, these latter forms were public, whereas auto transport is private and controlled by the driver." *See* Spitzer Rpt. ¶ 10.

45. "Interstate highways are today recognized as the primary corridors for 'iron pipeline' gun trafficking—the term applied by law enforcement to gun trafficking patterns from states with lax gun laws to states with stricter laws—such as is the case with Interstate Route 95 along the U.S. east coast." *See* Spitzer Rpt. ¶ 5.

46. All why "gunrunners use major Interstate highways as their smuggling routes" and why "restricting handgun purchases to one per month is an effective means of disrupting the illegal interstate transfer of firearms." *See* Spitzer Rpt. ¶¶ 8, 9–10.

47. Indeed, historically, "[w]hile there were instances in which government authorities attempted to identify or stop secret movements of guns, they did not face a societal problem akin to modern concerns about trafficked guns and their use in organized crime." *See* Rivas Rpt. ¶ 50.

**Historical Laws Imposed Quantity Restrictions and Licensing Requirements as Means of Regulating the Purchase of Arms and Secondary Markets.**

48. One 1676 Virginia law expressly limited the quantity of arms that persons could possess at a time, specifically "one gunn and tenn charges of powder and shott" under certain circumstances. *See* Spitzer Rpt. ¶¶ 13, 24.

49. A 1763 New York law limited the quantity of gunpowder kept within two miles of city hall. *See* Spitzer Rpt. ¶ 16.

50. An 1827 New Haven, Connecticut, ordinance also imposed a quantity limit of one pound of gunpowder on individuals. *See* Spitzer Rpt. ¶ 21.

51. One 1857 New Jersey measure restricted individuals from keeping more than two pounds of gunpowder on hand a given time, with the exception that individuals may keep more than two pounds if "in a magazine at least fifty feet distant from any building." *See* Spitzer Rpt. ¶ 29.

52. "[L]icensing as a regulatory tool is an old policy technique, dating to the 1600s." *See* Spitzer Rpt. ¶ 84.

53. Laws requiring licensing of commercial dealers of goods existed as early as 1642 in the Connecticut colony. *See* Spitzer Rpt. ¶ 71.

54. One 1689 New Hampshire law prohibited commerce in arms without first obtaining a license. *See* Spitzer Rpt. ¶ 71.

55. An 1814 Illinois measure expressly disallowed commerce vis-à-vis Natives unless a license was first obtained. *See* Spitzer Rpt. ¶ 72.

56. An 1802 New York law imposed licensing requirements on "pawn brokers, and dealers in sale of second hand" goods. *See* Rivas Rpt. ¶ 54.

57. An 1812 New York law continued licensing requirements for secondary market dealers and imposed even greater restrictions including categorical restrictions on from whom a secondary goods dealer could accept secondhand goods. *See* Rivas Rpt. ¶ 53.

58. An 1821 Philadelphia law likewise specifically imposed licensing restrictions on secondary market dealers and prohibited dealing in stolen and other unlawful goods. *See* Rivas Rpt. ¶ 53.

59. An 1863 Chicago licensing law also used "licensing as a way of regulating secondhand and junk dealers in addition to pawnbrokers." *See* Rivas Rpt. ¶ 54.

60. Many other nineteenth-century state laws operated similarly in that they used licensing and related means to closely regulate secondary markets of goods. *See* Rivas Rpt. ¶ 54 & n.109.

**Historical Laws Restricted Firearms Possession and Regulated Secondary Markets of Goods to Prevent Downstream Crime and Criminal Misuse.**

61. One 1676 Virginia law restricted trading certain quantities of arms with Natives with the purpose of attempting "to stem or otherwise control arms trading with Indigenous people." *See* Spitzer Rpt. ¶¶ 13–14.

62. Firearms trafficked interstate that are later used in crimes are more likely to have been initially purchased via multi-gun sales and later unlawfully transferred via secondary distributions to criminals. *See* Spitzer Rpt. ¶¶ 8– 9.

63. In fact, at least one study found that "between twenty-to-twenty five percent of handguns obtained at crime scenes were initially purchased as part of a multi-gun sale," Spitzer Rpt. ¶ 9, which may later be trafficked in a secondary distribution to criminals, *id.* ¶ 8.

64. The "reselling of stolen guns in secondary markets" was a concern for governments in the nineteenth century. *See* Rivas Rpt. ¶ 50.

65. The historical record reflects that secondary markets of goods had an "inherent connection to criminal activity" that "justified regulatory safeguards designed to prevent and/or remedy that activity." *See* Rivas Rpt. ¶ 54.

66. Secondary markets, like pawn shops, secondhand stores, junk stores, scrap dealers, and auction houses, "became sites for the disposal of stolen property." *See* Rivas Rpt. ¶ 54.

67. At bottom, "the offloading of stolen goods to secondhand stores and pawnbrokers" was a "cause of concern among Americans," especially in the nineteenth century. *See* Rivas Rpt. ¶ 55.

68. Thus, "longstanding regulations targeted pawn brokers, secondhand stores, junk shops, scrap metal dealers, and auction houses for heightened scrutiny by government officials due to their connection to downstream crime." *See* Rivas Rpt. ¶ 12.

Respectfully submitted,

JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY

By: *<u>/s/ Amanda Morejón</u>*
Deputy Attorney General