Steven J. Harfenist
Harfenist Kraut & Perlstein, LLP
3000 Marcus Avenue, Suite 2E1
Lake Success, New York 11042
T: (516) 355-9600
F: (516) 355-9601
E: sharfenist@hkplaw.com
*Attorneys for Plaintiffs*

Oliver M. Krawczyk*
Ambler Law Offices, LLC
115 South Hanover Street, Suite 100
Carlisle, PA 17013
T: (717) 525-5822
E: oliver@amblerlawoffices.com
PA Bar No. 334423
*Admitted Pro Hac Vice

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-----------------------------------------------------------------X
CHRISTIAN BENTON, COALITION OF NEW JERSEY FIREARM OWNERS, GUN OWNERS OF AMERICA, INC., and GUN OWNERS FOUNDATION,

**Civil Action No.:**
**24-CV-07098(KWM)(MJS)**

Plaintiffs,

-against-

JENNIFER DAVENPORT, in her Official Capacity as the Attorney General of New Jersey,

Defendant.
-----------------------------------------------------------------X

**BENTON PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

***Page***


TABLE OF AUTHORITIES ..... iv

ARGUMENT ..... 1

I. PLAINTIFFS HAVE STANDING ..... 1

A. Plaintiffs Need Not Submit to an Unconstitutional Regime as a Precondition to Challenging It ..... 1

B. The Organizational Plaintiffs Have Standing ..... 6

C. Plaintiffs' Harms Are Traceable to Defendant ..... 7

D. Plaintiffs' Harms Are Redressable by This Court ..... 8

II. THE OGAM STATUTE IS UNCONSTITUTIONAL ..... 13

A. New Jersey's OGAM Regime Is Not "Shall Issue" ..... 14

B. New Jersey's Rationing Scheme Is Not a "Condition" or "Qualification[] on the Commercial Sale of Arms." Even if It Were, that Would Not Render It "Presumptively Constitutional" ..... 23

1. The OGAM Scheme Is Not a Commercial Sale Regulation ..... 23

2. Commercial Sale Regulations Are Not "Presumptively Constitutional" Such that They Avoid Historical Analysis Under *Bruen* ..... 33

C. New Jersey's Handgun Rationing Scheme Is Ahistorical ..... 36

1. Defendant Cannot Demonstrate a Founding-Era Tradition Without Founding-Era Analogues ..... 36

2. Defendant Cannot Shirk Her Burden by Claiming This Case Is "Unprecedented." ..... 42

3. Defendant's Historical "Quantity Limits and Licensure Requirements" Bear No Resemblance to New Jersey's Handgun Rationing Scheme......44

4. Defendant Cannot Rely on the Disarmament of Prohibited Persons to Justify Disarming Law-Abiding Gun Owners ........................................48

CONCLUSION ..........................................................................................50

## TABLE OF AUTHORITIES

**Page**

**U.S. Constitution**

Article III, Section 2 .......... 34
Amendment II .......... *passim*
Amendment VIII .......... 40

**Cases**

*ANJRPC, Inc. v. Att'y Gen. N.J.*, 183 F.4th 211 (3d Cir. 2026) .......... *passim*
*ANJRPC, Inc. v. Christie*, 850 F. Supp. 2d 455 (D.N.J. 2012) .......... 15
*ANJRPC v. Governor of N.J.*, 707 F.3d 238 (3d Cir. 2013) .......... 19, 23
*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) .......... 3, 4
*Boone v. T-Mobile USA Inc.*, 2018 U.S. Dist. LEXIS 14951 (D.N.J. Jan. 26, 2018) .......... 9
*Christian v. James*, 176 F.4th 189 (2d Cir. 2026) .......... 40
*District of Columbia v. Heller*, 554 U.S. 570 (2008) .......... *passim*
*Elite Customs L.L.C. v. BATFE*, 2026 U.S. App. LEXIS 28760 (5th Cir. Sept. 18, 2026) .......... 27
*Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020) .......... 39
*Fischer v. Governor of N.J.*, 842 F. App'x 741 (3d Cir. 2021) .......... 10
*Frein v. Pa. State Police*, 47 F.4th 247 (3d Cir. 2022) .......... 30
*Gamble v. United States*, 587 U.S. 678 (2019) .......... 40
*Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023) .......... 24, 25
*Hirschfeld v. BATFE*, 5 F.4th 407 (4th Cir. 2021) .......... 26
*Hughes v. Lee*, 2025 LX 367096 (Tenn. Chancery Ct. Gibson Cnty. Aug. 22, 2025) .......... 48
*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) .......... 6
*John Wyeth & Brother Ltd. v. Cigna Int'l Corp.*, 119 F.3d 1070 (3d Cir. 1997) .......... 6
*Johnson v. City of Shelby*, 574 U.S. 10 (2014) .......... 10
*Kaspersky Lab, Inc., v. DHS*, 909 F.3d 446 (D.C. Cir. 2018) .......... 11
*Koons v. Att'y Gen. N.J.*, 156 F.4th 210 (3d Cir. 2025) .......... 4
*Lara v. Comm'r Pa. State Police*, 125 F.4th 428 (3d Cir. 2025) .......... 37, 40
*Larson v. Valente*, 456 U.S. 228 (1982) .......... 11
*Libertarian Party of Erie County*, 970 F.3d 106 (2d Cir. 2020) .......... 3
*McConnell v. FEC*, 540 U.S. 93 (2003) .......... 10
*McCoy v. BATFE*, 140 F.4th 568 (4th Cir. 2025) .......... 40
*McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024) .......... 24
*Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2023) .......... 15
*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) .......... *passim*
*Nguyen v. Bonta*, 140 F.4th 1237 (9th Cir. 2025) .......... *passim*

*Ortega v. Grisham,* 148 F.4th 1134 (10th Cir. 2025) ........................................ 25-28
*Phila. Taxi Ass'n v. Uber Techs.*, 886 F.3d 332 (3d Cir. 2018) .................................6
*Pitsilides v. Barr*, 128 F.4th 203 (3d Cir. 2025) ...............................................40, 41
*Reese v. BATFE*, 127 F.4th 583 (5th Cir. 2025) ..........................................27, 32, 33
*Rigby v. Jennings*, 630 F. Supp. 3d 602 (D. Del. 2022) ......................................35
*Rigby v. Jennings*, 2026 U.S. Dist. LEXIS 204409 (D. Del. Sept. 10, 2026)..........31
*Schoenthal v. Raoul*, 150 F.4th 889 (7th Cir. 2025) .............................................40
*Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016) .................................................26
*State v. A.M.*, 286 A.3d 660 (N.J. 2023) ..............................................................16
*State v. Wade*, 301 A.3d 393 (N.J. Super. Ct. App. Div. 2023) .........................14, 15
*Teixeira v. City of Alameda*, 873 F.3d 670 (9th Cir. 2017) .....................................24
*Timbs v. Indiana*, 586 U.S. 146 (2019) ..................................................................40
*Township of Lyndhurst v. Priceline.com Inc.*, 657 F.3d 148 (3d Cir. 2011)............11
*United States v. Berger*, 189 F.4th 333 (3d Cir. 2026) .....................................*passim*
*United States v. Carbajal-Flores*, 143 F.4th 877 (7th Cir. 2025)............................45
*United States v. Clerfe*, 186 F.4th 141 (3d Cir. 2026) ......................................30, 31
*United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012) ..........................................3
*United States v. Gore*, 118 F.4th 808 (6th Cir. 2024) .............................................33
*United States v. Hicks*, 649 F. Supp. 3d 357 (W.D. Tex. 2023) .............................37
*United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016) .........................................24
*United States v. James*, 677 F. Supp. 3d 329 (D.V.I. 2023) ...................................24
*United States v. Marzzarella,* 614 F.3d 85 (3d Cir. 2010) ................................32, 35
*United States v. Quailes*, 126 F.4th 215 (3d Cir. 2025) ..........................................37
*United States v. Rahimi*, 602 U.S. 680 (2024) ...........................................37, 41, 43
*We the Patriots v. Grisham*, 119 F.4th 1253 (10th Cir. 2024).................................11
*Wolf v. Walker*, 2014 U.S. Dist. LEXIS 59856 (W.D. Wis. Apr. 30, 2014) ...............9
*Wolford v. Lopez*, 146 S. Ct. 2032 (2026) ............................................................30
*Wolford v. Lopez*, 686 F. Supp. 3d 1034 (D. Haw. 2023).......................................50

**Statutes**

18 U.S.C. § 922(d)(5)..............................................................................................45
18 U.S.C. § 922(g)(8)..............................................................................................41
26 U.S.C. § 5812(a) ................................................................................................15
26 U.S.C. § 5822 .....................................................................................................15
N.J.S.A. § 2C:58-2(a)(7) ......................................................................................8, 12
N.J.S.A. § 2C:58-3(a)(2) .........................................................................................12
N.J.S.A. § 2C:58-3(h)(1) .........................................................................................13
N.J.S.A. § 2C:58-3(i) ...........................................................................................8, 12
N.J.S.A. § 2C:58-3.4 ................................................................................................17
N.J.S.A. § 2C:58-3.4(a) ..................................................................................16, 17, 23

N.J.S.A. § 2C:58-3.4(a)(2) ........ 19
N.J.S.A. § 2C:58-3.4(b) ........ 18, 19, 23
N.J.S.A. § 2C:58-3.4(c) ........ 19
N.J.S.A. § 2C:58-4(d) ........ 16, 17
N.M. Stat. Ann. § 30-7-7.3 ........ 28

**Other Authorities**

A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts (2012) ........ 17
Aesop's Fable "The Wolf and the Lamb" ........ 25
Black's Law Dictionary (8th ed. 2004) ........ 20
Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction, *Bergmann-Schoch v. Davenport*, No. 1:25-cv-00997-CPO-MJS (D.N.J. Oct. 13, 2026), ECF No. 69 ........ 49
L. Carroll, Through the Looking Glass (1895) ........ 20
*Permit to Carry Dashboard*, NJ Office of Justice Data ........ 21, 22

## ARGUMENT

## I. PLAINTIFFS HAVE STANDING

### A. Plaintiffs Need Not Submit to an Unconstitutional Regime as a Precondition to Challenging It

Asserting that "Plaintiffs have failed to establish every element of standing,"[1] Defendant first claims that "there is no indication that [Plaintiffs] have tried to obtain an exemption permit that would allow them to lawfully achieve precisely what they claim they want to do: 'purchase more than one handgun per month.'" State Defendants' Combined Brief in Opposition to Plaintiffs' Motions for Summary Judgment and in Support of Cross-Motion for Summary Judgment ("XMSJ") at 15, ECF No. 95-1; *see also id.* at 11 (Benton "did not assert that he has applied," while GOA and GOF "did not assert that any member has done so").

But Defendant has entirely missed the premise of Plaintiffs' challenge. Separate and distinct from the question of whether they would qualify for an exemption to New Jersey's one-gun-a-month ("OGAM") handgun rationing scheme – a questionable proposition – Plaintiffs brought a facial challenge to the requirement that a law-abiding person must obtain government preclearance before acquiring more than one handgun at a time. As Plaintiffs explained in their Complaint, "New

[1] Notably, Defendant did not dispute Plaintiffs' standing as to New Jersey's handgun rationing scheme when she previously moved to dismiss a portion of Plaintiffs' Complaint on standing grounds. *See* ECF No. 20-1.

Jersey's … purchase rationing schemes violate[s] the Second and Fourteenth Amendments." Compl. ¶12; *see also id.* ¶11 & n.10 ("there is no quantity limit on how many firearms 'the people' can purchase per month … [n]or is there any limit on how often one may speak, attend religious services, or invoke the right to counsel"). Plaintiffs were explicit: "[b]ut for New Jersey's … rationing scheme[], Benton … would buy more than one handgun a month." *Id.* ¶115; *see also id.* ¶116 ("Mr. Benton desires to purchase handguns when he wants, at the time of his choosing, in the limit of his choosing, as the Second Amendment provides.").[2]

In other words, Plaintiffs' challenge does not revolve around whether they *have or have not* applied for a OGAM exemption, or whether they *would or would not* qualify for one. Rather, Plaintiffs object to the OGAM regime on its face. Compl. ¶144 ("Historically, there is no support for the proposition that a law limiting the Founders' purchase of firearms, or otherwise rationing the Second Amendment's guarantees, would have been tolerated."); *see also id.*, Prayer for Relief ¶2. And it is axiomatic that Plaintiffs need not apply for a permit to which they object as a categorical matter, before challenging the OGAM regime. Otherwise, Plaintiffs would be forced to suffer the very harm they brought suit to avoid. Thus, it is not

[2] Interestingly, later in her brief when no longer contesting Plaintiffs' standing, Defendant finally concedes that Plaintiffs seek "to purchase multiple handguns without applying for an exemption permit," conducting transactions when "they would like … without needing to obtain a permit first...." XMSJ at 27.

true that a OGAM exemption "would provide [Plaintiffs] what they desire...." XMSJ at 15. Plaintiffs desire to purchase more than one handgun a month *without* appealing to the State Police Superintendent's benevolence to "grant" them special dispensation to exercise their enumerated rights.

For example, as the Second Circuit has held, a carry license applicant was not required to subject himself to New York's "good moral character" licensing requirements when it was *those licensing requirements* to which he objected. Indeed, "the State … argues that the only way a plaintiff can challenge an application process is to do exactly what the plaintiff claims that he may not be required to do. Such a rule contravenes common sense. An applicant who challenges an application itself is not required to first comply with the objected-to component before bringing suit." *Antonyuk v. James*, 120 F.4th 941, 980 (2d Cir. 2024).

Ironically, in support of her claim that Plaintiffs must apply for and be denied a OGAM exemption before having standing to challenge the OGAM scheme itself, Defendant cites *United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012), and *Libertarian Party of Erie County*, 970 F.3d 106 (2d Cir. 2020). XMSJ at 16. But the Second Circuit rejected those cases as irrelevant in this context: "Relying on our decisions in *United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012), and *Libertarian Party of Erie County*, the State contends that a litigant who wishes to challenge a licensing regime must either apply for a license and be denied or make a substantial

showing that his application would be futile. But challenging a rule that limits eligibility for a license is different from *challenging a component of the application process itself*." *Antonyuk*, 120 F.4th at 978 (emphasis added).

Although subsequently vacated pending rehearing *en banc*, a recent Third Circuit decision reached a similar result, citing *Antonyuk*'s reasoning. As the panel explained, "[i]f the … requirement unlawfully impairs Plaintiffs' rights under the Second Amendment, they should *not have to subject themselves to its strictures in order to challenge it*." *Koons v. Att'y Gen. N.J.*, 156 F.4th 210, 248 (3d Cir.) (emphasis added), *vacated, reh'g en banc granted*, 162 F.4th 100 (3d Cir. 2025). Given that the *Koons* panel decision approved of vast swaths of "sensitive places" restrictions, and given the Third Circuit's recent *en banc* decision striking New Jersey's semiautomatic firearms ban, it is highly unlikely the panel decision was vacated, and *en banc* review granted, on the basis of the panel's finding that the plaintiffs *had* standing. Thus, this Court should adopt that panel's reasoning here.

Even if Defendant were correct (she is not) that Plaintiffs first must apply and be denied a OGAM exception before challenging the underlying requirement, there is serious question as to whether Plaintiffs even would qualify for an exemption. In fact, even though Mr. Benton fully explained his reasons for wishing to acquire more than OGAM (Compl. ¶¶102-14), Defendant appears to equivocate on his eligibility, theorizing only that there are "strong reasons to suggest that [an] exemption … for

multiple handguns would be granted," based on "facts parallel [to] the statutory elements [of the OGAM law], which authorize the Superintendent to issue an exemption … to 'any person who devotes time and attention to acquiring firearms for the enhancement of the person's collection,' which includes for 'recreational' purposes, 'defensive purposes,' 'or any other lawful related purpose.'" XMSJ at 17-18. Of course, if Defendant cannot say for sure, even when presented with a fulsome record of Mr. Benton's reasons for wanting to purchase multiple handguns, how then would the Superintendent decide the issue if Mr. Benton were to file a formal application? Indeed, Defendant's equivocation about "strong reasons to suggest" that Plaintiffs might receive an exemption only highlights the "official[] discretion to deny licenses based on a perceived lack of … suitability" that *Bruen* says characterizes "may-issue" regimes. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 13 (2022). Or, to put it conversely, because Defendant cannot take a position one way or the other on Mr. Benton's eligibility for multiple handgun purchases, such eligibility cannot be said to be based on the sort of "objective criteria" and "'narrow, objective, and definite standards' guiding licensing officials" that the Court has said are characteristic of "shall-issue" regimes. *Id.* at 38 n.9. Were Benton's eligibility for a OGAM exemption an objective legal question based on definite standards, then Defendant should be able to determine conclusively whether Benton would qualify to buy more than one handgun a month.

### B. The Organizational Plaintiffs Have Standing

In a single footnote, Defendant disputes the standing of Plaintiffs Coalition of New Jersey Firearm Owners ("CNJFO"), Gun Owners of America, Inc. ("GOA"), and Gun Owners Foundation ("GOF") (the "Organizational Plaintiffs"), "for the same reasons." XMSJ at 18 n.7. *But see John Wyeth & Brother Ltd. v. Cigna Int'l Corp.*, 119 F.3d 1070, 1076 n.7 (3d Cir. 1997) ("arguments raised in passing (such as, in a footnote) … are considered waived"). However, because Benton's standing is clear, *see* Section I(A), *supra*, so too is CNJFO, GOA, and GOF's.

Aside from arguing that Benton does not have standing, and therefore that the Organizational Plaintiffs cannot show standing of one of their members, Defendant does not otherwise dispute their standing. But even if this Court were to consider the issue further, the Organizational Plaintiffs easily clear the standing bar. To "have associational standing, [an organization] must meet three requirements: (1) the organization's members must have standing to sue on their own; (2) the interests the organization seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires individual participation by its members." *Phila. Taxi Ass'n v. Uber Techs.*, 886 F.3d 332, 345 (3d Cir. 2018); *accord Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

*First*, the Organizational Plaintiffs' standing is premised not only on Benton's standing, who is a member of CNJFO and GOA (Compl. Ex. C, Declaration of

Christian Benton ¶2, ECF No. 1-3), but also on the other members and supporters of the Organizational Plaintiffs, some of whom they have described specifically. *See* Compl. ¶¶120-23; Compl. Ex. B, Declaration of Erich M. Pratt ¶¶17-19, ECF No. 1-2; Compl. Ex. A, Declaration of John C. Pyle ¶¶14-17. *Second*, the bringing of this case is germane to Plaintiffs' missions. Compl. ¶¶14-16. Indeed, part of that mission is expressly to "file litigation such as this to preserve, protect, and defend their right to keep and bear arms." *Id.* ¶16. *Third*, neither the claims asserted, nor the relief requested, requires the participation of "the members and supporters of GOA and GOF[, who] overwhelmingly support litigation such as this, which protects and defends their constitutional rights." *Id.* at ¶17. If the Challenged Laws are struck down, then all New Jerseyans would be free to acquire arms in their desired quantity, at their chosen time, without infringement. No fact pleaded by Plaintiffs requires individualized participation by gun owners to obtain that result.

**C. Plaintiffs' Harms Are Traceable to Defendant**

Despite her admitted "enforcement of the" OGAM law, Defendant seeks to wash her hands of any responsibility for the Challenged Laws, claiming that Plaintiffs are "inflicting harm on themselves," and that any injury is traceable to Plaintiffs' "own inaction" and "own decision" in not having applied for an exemption from the OGAM law. XMSJ at 20. But that is like a government official disclaiming responsibility for enforcing a limit of one "X" post per month, on the theory that it

was the would-be speaker who made the "decision" not to seek a discretionary exemption allowing additional posts. *See Nguyen v. Bonta*, 140 F.4th 1237, 1243 (9th Cir. 2025). So too, here, Plaintiffs' only "decision" is that they wish to exercise their rights, but the statute Defendant admittedly enforces prohibits them from doing so. Plaintiffs' injury is attributable to Defendant's enforcement of the statute, not Plaintiffs' failure to seek permission to escape it.

**D. Plaintiffs' Harms Are Redressable by This Court**

The redressability prong is also met. Defendant argues that, even if this Court were to declare N.J.S.A. § 2C:58-3(i) unconstitutional, enjoining enforcement and permitting Plaintiffs to *purchase* more than OGAM, a separate code section, N.J.S.A. § 2C:58-2(a)(7), "would continue to bar firearms dealers from *selling* multiple handguns...." XMSJ at 21. But this argument fails, for at least six reasons.

*First*, Plaintiffs' Complaint was abundantly clear in the nature of the challenge being brought, and Defendant is obviously on notice as to the statutory scheme under review. As Plaintiffs explained, "[t]his case involves a challenge to New Jersey's onerous, unconstitutional, and ahistorical … 'one gun a month' law." Compl. ¶1. Plaintiffs alleged that "New Jersey's … purchase rationing schemes violate[s] the Second and Fourteenth Amendments." *Id.* ¶12. And while Plaintiffs listed specific statutory sections in their Prayer for "[a]n order declaring that New Jersey's 'one gun a month' law … is unenforceable, unconstitutional, and violates the Second and

Fourteenth Amendments to the United States Constitution," their request for injunctive relief did not, instead broadly seeking "[a]n order permanently enjoining Defendants and all other officers, agents, servants, employees, and persons under the authority of the State, from enforcing *all laws* … limiting handgun purchases to one per month...." *Id.*, Prayer for Relief ¶¶2, 3 (emphasis added).

*Second*, even if Plaintiffs had not broadly sought relief from "all laws" that make up New Jersey's OGAM rationing scheme, courts do not play the sort of "haha, gotcha" games that Defendant invites. To that end, "[c]ourts do not generally dismiss complaints for failure to cite to a specific subsection of a statute." *Boone v. T-Mobile USA Inc.*, 2018 U.S. Dist. LEXIS 14951, at *31 (D.N.J. Jan. 26, 2018) (citing *Albert v. Carovano*, 851 F.2d 561, 571 n.3 (2d Cir. 1988)) ("[F]ailure to cite the correct section of the [statute] does not require us to … dismiss[] … so long as [the plaintiff] has alleged facts sufficient to support a meritorious legal claim. … '[T]he failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters.'"); *see also Wolf v. Walker*, 2014 U.S. Dist. LEXIS 59856, at *7-9 (W.D. Wis. Apr. 30, 2014) ("Generally, plaintiffs are required to plead *facts* showing that they have a plausible claim; they do not have to plead law. … Plaintiffs have identified … the conduct they believe violates their rights.... Regardless which statutes that … implicates, the facts and law … should be the same. … [D]efendants identify no reason why their

ability to defend the constitutionality of the [law] … is contingent on the list of statutes that underlies the [law]. Further, they do not cite a single case in which a court required this degree of specificity....”); *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam) (“no heightened pleading rule requires plaintiffs seeking damages for violations of constitutional rights to invoke [a statute] expressly”).

*Third*, Defendant’s cases are not to the contrary. First, *Fischer v. Governor of N.J.*, 842 F. App’x 741 (3d Cir. 2021), did not involve the fact pattern Defendant thinks. There, plaintiffs were unable to challenge a statutory delay for a “dues-authorization revocation [to] be effective” because, even “absent the statute, they would have been bound by the effective dates set forth in their membership agreements.” *Id.* at 750. Thus, rather than cause them harm, the Third Circuit explained, “the statute’s thirty-day provision saved the Plaintiffs from paying three months of unwanted union dues” that their contract otherwise required. *Id.* Second, in *McConnell v. FEC*, 540 U.S. 93, 229 (2003), the Supreme Court noted that, even though it “has jurisdiction to hear a challenge to” a statute providing for “increases and indexes” to campaign donation limits, “[t]his Court has no power to adjudicate a challenge to the [underlying] FECA limits,” which “are subject to direct review before an appropriate *en banc* court of appeals.” Thus, the plaintiffs’ lack of redressability centered on the Court’s lack of *jurisdiction* to review the underlying statute, not some failure to precisely list every challenged statutory section. Third,

*We the Patriots v. Grisham*, 119 F.4th 1253, 1259-61 (10th Cir. 2024), involved a challenge to a governor's "Public Health Order" banning "firearm carry in public … playgrounds," where the Tenth Circuit found that multiple unrelated city, county, and state ordinances and statutory schemes independently banned the same activity. *Id.* at 1259. In contrast here, Plaintiffs are challenging a single statutory scheme, contained in consecutive section numbers. That is nothing like the entirely unrelated schemes in *We the Patriots*. Fourth, *Kaspersky Lab, Inc., v. DHS*, 909 F.3d 446, 465 (D.C. Cir. 2018), is the same. Like in *We the Patriots*, the plaintiffs there challenged a DHS directive, but failed to challenge an independent statutory scheme, which "prohibits all the same conduct as the Directive – and then some." Plus, *Kaspersky Lab* was brought "under the Administrative Procedure Act" (*id.* at 453) – not a constitutional challenge to a congressionally enacted statute. Here, Plaintiffs have brought a Second Amendment challenge to a single, unified statutory scheme.

*Fourth*, even if Plaintiffs were required to provide a precise list of specific code sections in their Complaint (they were not), it is axiomatic that "a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982); *see also Township of Lyndhurst v. Priceline.com Inc.*, 657 F.3d 148, 154 n.10 (3d Cir. 2011)

("the point has always been the same: whether a plaintiff personally would benefit in a tangible way from the [C]ourt's intervention").

*Fifth*, and perhaps most fundamentally, should this Court grant Plaintiffs the relief they seek, they will be able to purchase multiple handguns per month *even if* N.J.S.A. § 2C:58-2(a)(7) somehow created an independent bar. That is because that statute is not worded the way Defendant apparently thinks. Tellingly, the plain text of Section 2C:58-2(a)(7) states that "*[a] dealer* shall not knowingly deliver more than one handgun to *any person* within any 30-day period." But there is more than one gun dealer in New Jersey, and there is no statute prohibiting someone from acquiring firearms from more than "*a dealer*." Thus, were this Court to strike down Section 2C:58-3(i), Plaintiffs could acquire one handgun from *a dealer*, and a second handgun from *another dealer*, and so on, within the same 30-day period, without running afoul of the provision Defendant identifies (even if it applied).

*Finally*, even if this Court accepted Defendant's argument that Section 2C:58-2(a)(7)'s bar on *dealer* transfers somehow constitutes an independent bar to redressability, that would apply only in the context of *dealer* transfers. And importantly, while Section 2C:58-3's limit of OGAM applies broadly, no matter the source of the handgun, there is more than one way to lawfully transfer a handgun in New Jersey, in addition to through a dealer. For example, while Section 2C:58-3(a)(2) generally provides that any noncommercial sale must be routed "through a

licensed retail dealer," that provision "shall not apply if the transaction is … between collectors of … curios and relics," or "between members of an immediate family." Instead, such transfers "shall be conducted via the web portal established or designated by the superintendent...." *Id.* § 2C:58-3(h)(1). Thus, even under Defendant's theory, there still would be redressability, because Plaintiffs could acquire more than one handgun per month from family or other collectors.

For any one of these reasons, Defendant's redressability argument fails. The scope of Plaintiffs' challenge to New Jersey's OGAM statute is abundantly clear, Defendant has ample notice of what is under review, and this Court has ample authority to strike down the offending portions of the statutory scheme.

## II. THE OGAM STATUTE IS UNCONSTITUTIONAL

Arguing that New Jersey's OGAM rationing scheme is constitutional, Defendant initially attempts to shirk her duty under *Bruen* to show a widespread historical tradition of similar regulation. XMSJ at 22-36. First, she argues that the OGAM scheme is in fact a shall-issue licensing regime and therefore conclusively constitutional. *Id.* at 23-27. Second, Defendant asserts that the OGAM scheme "is a presumptively constitutional commercial regulation" and therefore similarly exempt from historical review. *Id.* at 28-36. Only in the alternative does Defendant then proceed to the historical tradition under *Bruen*, arguing that the OGAM scheme fits within it. *Id.* at 37-50. But as detailed below, each of these arguments fails.

### A. New Jersey's OGAM Regime Is Not "Shall Issue"

Demurring that Plaintiffs may obtain more than one gun per month – "they just need to obtain the appropriate permit first" – Defendant asserts that the OGAM law "is part of New Jersey's 'shall-issue' firearms regime...." XMSJ at 1. In fact, Defendant claims, the OGAM scheme allows "no 'discretion to deny' … if an applicant 'satisfies the statutory criteria'...." *Id.* at 26 (citing *Bruen*). But this is fanciful thinking, undermined not only by the plain text of the statute, but also by Defendant's own data, testimony, and briefing.

*First*, Defendant claims that, subsequent to *Bruen*, "New Jersey courts have recognized that … New Jersey's gun-permitting scheme [is] 'a shall-issue regime.'" XMSJ at 4 n.3 (citing *State v. Wade*, 301 A.3d 393, 405 (N.J. Super. Ct. App. Div. 2023)). But *Wade* was characterizing the statutory process for "[a]n applicant seeking a gun-carry permit" (301 A.3d at 401), not New Jersey's entirely separate regime for acquisition of more than one handgun per month. And while New Jersey made "post-*Bruen* amendments" to its *carry* permit regime (XMSJ at 4 n.3) in order to render it shall-issue, New Jersey's OGAM scheme for *acquisition* remains unchanged. Thus, it is *definitionally* a remnant of the State's prior may-issue regime.[3] Indeed, *Wade* expressly noted that it was reviewing "'a licensing scheme

[3] Indeed, *Bruen* differentiated between "shall-issue" regimes and "may-issue" regimes, counting New Jersey's as an example of the latter. *See* 597 U.S. at 14-15.

that removes the unconstitutional justifiable need requirement.'" 301 A.3d at 397. In contrast, the OGAM scheme's "need requirement" *was not removed*, and Plaintiffs are aware of no case finding that the OGAM scheme is "shall issue." In fact, this Court expressly found the *opposite*: "New Jersey's law vests the Superintendent with … discretion regarding the Exemptions. This is underscored by the language of the statute which indicates that the superintendent 'may' grant the exemption if the applicant meets one of the only three conditions for exemption." *ANJRPC, Inc. v. Christie*, 850 F. Supp. 2d 455, 461 (D.N.J. 2012).

*Second*, and for that reason, Defendant's cases are of no help. *United States v. Berger*, 189 F.4th 333 (3d Cir. 2026), involved the registration of silencers under the National Firearms Act ("NFA"), which authorizes the Bureau of Alcohol, Tobacco, Firearms and Explosives to deny registration applications "if the making or possession of the firearm would place the person making the firearm in violation of law." *See* 26 U.S.C. §§ 5812(a), 5822. The NFA's verifying of legal eligibility (*Berger*, 189 F.4th at 341) is different than the OGAM scheme's evaluation of the justification and need for exercising an otherwise protected right. *See also Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 216 (4th Cir. 2023) (emphasis added) ("Under this law, the state of Maryland *does not retain any discretion* to deny a 'handgun

---

Since nothing about the OGAM statute has changed, it is hard to see how it somehow has transformed overnight into a "shall-issue" regime.

qualification license' to applicants who meet the statutory requirements," including submission of fingerprints, proof of training, and law-abiding status.).

*Third*, numerous portions of the statutory text confirm the "may-issue" nature of New Jersey's OGAM scheme. With respect to *carry* permits, the statute says that, if an applicant meets certain objective criteria, "the chief police officer or the superintendent *shall issue* the permit." N.J.S.A. § 2C:58-4(d) (emphasis added). But with respect to an exemption to *acquire* more than OGAM, the statute reads quite differently: "[t]he superintendent *may grant* an exemption … if the applicant demonstrates *to the satisfaction of the superintendent*...." *Id.* § 2C:58-3.4(a) (emphasis added).[4] This "may grant" language in the OGAM regime is the polar

---

[4] Unpersuasively seeking to recast New Jersey's "may-issue" OGAM statute as a "shall-issue" one, Defendant audaciously claims that the statute's use of the word "may" in fact means "shall," on the theory that "may" simply "denotes that the Superintendent is vested with authority to process and grant exemption[s]" to the OGAM restriction. XMSJ at 7 n.5; *see also id.* (claiming that the statute in fact "directs the Superintendent to grant an exception permit"); *id.* at 8 (claiming that "[t]he statute expressly disavows subjective criteria"). But Defendant's cited case does not support her position. While the court in *State v. A.M.*, 286 A.3d 660, 671 (N.J. 2023), explained that "may" and "shall" can be used interchangeably when it comes to vesting authority in certain officials, the court then noted that "allocating power to judges does not by itself reveal whether they must grant or have discretion to deny relief...." *Id.* at 671-72. And as to *that* question – *i.e.*, the same question at issue here – the court determined that, "[c]onsistent with the text and history of the statute," the word "may" means that "trial courts have discretion...." *Id.* at 674.

opposite of "shall issue," and it plainly – *obviously* – denotes a "may issue" regime.[5] Indeed, "a material variation in terms suggests a variation in meaning." A. Scalia & B. A. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012).

So too is it with the OGAM statute's use of the word "grant" (N.J.S.A. § 2C:58-3.4(a)) as opposed to the carry licensing's statute's quite different term "issue" (*id.* § 2C:58-4(d)). While the word "issue" means "[t]o circulate or distribute in an official capacity,"[6] connoting the objective and administrative act of delivery, the word "grant" means "[t]o allow or consent to,"[7] and "to permit as a right, privilege, or favor,"[8] which inherently involves the exercise of discretion.

Also key is the phrase "to the satisfaction of the superintendent" – language which Defendant conspicuously excises from her recitation of the OGAM law. XMSJ at 7. In fact, this statutory language appears nowhere in Defendant's brief. Nevertheless, the word "satisfaction" indicates that someone is "content" or "convinced"[9] of something, conveying the need to *persuade* the Superintendent of one's entitlement – hardly "an 'objective and definite' process...." *Berger*, 189 F.4th

---

[5] Also of note, while the New Jersey statute imposes a 30-day time limit for the issuance of a carry permit, the OGAM statute imposes no deadline on the processing of an exemption application. N.J.S.A. § 2C:58-3.4. Processing is thus *discretionary*.
[6] https://ahdictionary.com/word/search.html?q=issue.
[7] https://ahdictionary.com/word/search.html?q=grant.
[8] https://www.merriam-webster.com/dictionary/grant.
[9] https://www.dictionary.com/browse/satisfied.

at 340. If New Jersey's OGAM scheme were "shall issue," one's bona fides would be fixed, objective, and easily verifiable – not subject to any person's "satisfaction."

Such subjective and discretion-laden decision-making power is – despite Defendant's protestations – precisely the sort of "official[] discretion to deny licenses based on a perceived lack of need or suitability" that *Bruen* says embodies a "may-issue" regime. *Bruen*, 597 U.S. at 17. In fact, the statute uses one of those very words *Bruen* rejected – "need" – in discussing who may be "grant[ed]" an "exemption." *See id.* at 70-71 ("We know of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need. That is not how … the Second Amendment works when it comes to public carry for self-defense."). Thus, when it comes to a collector, one must "ha[ve] a *need* to purchase or otherwise receive multiple handguns," while a competitor likewise must "*need* to purchase or otherwise receive multiple handguns in a single transaction," and both such applicants must provide "pertinent documentation supporting the *need* for an exemption." N.J.S.A. § 2C:58-3.4(b) (emphases added); *see also* Deposition of Matthew Daiello ("Daiello Depo.") at 47:18-21, ECF No. 95-5 (discussing the "lawful purpose standard for need"). In other words, the Superintendent is expected and required to determine whether the applicant's claim of "need" is satisfactory. A statutory requirement of "need" is inherently discretionary, and directly conflicts with *Bruen*.

The statute further describes a requirement to show a "reasonable likelihood" of future unavailability, whether separate purchases are "feasible or practical," or whether the OGAM limit would have a "materially adverse impact" on collecting activities. N.J.S.A. § 2C:58-3.4(a)(2). All of that open-ended language requires a subjective determination of "need," which is *precisely* what *Bruen* prohibits.[10]

And although Defendant claims that the OGAM scheme does not allow the sort of "discretion" that *Bruen* prohibits, the statutory appeal process explicitly provides that the Superintendent's denials of OGAM exemptions are reviewed for an "abuse of *discretion*." N.J.S.A. § 2C:58-3.4(c). If the criteria were objective, the standard of review would be *de novo*.

*Fourth*, Defendant's own briefing undermines her claim that the OGAM scheme is "shall issue." As explained above, Defendant cannot even say for sure

---

[10] Defendant repeatedly asserts that the OGAM exemption can be received for any "lawful purpose[]." *See, e.g.*, XMSJ at 9, 30, 35, 43, 44, 50. But this blatantly conflicts with the statutory requirements to show both "need" and status as a "collector" or "competitor." It also ignores the statutory *disqualification* for purchase of multiple handguns on the basis that a pricing discount is received (N.J.S.A. § 2C:58-3.4(b)) – certainly a "lawful purpose," but not one the statute permits. Undeterred, Defendant promises that "[t]he Superintendent 'will approve' an application for an exemption permit if the applicant meets the statutory 'lawful related purpose' criteria." XMSJ at 26 (citing State SOMF ¶¶4-5, ECF No. 95-2). But that is not borne out by the data, wherein Defendant rejects about one in four such applications for reasons other than public safety. *See* State SOMF ¶3. Tellingly, the Third Circuit has already implicitly rejected Defendant's "lawful purpose" claim, explaining that "the One Gun Law … provides exemptions … for certain groups of people, such as collectors … and competitive shooters" – not any "lawful purpose." *ANJRPC v. Governor of N.J.*, 707 F.3d 238, 240 (3d Cir. 2013).

whether Benton is eligible to purchase more than OGAM. If the statute contained objective and nondiscretionary criteria, Defendant should have been able to easily answer the question. *See* Section I(A), *supra*.

*Fifth*, Defendant's own chosen terminology is telling. Seeking to recharacterize New Jersey's OGAM rationing scheme as "shall issue," Defendant repeatedly refers to it as a "permitting" regime. *See, e.g.*, XMSJ at 1 ("appropriate permit"), 14 ("exemption permit"), *passim*. This characterization of OGAM as a "permit" appears no fewer than 31 times in Defendant's brief. But not once does the OGAM statute use the term "permit." Again, a true "shall-issue" permitting regime welcomes all comers, and simply requires a permit before engaging in certain activity. The OGAM scheme, in contrast, constitutes a flat ban on acquisition of more than OGAM, subject to a discretionary "grant" of an "exemption." An exemption is "freedom from a duty, liability, or other requirement … to which others are held … an exception." Black's Law Dictionary 612 (8th ed. 2004). New Jersey's OGAM scheme cannot be recast as a "shall-issue" licensing regime simply by claiming that the statute does not mean what it says. *See* L. Carroll, Through the Looking Glass 124 (1895) ("'When I use a word,' Humpty Dumpty said in rather a scornful tone, 'it means just what I choose it to mean – neither more nor less.'").

*Sixth*, Defendant's own witness undermines her claim that the OGAM scheme "is a presumptively constitutional shall-issue regulation." XMSJ at 23. In his

deposition, Matthew Daiello was asked whether "the statute says that the superintendent may grant an exemption. It doesn't say that he shall grant an extension," and he agreed "[t]hat's what it says." Daiello Depo. at 39:19-23.

*Seventh*, the numbers bear out the reality that OGAM exemptions are anything but "shall issue." Defendant reports that roughly three-quarters of OGAM exemption applications are approved. XMSJ at 9; State SOMF ¶3, ECF No. 95-2 (citing Daiello Depo. at 23:16-18, 22:9-15, 42:14-43:1). But all this means is that about one in four such applications is denied. In stark contrast, New Jersey reports that, since *Bruen* was decided, it has granted virtually all – 99.6 percent – of applications for concealed carry permits (116,976 of 117,482 permits granted).[11] If New Jersey's OGAM regime were truly "shall issue," then one would expect virtually all requests for exemption to be granted, just as they are for carry permits. But that is not the case, indicating the discretionary nature of the system.

But even New Jersey's three-quarters-granted figure is misleading, because it assumes a regime where only certain narrow categories of persons qualify for OGAM exemptions, and where persons (like Plaintiffs[12]) who believe they do not

---

[11] *Permit to Carry Dashboard*, NJ Office of Justice Data, https://perma.cc/7ELH-QQZ9 (post-*Bruen*).

[12] As Plaintiffs have explained, even if they would be counted as "collectors" (a dubious proposition), they cannot assert any statutory "need to purchase" more than OGAM, such as lack of future availability. Rather, they merely wish to exercise

qualify for an exemption do not even bother to apply. *See* Daiello Depo. at 47:1-6 ("if someone believes they do not qualify," then "they can just not apply"). Not to mention, the exemption application process itself serves as an obvious deterrent – many of those who would purchase more than OGAM simply wait till next month, rather than jump through New Jersey's hoops to exercise their rights. Indeed, prior to *Bruen*, New Jersey reports having received only 635 carry applications per year.[13] But since *Bruen* was decided, that number has skyrocketed by 4,600 percent – to nearly 30,000 applications per year. *Id.* Were New Jersey's OGAM statute invalidated, a similar increase in persons purchasing more than one handgun per month could be expected. Defendant's "shall-issue" claim is belied by the data.

*Eighth*, Defendant claims that "the Superintendent is authorized to 'not grant an exception' only 'if he finds a reasonable likelihood that the public safety would be endangered....'" XMSJ at 9 (emphasis added); *see also id.* at 26. But Defendant's own witness testified quite differently, stating that he was "not … aware of" any case where a OGAM exemption application had ever been denied based on a finding of danger to public safety. *See* Daiello Depo. at 40:14-19. This shows that *some other discretionary reason* must be behind *every* denial. Indeed, the statute provides that

---

their Second Amendment right to acquire "Arms" in the plural. Compl. Ex. C, Declaration of Christian Benton ¶¶9, 12.

[13] *Permit to Carry Dashboard*, NJ Office of Justice Data, https://perma.cc/TK94-TCSH (pre-*Bruen*).

the "superintendent shall not grant an exemption if he finds a reasonable likelihood that the public safety would be endangered," while in all other non-public-safety cases, "[t]he superintendent may grant an exemption … to the satisfaction of the superintendent...." N.J.S.A. §§ 2C:58-3.4(b), (a). Defendant's conveniently added word "only" is a blatant attempt to make the OGAM scheme appear "shall issue," but it does not appear in the statute. A mandate to "shall not grant" in certain situations does not automatically mean "shall grant" in all other situations.

For any one of these reasons, this Court must reject Defendant's claim that New Jersey's OGAM scheme is "shall issue."

### B. New Jersey's Rationing Scheme Is Not a "Condition" or "Qualification[] on the Commercial Sale of Arms." Even if It Were, that Would Not Render It "Presumptively Constitutional"

#### 1. The OGAM Scheme Is Not a Commercial Sale Regulation

Claiming that the OGAM scheme merely "regulates the commercial 'purchase[]' of a firearm from a licensed retailer and does not criminalize mere possession," Defendant claims that the scheme is entitled to "presumptive constitutionality...." XMSJ at 28, 36. In support, Defendant relies on the Third Circuit's decision in *ANJRPC v. Governor of N.J.*, 707 F.3d 238, 240 (3d Cir. 2013), which noted that, while the OGAM scheme limits sales "to one per person per month," it "is not a complete prohibition." But that was an equal protection and

statutory preemption case, and it did not involve the question of what constitutes a "condition" or "qualification on the commercial sale of arms."

Nor is a "complete prohibition" the test that any court has adopted. Rather, interpreting dicta from *District of Columbia v. Heller*, 554 U.S. 570 (2008), courts have identified "commercial sale" regulations to include dealer licensing,[14] zoning rules,[15] security and inspection requirements,[16] and background checks designed to prevent prohibited persons from acquiring arms.[17] Defendant recognizes as much. XMSJ at 28-29 (same).

In contrast, the OGAM statute does not "regulate" a "purchase" – it stops a purchase from ever occurring. OGAM rationing cannot be "part of the process of buying and selling guns" (*Berger*, 189 F.4th at 340) – it mandates that "buying and selling" cannot occur (at least not until next month). The OGAM scheme does not "target the transfer of the firearm," *United States v. James*, 677 F. Supp. 3d 329, 342-43 (D.V.I. 2023) – under the OGAM statute, *there is no transfer*. The OGAM scheme is not an "incidental burden" on the exercise of a right (*Berger*, 189 F.4th at 340) – it says that the right cannot be exercised at all. The OGAM scheme does not

[14] *United States v. Hosford*, 843 F.3d 161, 165-67 (4th Cir. 2016).
[15] *Teixeira v. City of Alameda*, 873 F.3d 670, 679-80 (9th Cir. 2017).
[16] *Gazzola v. Hochul*, 88 F.4th 186, 194-98 (2d Cir. 2023).
[17] *McRorey v. Garland*, 99 F.4th 831, 836-40 (5th Cir. 2024).

merely "threaten a citizen's right to acquire firearms," *Gazzola*, 88 F.4th at 196-97 – it delays and thereby denies acquisition entirely.[18]

Nor does the OGAM scheme serve any such recordkeeping or gatekeeping function – the hallmarks of other "commercial sale" regulations. In fact, a *separate* background check is run at point of sale, rendering the OGAM exemption "'a prophylaxis-upon-prophylaxis approach'...." Compl. ¶86. Such a rationing system does not "condition" gun sales on certain status, such as dealer licensure, or establish a "qualification" for buyers, such as law-abiding status. Rather, it "meter[s] the exercise of constitutional rights" by effecting a "categorical[] prohibition" on the acquisition of arms. *Nguyen*, 140 F.4th at 1243.

Perhaps for that reason, Plaintiffs are not aware of any court that has held a firearm rationing scheme to be a condition or qualification on the commercial sale of arms. To the contrary, in *Ortega v. Grisham,* 148 F.4th 1134, 1148 (10th Cir. 2025), the Tenth Circuit struck down New Mexico's seven-day waiting period on firearm purchases. As that court explained, "[i]t is not enough that a regulation

[18] Attempting to shift blame from the OGAM scheme's obvious rationing of firearm purchases, Defendant claims vaguely that Plaintiffs "misunderstand" the statute, that the statute must be read as a whole, that it "permits precisely the conduct [plaintiffs] claim is prohibited," and that it is in fact not the statute but "Plaintiffs' decision not to apply for an exemption" that has "prohibited them from purchasing firearms." XMSJ at 29-30. Defendant would be wise to remember the moral of Aesop's Fable "The Wolf and the Lamb": "The tyrant can always find an excuse for his tyranny."

sometimes affects a commercial sale. A blanket waiting period is simply not of a kind with the conditions and qualifications imposed by other presumptively lawful measures. … '[T]he Supreme Court in *Heller* could not have meant that *anything* that *could* be characterized as a condition and qualification on the commercial sale of firearms is immune from more searching Second Amendment scrutiny.' … By New Mexico's logic … an outright ban on commercial sales would also be a condition or qualification on commercial sales, and presumptively lawful." *Id.* And as *Ortega* points out, the Ninth Circuit also declined to adopt such an argument, which appeared only in a concurrence by one judge. *See id.*; *see also Silvester v. Harris*, 843 F.3d 816, 830 (9th Cir. 2016) (Thomas, C.J., concurring).

Reviewing a federal statute that bans handgun purchases from licensed dealers by young adults between the ages of 18 and 21, the Fourth Circuit similarly found that such "laws are not 'conditions and qualifications on the commercial sale of arms.' … A condition or qualification on the sale of arms is a hoop someone must jump through to sell a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records.... Here, though, the restrictions operate as a total ban on *buying* a gun from a licensed dealer that has met the required conditions and qualifications to sell arms. There is nothing a law-abiding 18- to 20-year-old can do to buy a handgun from a licensed dealer except wait...." *Hirschfeld v. BATFE*, 5 F.4th 407, 416 (4th Cir.), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021). So too here,

the OGAM scheme "operate[s] as a total ban on buying a [second] handgun from a licensed dealer," and "there is nothing a [buyer] can do to buy a [second] handgun from a licensed dealer except wait" (either for 30 days to expire, or for an exemption application to be approved after 30 days).

The Fifth Circuit is in accord. In *Reese v. BATFE*, 127 F.4th 583, 590 n.2 (5th Cir. 2025), the Fifth Circuit criticized another court's description of a "state firearms purchase ban on 18-to 20-year old adults as a 'presumptively lawful regulatory measure,'" calling such "exclu[sion] … from the *Bruen* analysis" a "category error." Likewise, in *Elite Customs L.L.C. v. BATFE*, 2026 U.S. App. LEXIS 28760, at *12 (5th Cir. Sept. 18, 2026), the Fifth Circuit recently explained that "[a]lmost any ban on purchasing firearms under certain circumstances can be recharacterized as merely imposing conditions and qualifications on such purchases. Because it is obvious that neither *Heller* nor its progeny means to vest wide-reaching purchase bans with a presumption of constitutionality, it is equally evident that neither *Heller* nor its progeny blesses the notion that regulations can be routinely upheld under the auspices of garden-variety 'conditions and qualifications.'"

In other words, four courts of appeals have rejected the argument Defendant advances here. Undaunted, Defendant attempts to explain away *Ortega*, demurring that, unlike the OGAM scheme here, the New Mexico waiting period contained no opportunity to seek an exemption. XMSJ at 35. But Defendant hoists herself with

her own petard. While the New Mexico waiting period was seven days, and allowed purchasers to acquire as many firearms as they wished (*Ortega*, 148 F.4th at 1139; N.M. Stat. Ann. § 30-7-7.3), the OGAM scheme here rations handguns to one per month. And as for the supposed opportunity to apply for an exemption (*see* XMSJ at 35), Defendant's own witness testified that an OGAM exemption applicant can expect to wait at least 30 days for an answer – unsurprisingly, the same amount of time before the statute permits a second handgun to be purchased. *See* Daiello Depo. at 37:6-11 (Question: "let's say it was the perfect application and everything was in order. How long would it take you … to rule on something like that?" Answer: "it depends on the PD, the local, whoever's processing it, but 30 days."). And so whether one waits 30 days to purchase a second handgun, or applies for an exemption and then waits 30 days or more for it to be approved, the result is the same. All Defendant has shown is that the OGAM scheme is *worse* than the New Mexico waiting period the Tenth Circuit struck down.[19]

---

[19] Another Third Circuit decision undermines Defendant's argument here. In *ANJRPC, Inc. v. Att'y Gen. N.J.*, 183 F.4th 211 (3d Cir. 2026), the *en banc* Third Circuit struck down New Jersey's ban on ammunition magazines with capacities in excess of ten rounds, explaining that "nothing in text of the Second Amendment suggests that the capacity of a magazine bears on whether it receives constitutional protection." *Id.* at 248. So if New Jersey cannot limit *magazine capacity*, the State cannot limit the capacity of its citizens to acquire handguns, either. Indeed, the Second Amendment uses the plural term "Arms" quite clearly.

Further undermining her own position, Defendant recycles the data about granting about three-quarters of OGAM exemption applications (after approximately 30 days, of course). XMSJ at 31. Defendant theorizes that, for the approximately one-quarter of applications that are denied, some "*may* have just been incomplete" and some "*may*" be "due to … public safety concerns." *Id.* (emphasis added). On the contrary, Defendant's own witness testified that the Superintendent had *never* denied a OGAM exemption for public safety concerns (Daiello Depo. at 40:14-19), such as "straw purchasing" and "illegal gun trafficking" (XMSJ at 9; *see also id.* at 4).[20] In other words, according to Defendant's own testimony, *every* OGAM exemption denial must have been to an eligible firearms purchaser who wished to engage in a lawful purchase of multiple handguns. One can only speculate how Defendant nevertheless concludes that such a system "can hardly be understood as a ban on keeping and bearing arms." XMSJ at 31. That is precisely what it is.

Defendant next attempts to explain away each of the cases Plaintiffs marshalled in support of their position. XMSJ at 33-36. Objecting to the relevance of the many cases which have held that the Second Amendment protects the acquisition of "Arms" – not "Arm" – Defendant demurs that the OGAM scheme "does not impose a burden that prevents the meaningful exercise of the core right to possess firearms for self-defense." XMSJ at 33. But such an obvious interest-

[20] *Cf. Berger*, 189 F.4th at 340-41.

balancing-laden standard has been flatly rejected. Neither the Third Circuit nor the Supreme Court has sanctioned a freewheeling standard whereby only "burden[s] that prevent[] the meaningful exercise" of rights constitute infringements. To the contrary, *Berger* says that infringements are those that "destroy[] or illegitimately restrict[] the right." 189 F.4th at 340. Indeed, "it matters whether a commercial regulation impinges upon the 'right to possess and carry weapons in case of confrontation.'" *United States v. Clerfe*, 186 F.4th 141, 147 (3d Cir. 2026). "Impinge" – to "have an effect or impact"[21] – implies something lesser than "preventing the meaningful exercise." Thus, the Third Circuit has explained that the Second Amendment "guarantee … forbids 'destroy[ing]' the right by banning gun ownership. … But it also forbids lesser 'violat[ions]' that 'hinder' a person's" rights. *Frein v. Pa. State Police*, 47 F.4th 247, 254 (3d Cir. 2022). And that is unsurprising. *Bruen* itself rejected the concept that only so-called "core" rights deserve exacting Second Amendment protection (597 U.S. at 18-19), and the Supreme Court has subsequently (and definitively) resolved any doubts on the matter: "*any restrictions* on either the 'keep[ing]' (*i.e.*, possession) or the 'bear[ing]' (*i.e.*, carrying) of arms" are "*presumptively unconstitutional*." *Wolford v. Lopez*, 146 S. Ct. 2032, 2043, 2044 (2026) (emphases added). Finally, *ANJRPC* recently made clear that the Second Amendment protects much more than merely "self-defense," as Defendant

---

[21] https://www.dictionary.com/browse/impinge.

apparently believes. *ANJRPC, Inc.*, 183 F.4th at 234. Virtually every word of Defendant's statement is foreclosed by precedent.[22]

Defendant next seeks to distinguish *Nguyen* claiming that, unlike here, the California statute "establishe[d] no exemption or pathway" to "purchase more than one firearm within a 30-day period." XMSJ at 35 (citing *Nguyen*, 140 F.4th at 1248); *see also id.* (attempting to distinguish *Ortega* on the same theory). But as Plaintiffs have explained, neither does the OGAM statute. Defendant's witness testified that any exemption typically will be ruled upon only *after* the 30-day statutory clock already has run. *See* Daiello Depo. at 37:6-11. That is not a real exemption, and Plaintiffs already have rebutted it *supra*.

Next, Defendant argues that the Third Circuit has '*held*' that, so long as there is a "'categorical exception'" available for "'restrictions'" on the acquisition of firearms, "'it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms'" as a general matter. XMSJ at 35 (citing *Clerfe*,

[22] Defendant objects to the relevance of *Rigby v. Jennings*, 2026 U.S. Dist. LEXIS 204409 (D. Del. Sept. 10, 2026), noting that the text Plaintiffs cited came in the court's discussion of assembling and manufacturing unserialized firearms, rather than the serialization requirement for commercial sales. XMSJ at 34. But Defendant misses the point. The commercial serialization requirement in *Rigby* "ensures that those wishing to commercially distribute unfinished firearm frames or receivers are federally licensed and comply with federal serialization requirements," and "does not prohibit keeping or bearing firearms." 2026 U.S. Dist. LEXIS 204409, at *21. In contrast here, the OGAM statute is directed at Plaintiffs – not dealers – and expressly prohibits them from acquiring more than OGAM. It is exactly what the *Rigby* statute was not.

186 F.4th at 147). Apparently, Defendant thinks this means that a complete ban on acquiring firearms is permissible, so long as a theoretical, discretionary exemption were offered, like here. But that is not even close to what *Clerfe* said. *Clerfe* was quoting *United States v. Marzzarella,* 614 F.3d 85, 92 n.8 (3d Cir. 2010), and both courts *rejected* the notion that the Second Amendment contains some "categorical exception" for regulations of commercial sales. Indeed, in the very next sentence of *Clerfe – which Defendant fails to quote* – the Third Circuit explained that "such a result would be untenable." 186 F.4th at 147.[23] But apparently the court's *reductio ad absurdum* was lost on Defendant, *who seems to believe that Clerfe approved banning firearm purchases*. It did nothing of the sort.

Finally, Defendant objects to a series of cases that establish the Second Amendment right to acquire firearms. XMSJ at 35-36 & n.9. Defendant claims, for example, that the Fifth Circuit's decision in *Reese*, 127 F.4th, "did not consider whether the challenged laws at issue were presumptively constitutional commercial regulations...." XMSJ at 36. Au contraire. The Fifth Circuit *explicitly* rejected the notion that a "firearms purchase ban on 18- to 20-year old adults [i]s a 'presumptively lawful regulatory measure'" based on *Heller*'s language about

[23] *See also United States v. Hicks*, 649 F. Supp. 3d 357, 360 (W.D. Tex. 2023) ("[A]ccording to the Government, Congress could throttle gun ownership without implicating Second Amendment scrutiny by just banning the buying and selling of firearms. What a marvelous, Second Amendment loophole!"), *rev'd on other grounds*, 2025 U.S. App. LEXIS 18297 (5th Cir. July 23, 2025).

"regulations on commercial firearms sales." 127 F.4th at 590 n.2. And while the Sixth Circuit's decision in *United States v. Gore*, 118 F.4th 808 (6th Cir. 2024), did not expressly address the "commercial sale" question (XMSJ at 36 n.9), the Sixth Circuit proceeded *directly* to historical analysis. 118 F.4th at 812. If such a "commercial sale … qualification" were "presumptively constitutional" at the outset, then the court would never have applied *Bruen*'s historical framework. In other words, *Gore* too implicitly rejects Defendant's claim.

**2. Commercial Sale Regulations Are Not "Presumptively Constitutional" Such that They Avoid Historical Analysis Under *Bruen***

Even if New Jersey's OGAM regime were a "condition[]" or "qualification[] on the commercial sale of arms," that would not render it "presumptively constitutional," as Defendant erroneously believes. XMSJ at 5, 29. To the contrary, *Bruen* was decided "[i]n keeping with *Heller*," and established no safe harbor from its rigorous analytical framework. *Bruen*, 597 U.S. at 17. Rather, the Court made clear that, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and "*[o]nly if* a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 17 (emphasis added). This unyielding language – "only if" – leaves no room for Defendant's request to simply declare the OGAM statute

"presumptively constitutional" based on *Heller*'s dicta, and thereby to avoid the historical analysis *Bruen* requires in *every* case.

Tellingly, Defendant does not cite *Bruen* for this claim, but instead the Ninth Circuit's characterization of *Bruen*. XMSJ at 5. But *Bruen*'s footnote nine discussed background checks for *carry permits* – not New Jersey's OGAM *rationing* of firearm *acquisition*. And even if Defendant were allowed to recharacterize the OGAM rationing scheme as a "permitting" regime (*but see* Section II(A), *supra*), neither *Bruen* nor *Heller* widely blessed licensing schemes as "presumptively constitutional." To the contrary, the Court qualified that other states' licensing regimes only "appear[ed] to operate" as shall issue regimes, and only "appear[ed] to contain" certain features. *Bruen*, 597 U.S. at 13 n.1, 38 n.9. This emphasis on "appearances" made perfect sense. Opining on the constitutionality of hundreds of laws across dozens of unchallenged regimes not only was unnecessary to deciding *Bruen*, but it also would have been untenable under the Constitution's bar against rendering advisory opinions. *See* U.S. Const. art. III, § 2. Thus, when the Court declined "to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes" in *Bruen*'s footnote nine, it merely acknowledged that what was not at issue was not at issue. In fact, only two of the Court's nine justices took the position that licensure is constitutional. *See Bruen*, 597 U.S. at 79 (Kavanaugh, J., concurring). That conclusion was, definitionally, *not* the opinion of the Court.

Numerous courts are in accord, explaining that "not every regulation on the commercial sale of arms is presumptively lawful," *Rigby v. Jennings*, 630 F. Supp. 3d 602, 613 (D. Del. 2022), and instead finding that all firearm regulations must be assessed under *Bruen*'s historical framework. Although decided prior to *Bruen*, the Third Circuit explained that, "[i]n order to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition. If there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*." *Marzzarella,* 614 F.3d at 92 n.8 (3d Cir. 2010). Yet a "categorical exception" to "prohibit[] the commercial sale of firearms" above one per month is precisely what Defendant seeks here.

And in *Nguyen*, 140 F.4th, the Ninth Circuit decided the very question at issue here, ruling that California's

> monthly metering of firearm purchases meaningfully constrains the right to purchase and possess firearms and is thus presumptively unconstitutional.... We are not aware of any circumstance where government may temporally meter the exercise of constitutional rights in this manner. And we doubt anyone would think government could limit citizens' free-speech right to one protest a month, their free-exercise right to one worship service per month, or their right to be free from unreasonable searches and seizures to apply only to one search or arrest per month. … If the frequency with which constitutional rights can be exercised could be regulated in this manner without infringement, what would limit government from deciding that a right

> need only be available every six months or once a year or at any other interval it chooses? [*Id.* at 1243.]

The same is true here. New Jersey lacks authority to dole out Second Amendment rights to whom and in such quantities as it chooses. Such a rationing regime is not "presumptively constitutional," and it cannot avoid *Bruen*'s historical review.

**C. New Jersey's Handgun Rationing Scheme Is Ahistorical**

Finally attempting to shoulder her historical burden, Defendant claims that the Challenged Laws are "'consistent with the principles that underpin the Nation's regulatory tradition.'" XMSJ at 37. But at the outset, Defendant makes two methodological attempts to lower the analytical hurdle that her paltry historical showing must clear. Each claim misstates or ignores a key aspect of the Second Amendment's textual and historical framework.

**1. Defendant Cannot Demonstrate a Founding-Era Tradition Without Founding-Era Analogues**

*First*, Defendant claims that *all historical time periods* are fair game for analysis, so long as evidence from those periods "all point[s] in the same direction...." XMSJ at 38. But both the Supreme Court and the Third Circuit have rejected that notion.[24] To the contrary, *Bruen* "generally assumed that the scope of

[24] To be sure, "'where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic,'" such longevity can be evidence of the practice's constitutionality. *Bruen*, 597 U.S. at 36. But as explained *infra*, Defendant does not merely seek to confirm a longstanding historical practice. Rather, she seeks to paper over a Founding-era record that favors *Plaintiffs* by

the protection applicable to the … States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37. And what *Bruen assumed*, the Third Circuit has definitively *held* – Founding-era understandings control. *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 441 (3d Cir. 2025) ("the constitutional right to keep and bear arms should be understood according to its public meaning in 1791"), *reh'g en banc denied*, 130 F.4th 65 (3d Cir. 2025); *see also ANJRPC*, 183 F.4th at 232 ("we must look to Founding-era laws"). Thus, "19th-century evidence [i]s 'treated as mere confirmation of what the Court thought had already been established,'"[25] while "'postratification adoption … of laws that are inconsistent with the original meaning … obviously cannot overcome or alter th[e] text.'" *Bruen*, 597 U.S. at 37, 36; *see also United States v. Quailes*, 126 F.4th 215, 222 (3d Cir. 2025) (alteration in original) ("Practices into the 19th century provide 'confirmation of [what the Founding-era laws] established.'"). Under this standard, if the Founding generation did not restrict the

---

resorting to evidence from *other* historical time periods to establish a tradition that did not exist at the Founding. Use of other historical time periods for *that* purpose, *Bruen* does not allow. *See id.* ("to the extent later history contradicts what the text says, the text controls").

[25] The same applies to Colonial-era evidence, which could help evince "[a] long, unbroken line" of regulation the Framers eventually adopted. *Bruen*, 597 U.S. at 35. But "English common-law practices and understandings … cannot be indiscriminately attributed to the Framers of our own Constitution." *Id.* Rather, "courts must exercise care to rely only on the history that the Constitution actually incorporated and not on the history that the Constitution left behind." *United States v. Rahimi*, 602 U.S. 680, 723 (2024) (Kavanaugh, J., concurring).

number of handguns Americans could purchase at once – *i.e.*, if there are no 1791-era historical analogues to be found – then there is nothing for earlier or later history to "confirm." As the *en banc* Third Circuit ruled earlier this year, "[p]ost-ratification practice can be evidence of Founding-era principles, but it cannot create a new tradition or contradict Founding-era practices." *ANJRPC*, 183 F.4th at 244. To adopt Defendant's arguments would effectively overturn *ANJRPC*.

Defendant's obfuscation on this issue is hardly surprising. No doubt, if there are analogues from "English law, Founding-era law, and 19th-century law," and they "all point in the same direction," then "the court should consider them all." XMSJ at 38. But that is decidedly *not* what Defendant has presented to this Court. Rather, Defendant offers almost exclusively "English law" and "19th-century law" bookends – with a conspicuous dearth of "Founding-era" analogues in between. Thus, Defendant references sources from "the 1600s," 1642, 1676, 1689, and 1713, as well as laws from 1814, 1821, 1827, 1857, 1866, and "during and after the Civil War." *Id.* at 40-48. In contrast, markedly few of Defendant's sources can truly be said to be "Founding-era" – only those from 1777, 1802, and *perhaps* 1812. *Id.* at 48, 42. But those three Founding-era regulations either disarmed the "disloyal" (1777 New Jersey) or required licensing for dealers of secondhand goods (1802 and 1812 New York), and they represent the laws of only *two* states. *See id.* Not to mention, wartime loyalty oaths and secondhand goods are not the same thing, and

one-off laws dealing with entirely different subject matters do not form a tradition of anything. Indeed, *Bruen* "doubt[ed]" that only "*three*" regulations *of the same type* "could suffice to show a tradition...." *Bruen*, 597 U.S. at 46. In other words, if not even three of a kind is good enough under *Bruen*, then Defendant's jack, two, and four certainly does not pass muster. As the Ninth Circuit noted last year, "while *Bruen* does not require a 'historical twin' for a modern firearm regulation to pass muster, … the historical record *does not even establish a historical cousin* for [a] one-gun-a-month law." *Nguyen*, 140 F.4th at 1249 (emphasis added).

Nor does "an absence of Founding-era regulation" (XMSJ at 38) mean that Defendant can substitute *other* time periods to assert a tradition that never existed. As the Supreme Court explained in *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020), "a tradition" that "arose in the second half of the 19th century," even in "more than 30 States," "cannot by itself establish an early American tradition." In fact, *Bruen* relied on *Espinoza* to reject precisely what Defendant claims is permissible here. *See Bruen*, 597 U.S. at 36 ("to the extent later history contradicts what the text says, the text controls"); *see also id.* at 82 (Barrett, J., concurring) ("if 1791 is the benchmark, then … appeals to Reconstruction-era history would fail for the independent reason that this evidence is simply too late (in addition to too little)"). Thus, courts *cannot* "rely on evidence from the Reconstruction era if there is little Founding-era evidence on point," as Defendant

wrongly claims. XMSJ at 38. The out-of-circuit cases Defendant cites for that proposition[26] *reject* this Circuit's (and the Supreme Court's[27]) Founding-era focus.

Defendant's citation to *Pitsilides v. Barr*, 128 F.4th 203, 209 (3d Cir. 2025), changes nothing. Defendant claims *Pitsilides* stands for the proposition that "an absence of Founding-era regulation does not mean such regulation is constitutionally prohibited...." XMSJ at 38. But that would be a startling holding, considering the Third Circuit had just held the *opposite* in *Lara*: "the government bears the burden of identifying a 'founding-era' historical analogue to the modern firearm regulation." *Lara*, 125 F.4th at 434. To the contrary, *Pitsilides* simply noted that Founding-era legislatures might not have "'maximally exercised their power to regulate' conduct," when it comes to "*the extent to which modern firearm restrictions need to match historical analogues*." *Pitsilides*, 128 F.4th at 209 (emphasis added). In other words,

[26] *See Christian v. James*, 176 F.4th 189, 195 (2d Cir. 2026) ("'1868 and 1791 are both focal points of our analysis'"); *Schoenthal v. Raoul*, 150 F.4th 889, 913 (7th Cir. 2025) (claiming Reconstruction-era evidence is "especially" useful "when reviewing a state law"). In contrast, *McCoy v. BATFE*, 140 F.4th 568, 577, 578 (4th Cir. 2025), focused on "founding-era restrictions," using later history as "helpful 'confirmation' of original meaning," and it therefore supports Plaintiffs.

[27] Defendant relies on *Gamble v. United States*, 587 U.S. 678 (2019), and *Timbs v. Indiana*, 586 U.S. 146 (2019), in further support of her time period-shifting approach. But neither case stands for that proposition. The Court "made clear in *Gamble* that … mid- to late-19th-century commentary was *secondary*." *Bruen*, 597 U.S. at 37 (emphasis added). And *Timbs* examined "colonial-era provisions" and the "constitutions of eight States" in 1787 to determine the Eighth Amendment's original meaning, *before* finding further confirmation in "[a]n even broader consensus … in 1868...." *Timbs*, 586 U.S. at 152. That should come as no surprise – Plaintiffs' methodology is correct, because it is *the Supreme Court's methodology*.

Founding-era analogues are required, but they need not be *identical* to a modern regulation to pass muster. Properly understood, then, *Pitsilides* stands only for the proposition that the Framers did not have to "maximally" regulate in the *same exact way* as a modern regulation, so long as there was *something similar* at the Founding that establishes the relevant historical principle. As *Pitsilides* acknowledged, *Rahimi*'s reliance on surety and going-armed laws to uphold 18 U.S.C. § 922(g)(8) "helpfully illustrated this approach." *Id.* But those were *Founding-era* analogues.

*Rahimi* confirms Plaintiffs' reading of *Pitsilides*. The Supreme Court did not identify a Founding-era law prohibiting persons subject to domestic-violence restraining orders from possessing firearms. Rather, it identified surety and going-armed laws, which established the Founding-era historical principle that individuals found by a court to present a clear threat of physical violence could be disarmed. 602 U.S. at 696-98. Thus, while the government need not identify a historical twin, it must identify historical regulations from the Founding era establishing a relevant principle. *Pitsilides* did not suggest that the government may dispense with the requirement to show Founding-era sources at all, as Defendant apparently believes.

The Third Circuit's *en banc* decision in *ANJRPC* further confirms that *Pitsilides* does not say what Defendant claims. There, the court held quite clearly that, "[w]here no precedent from the Founding era 'evinces a comparable tradition of regulation,' regulations from the mid- to late-1800s cannot bear much weight."

183 F.4th at 244-45. Again, post-ratification laws may confirm Founding-era principles; they cannot create one. *Id.* Defendant's interpretation of *Pitsilides* effectively inverts that settled distinction, allowing a Founding-era tradition to be created using zero Founding-era analogues. That is not the law in this Circuit.

**2. Defendant Cannot Shirk Her Burden by Claiming This Case Is "Unprecedented"**

*Second*, Defendant claims this case warrants the "more nuanced approach" to historical analysis that *Bruen* contemplated (597 U.S. at 27), theorizing that modern "commercial availability of firearms" and the risk of "'arms trafficking'" are "'unprecedented societal concerns or dramatic technological changes'...." XMSJ at 44 n.14, 39. Purportedly, these "evolving technologies and social problems … 'diminish the government's burden of drawing a tight historical analogy'...." *Id.* at 39 (quoting *Zherka v. Bondi*, 140 F.4th 68, 79 (2d Cir. 2025)). But while Defendant's fast-and-loose approach to analogical reasoning may fly in the nonbinding *Second* Circuit, that is not the law of this Circuit, or of the Supreme Court. Rather, no matter how "much nuance we might employ," Defendant "[can]not overcome [a] dearth of relevantly similar Founding-era restrictions." *ANJRPC*, 183 F.4th at 250.

More fundamentally, though, Defendant is *wrong* that the commercial availability of modern firearms – or their criminal trafficking – is a "novel issue." XMSJ at 39. To the contrary, Defendant concedes that the "Ninth Circuit has concluded that 'arms trafficking is not a <u>new</u> problem'" in *Nguyen*. XMSJ at 44 n.14

(emphasis added). Even so, Defendant claims, "'arms trafficking' … [is] a 'distinctively modern[]' problem...." *Id.* (emphasis added). Tomato, to-mah-toe. Regardless of whether Defendant swaps the word "*new*" with its synonym "*modern*," the fact remains that Defendant *herself* has admitted arms trafficking has been around since before the Founding. Indeed, Defendant points to a 1676 colonial Virginia law that "restricted arms trading with Natives" in "areas … susceptible to illegal trafficking." XMSJ at 48, 41. Of course, firearm "trafficking" is just a modern term for the concept of placing guns *into the wrong hands*. This problem has existed as long as weapons have, and prior generations enacted laws to address it – just never through limitations on how many firearms one could *purchase*. Defendant must point to a Founding-era tradition of rationing handguns purchases, but she has not done so, because none exists.

Nor would a "more nuanced approach" mean that Defendant can simply note that handgun availability has increased, and then vaguely invoke the prevention of "public danger" as a historical principle. XMSJ at 40. If preventing "public danger" were a valid analogical "why," *Bruen*'s test would backslide into interest balancing, sanctioning all manner of ahistorical gun control. But "a court must be careful not to read a principle at such a high level of generality that it waters down the right." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring). There is no higher level of

generality than Defendant's vague appeals to "public safety," and such a prohibited interest-balancing approach cannot justify the Challenged Laws here.

### 3. Defendant's Historical "Quantity Limits and Licensure Requirements" Bear No Resemblance to New Jersey's Handgun Rationing Scheme

At the outset, Defendant asserts that "[f]irearms were not widely commercially available or feasible to purchase in bulk during the Founding Era...." XMSJ at 40. But that is demonstrably false, as Plaintiffs already collected numerous "historical sources show[ing] the Founding generation purchasing more than one handgun at the same time." MSJ at 28. That is exactly what Plaintiffs wish to do here, and it is exactly what New Jersey has criminalized. The fact that Plaintiffs can no longer do literally *what the Framers once did* is "relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. Defendant's disparate and anachronistic "quantity restrictions and licensing requirements" confirm the point. XMSJ at 40.

*First*, Defendant cites a 1676 colonial Virginia law that prohibited colonists from selling firearms or ammunition to American Indians. XMSJ at 41; *see* Expert Declaration of Dr. Robert J. Spitzer ("Spitzer Dec.") ¶13, ECF No. 95-15. But that law did not limit the quantity of firearms (or ammunition) that early Virginians *could purchase*, and so it fails *Bruen*'s "how" by imposing an entirely different burden on the right to acquire firearms – none at all. If anything, Defendant's 1676 Virginia

law might justify a modern law like 18 U.S.C. § 922(d)(5), which prohibits the sale of firearms or ammunition to "aliens" – *i.e.*, those who are not members of "the people."[28] But it does not support a handgun rationing scheme for *Americans*.

*Second*, Defendant skips the operative Founding era, citing a *city ordinance* from 1827 New Haven, Connecticut, and an 1857 New Jersey law that both "limited the quantity of gunpowder a person could possess...." XMSJ at 41. But the Third Circuit already explained that historical gunpowder regulations "were enacted as fire-safety measures, not to address firearm violence" or the criminal trafficking that might enable it. *ANJRPC*, 183 F.4th at 243; *see also Heller*, 554 U.S. at 632 (explaining that early "gunpowder-storage" regulations were "fire-safety laws"). These regulations therefore "are not apt comparators because the 'why' is not analogous." *ANJRPC*, 183 F.4th at 243. Not to mention, these two late-coming regulations – from one city and one state – do not come close to proving a "well-established and representative" tradition (*Bruen*, 597 U.S. at 30) even of gun-related *fire-safety* measures. Again, *Bruen* "doubt[ed]" that only "*three*" regulations "could suffice to show a tradition...." *Bruen*, 597 U.S. at 46.

[28] *See United States v. Carbajal-Flores*, 143 F.4th 877, 886 (7th Cir. 2025) ("disarming … Native Americans survived the Revolutionary War, confirming the Founders adhered to the tradition of barring groups deemed outside the polity from keeping arms").

Critically, that is all Defendant offers in support of her claimed tradition of imposing "quantity limits" on gun owners. But the Virginia law did not impose *any* quantity limits on Americans' acquisition of firearms at all. Nor did the gunpowder regulations, which were enacted to prevent volatile black powder stores from setting whole towns ablaze, not to prevent "downstream criminal trafficking." XMSJ at 40. This Court should end its historical analysis here – Defendant has failed to show any tradition of imposing "quantity limits" on the acquisition of "Arms."

*Third*, Defendant pivots to "licensing" laws in an attempt to shore up her meager historical showing as to "quantity limits." XMSJ at 41. To that end, Defendant first cites laws from 1642 Connecticut, 1689 New Hampshire, and 1814 Illinois that purportedly imposed licensing requirements on "commerce in arms." *Id.* at 42. But by Defendant's own admission, these licensing requirements all were enacted to prevent *American Indians* (or the French) from acquiring firearms – persons who, at the time, were not considered members of "the people" with Second Amendment rights. *See* Spitzer Dec. ¶71 (1642 Connecticut "barred the sale or barter of weapons to Indigenous people," while 1689 New Hampshire "similar[ly] … made it a crime to 'Barter give, or by any meanes Supply any indian or Indians, or the neighbouring French, w'th Armes or Am'unition'"); ¶72 (1814 Illinois "made it unlawful for whites to engage in commercial activities with Native Americans unless they obtained a license"). Moreover, these laws imposed licensing

requirements only on the commercial *sellers* of firearms.[29] They prove *nothing* about requiring Americans to seek licenses to purchase arms for themselves.

Next, Defendant cites licensing laws from 1802 New York, 1812 New York, and 1821 Philadelphia, Pennsylvania, "to regulate secondary markets and prevent unlawful trade," before vaguely referencing[30] additional, "[c]omparable" licensing laws from "during and after the Civil War." XMSJ at 42. But again, such laws imposed licensing requirements only on commercial *sellers*, and were not restrictions on buyers – a different "how." *See* Expert Declaration of Dr. Brennan Rivas ("Rivas Dec.") ¶54, ECF No. 95-14. Moreover, they were aimed at curbing trade in "stolen property" (*id.*) – a different "why." *Cf.* XMSJ at 50 (the Challenged Laws "prevent straw purchasing and illegal gun trafficking").

*Fourth*, Defendant seeks to distinguish *Nguyen*, on the theory that, unlike the New Jersey laws at issue here, the California law contained "'no exemption or pathway'" to acquire more than one handgun per month. XMSJ at 43. Thus, Defendant cry 'no harm, no foul,' theorizing that New Jersey's handgun rationing scheme contains an exemption that purportedly "allows *anyone* to buy multiple handguns for lawful purposes with a license." *Id.* *But see* Daiello Depo. at 37:6-11 (explaining it takes about "30 days" to process an exemption application). This is a

[29] This case does not challenge firearm dealers' commercial licensing requirements.
[30] Of course, "we are not obliged to sift the historical materials for evidence to sustain [the] statute. That is [Defendant's] burden." *Bruen*, 597 U.S. at 60.

distinction without a difference. The Challenged Laws criminalize *as a general matter* the purchase of more than one handgun per month, relegating a so-called "bulk" purchase to a mere *exemption*.[31]

All told, Defendant's historical record fails to justify criminalizing the purchase of more than one handgun per month. The purpose of "combatting arms trafficking" (XMSJ at 45) is nothing new. Indeed, prior generations sought to prevent all manner of groups from acquiring firearms – from "Papists" (Catholics) to slaves to *former* slaves. *See Heller*, 554 U.S. at 582, 614. But as Plaintiffs' contrary tradition shows (MSJ at 28), and Defendant's record now bears out, the Framers *never* addressed that age-old problem by restricting the number of firearms Americans could purchase. New Jersey cannot start now.

**4. Defendant Cannot Rely on the Disarmament of Prohibited Persons to Justify Disarming Law-Abiding Gun Owners**

Finally, Defendant attempts to bootstrap New Jersey's rationing scheme to the historical disarmament of groups believed to be "dangerous." *See* XMSJ at 46-48. According to Defendant, historical group-disarmament laws "often made predictive judgments about whether a certain group should be presumptively disarmed," and

[31] As a three-judge panel in Tennessee recently explained, the government cannot "proscrib[e] *in toto* … the right to bear arms … subject to narrow exceptions...." *Hughes v. Lee*, 2025 LX 367096, at *48 (Tenn. Chancery Ct. Gibson Cnty. Aug. 22, 2025). New Jersey is not entitled to infringe the rights of all on the theory that it later restores the rights of some through discretionary exemption.

"[h]ere … unlicensed bulk purchases of guns a[re] a 'red flag' indicating potential straw purchasing and/or trafficking...." *Id.* at 48, 49. Thus, handgun rationing merely serves the end of "screen[ing] out dangerous individuals who may engage in criminal gun trafficking...." *Id.* at 47. But this argument fails for two reasons.

*First*, this case is not about "prohibited persons." Plaintiffs are not dangerous or even "presumptively" dangerous, and they are perfectly eligible to purchase and possess firearms under New Jersey and federal law. *See* Compl. ¶¶13-17. Any tradition of disarming supposedly "dangerous" groups categorically does not apply to Plaintiffs. Acquiring "Arms" – plural – is protected by the plain text of the Second Amendment, and New Jersey has no purview to declare Plaintiffs "presumptively" dangerous for wanting to do just that.

*Second*, Defendant's argument betrays New Jersey's animus to gun owners. To Defendant, the mere desire to purchase two handguns at once is a "red flag" implying *dangerousness* and warranting closer investigation. In recent briefing in another case before this Court, Defendant Davenport made a similar argument – that gun ownership "increas[es] the chances" of "aggressi[on]" and inclination towards criminality.[32] Of course, not only is such an argument scurrilous, but also it is

---

[32] Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction at 39 n.15, *Bergmann-Schoch v. Davenport*, No. 1:25-cv-00997-CPO-MJS (D.N.J. Oct. 13, 2026), ECF No. 69 (claiming "[s]tudies show" that, "when a person is in the presence of a firearm, they are more likely to perceive others as hostile, increasing the chances that they will react aggressively").

egregiously wrong. *See Wolford v. Lopez*, 686 F. Supp. 3d 1034, 1075 (D. Haw. 2023) ("vast majority" of firearm licensees "are law-abiding" and "are significantly less likely to commit gun-related crimes"), *rev'd on other grounds*, 116 F.4th 959 (9th Cir. 2024), *rev'd*, 146 S. Ct. 2032 (2026). There is nothing inherently suspect about purchasing more than one firearm at once. Again, the Framers did it all the time (MSJ at 28), and New Jersey allows it for long guns – apparently with no concern over "trafficking" of *those* firearms.

## CONCLUSION

Defendant's own expert gives away the case. He testified that New Jersey's "One Gun Per Month … limitation[] … did not exist early in the country's history." Spitzer Dec. ¶1. Rather, OGAM "is a distinctly modern public policy tool-dating only to the 1970s." *Id.* ¶85. And the only possible analogues for that modern invention are those "regulating gunpowder" and "licensing/permitting laws...." *Id.* ¶15. But as Defendant's expert admits, these are "different from the guns per month law." *Id.* ¶84. That is all this Court needs to conclude that no historical tradition justifies New Jersey's extreme outlier statute, and to strike it down under *Bruen*.

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment should be granted and Defendant's Cross-Motion for Summary Judgment should be denied.

Dated: Lake Success, New York
November 23, 2026

Respectfully submitted,
HARFENIST KRAUT & PERLSTEIN, LLP

By: *Steven J. Harfenist*

Steven J. Harfenist
*Attorneys for Plaintiffs*
3000 Marcus Avenue, Suite 2E1
Lake Success, New York 11042
T: (516) 355-9600
F: (516) 355-9601
E: SHarfenist@hkplaw.com

Oliver M. Krawczyk*
Ambler Law Offices, LLC
115 South Hanover Street, Suite 100
Carlisle, PA 17013
T: (717) 525-5822
E: oliver@amblerlawoffices.com
**Admitted Pro Hac Vice*