Steven J. Harfenist
Harfenist Kraut & Perlstein, LLP
3000 Marcus Avenue, Suite 2E1
Lake Success, New York 11042
T: (516) 355-9600
F: (516) 355-9601
E: sharfenist@hkplaw.com
*Attorneys for Plaintiffs*

Oliver M. Krawczyk*
Ambler Law Offices, LLC
115 South Hanover Street, Suite 100
Carlisle, PA 17013
T: (717) 525-5822
E: oliver@amblerlawoffices.com
PA Bar No. 334423
*Admitted Pro Hac Vice

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---------------------------------------------------------------X

CHRISTIAN BENTON, COALITION OF NEW JERSEY FIREARM OWNERS, GUN OWNERS OF AMERICA, INC., and GUN OWNERS FOUNDATION,

**Civil Action No.: 24-CV-07098(KWM)(MJS)**

Plaintiffs,

-against-

JENNIFER DAVENPORT, in her Official Capacity as the Attorney General of New Jersey,

Defendant.

---------------------------------------------------------------X

**BENTON PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

1. In New Jersey, applications for a "multi-handgun exemption" permit allowed pursuant to N.J. Stat. Ann. § 2C:58-3.4 are received and processed by the Firearms Regulatory Investigative Bureau and Firearms Dealer Investigation Unit of the N.J. State Police. *See* Decl. of Amanda Morejón Ex. A, Tr. of 30(b)(6) Dep. of Detective Sergeant First Class Matthew Daiello (hereafter "Daiello Dep.") at 14:8–9; 15:21–16:15.

**RESPONSE: Undisputed.**

2. "[A]nyone" seeking to purchase more than one handgun within a thirty-day period may do so if they first obtain an exemption permit, and anyone can apply for such a permit via an online "application portal" managed by N.J. State Police. *See* Daiello Dep. at 43:17–21; 46:4–7.

**RESPONSE: Disputed to the extent this Statement implies "[a]nyone" may obtain an exemption permit if they desire one. The statute provides only that the State Police Superintendent "may grant" an exemption permit if "satisf[ied] … that the applicant's request meets" an enumerated "condition," some of which require a demonstration of "need." N.J.S.A. § 2C:58-3.4(a). And as Defendant admits, many exemption permits are not granted. *See* Daiello Dep. at 22:9-23:18.**

3. In the past five years, 3,065 exemption permit applications were submitted to the N.J. State Police. *See* Daiello Dep. at 23:16–18. Of those 3,065 applications, N.J. State Police granted 2,347 exemption permits. *See id.* at 22:9–15; 42:14–43:1. Of the exemption permit applications that were submitted but not approved, some may have just been incomplete or the applicant may have failed to "follow through with it." *Id.* at 22:14-24; 23:16–24:3.

**RESPONSE: Undisputed as to the numbers of applications received and granted. Disputed as to the reason why exemption denials "may have"**

**occurred, as Defendant is merely speculating. *See Scott v. Calpin*, 527 F. App'x 123, 127 (3d Cir. 2013) ("'speculation or conjecture are … inappropriate material for consideration on a motion for summary judgment'"). If Defendant lacks knowledge as to why exemption applications were "not approved," then Plaintiffs certainly do not know why, either.**

4. An exemption permit is granted if the applicant satisfies the statutory criteria requiring that the multiple handguns sought to be purchased within a single thirty-day period are being purchased for a "lawful related purpose." *See* Daiello Dep. at 31:16–20.

**RESPONSE: Disputed, as this Statement contains inappropriate "'legal argument or conclusions of law'" as to how the statute operates. *Ill. Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 85 F. Supp. 3d 785, 792 (D.N.J. 2015). Likewise, "[s]tatements that 'blur[] the line between fact and opinion' and include 'arguments cloaked as "undisputed facts"' are improper under the Rule and will not be considered by the court." *Id.* Plaintiffs' responsive legal argument as to why the statute does not operate in the manner Defendant claims is contained within Plaintiffs' accompanying memorandum. *See* Benton Plaintiffs' Combined Opposition at 4-5, 14-23.**

5. If an individual applying for an exemption permit meets that standard, then N.J. State Police "will approve" the permit. *See* Daiello Dep. at 48:2–5; 47:11–21.

**<u>RESPONSE</u>: Disputed, as this Statement contains inappropriate "'legal argument or conclusions of law'" as to how the statute operates. *Ill. Nat'l Ins. Co.*, 85 F. Supp. 3d at 792. Likewise, "[s]tatements that 'blur[] the line between fact and opinion' and include 'arguments cloaked as "undisputed facts"' are improper under the Rule and will not be considered by the court." *Id.* Plaintiffs' responsive legal argument as to why the statute does not operate in the manner Defendant claims is contained within Plaintiffs' accompanying memorandum. *See* Benton Plaintiffs' Combined Opposition at 4-5, 14-23.**

6. "Lawful purpose" means "not illegal." *See* Daiello Dep. at 47:15.

**<u>RESPONSE</u>: Disputed, as this Statement contains inappropriate "'legal argument or conclusions of law'" as to how the statute operates. *Ill. Nat'l Ins. Co.*, 85 F. Supp. 3d at 792. Likewise, "[s]tatements that 'blur[] the line between fact and opinion' and include 'arguments cloaked as "undisputed facts"' are improper under the Rule and will not be considered by the court." *Id.* Plaintiffs' responsive legal argument as to why the statute does not operate in the manner Defendant claims is contained within Plaintiffs' accompanying memorandum. *See* Benton Plaintiffs' Combined Opposition at 4-5, 14-23.**

7. "[S]traw purchasing" is one example of an illegal purpose that does not qualify as a lawful purpose to obtain an exemption permit. *See* Daiello Dep. at 47:15–17.

**<u>RESPONSE</u>: Undisputed.**

8. There is no limit to the number of exemption permits a person can seek within a single thirty-day period. *See* Daiello Dep. at 45:8–17; 33:7–9.

**<u>RESPONSE</u>: Undisputed.**

9. On a single application for a single exemption permit, an individual may apply to purchase up to "99" handguns within a single thirty-day period. *See* Daiello Dep. at 44:7–23.

**<u>RESPONSE</u>: Undisputed.**

10. Plaintiff Christian Benton admitted that he "may" apply, pursuant to N.J. Stat. Ann. § 2C:58-3.4, for a permit granting an exemption from N.J. Stat. Ann. § 2C:58-3(i) ("Bulk Gun Purchase Law"), but does not assert that he has applied. *See* Decl. of Amanda Morejón Ex. B, Pl. Benton's Resps. to Defs.' First Set of Reqs. for Admis. No. 3.

**<u>RESPONSE</u>: Disputed as immaterial. As Plaintiffs explain in their accompanying memorandum, whether or not Plaintiffs applied for an exemption is immaterial to their standing to challenge New Jersey's handgun rationing scheme. *See* Benton Plaintiffs' Combined Opposition at 1-5.**

11. Plaintiff Coalition of New Jersey Firearm Owners ("CNJFO") admitted that at least one CNJFO member "could" apply, pursuant to N.J. Stat. Ann. § 2C:58-3.4, for a permit granting an exemption from the Bulk Gun Purchase Law but does not assert that any member has applied. *See* Decl. of Amanda Morejón Ex. C, Pl. CNJFO's Resps. to Defs.' First Set of Reqs. for Admis. Nos. 3, 4.

**RESPONSE: Disputed as immaterial. As Plaintiffs explain in their accompanying memorandum, whether or not Plaintiffs applied for an exemption is immaterial to their standing to challenge New Jersey's handgun rationing scheme. *See* Benton Plaintiffs' Combined Opposition at 1-7.**

12. Plaintiff Gun Owners of America ("GOA") admitted that at least one GOA member "could" apply, pursuant to N.J. Stat. Ann. § 2C:58-3.4, for a permit granting an exemption from the Bulk Gun Purchase Law but does not assert that any member has applied. *See* Decl. of Amanda Morejón Ex. D, Pl. GOA's Resps. to Defs.' First Set of Reqs. for Admis. Nos. 3, 4.

**RESPONSE: Disputed as immaterial. As Plaintiffs explain in their accompanying memorandum, whether or not Plaintiffs applied for an exemption is immaterial to their standing to challenge New Jersey's handgun rationing scheme. *See* Benton Plaintiffs' Combined Opposition at 1-7.**

13. Plaintiff Gun Owners Foundation ("GOF") admitted that at least one GOF supporter "could" apply, pursuant to N.J. Stat. Ann. § 2C:58-3.4, for a permit

granting an exemption from the Bulk Gun Purchase Law but does not assert that any supporter has applied. See Decl. of Amanda Morejón Ex. E, Pl. GOF's Resps. to Defs.' First Set of Reqs. for Admis. Nos. 3, 4.

**<u>RESPONSE</u>: Disputed as immaterial. As Plaintiffs explain in their accompanying memorandum, whether or not Plaintiffs applied for an exemption is immaterial to their standing to challenge New Jersey's handgun rationing scheme. *See* Benton Plaintiffs' Combined Opposition at 1-7.**

14. Plaintiff Matthew Struck admitted that he is "capable of submitting an application" for a permit granting an exemption from the Bulk Gun Purchase Law but does not assert that he has applied. *See* Decl. of Amanda Morejón Ex. F, Pl. Struck's Resps. to Defs.' First Set of Reqs. for Admis. No. 3.

**<u>RESPONSE</u>: This Statement pertains to a plaintiff in the consolidated case *Struck v. Davenport*, No. 3:24-cv-9479. Accordingly, the *Benton* Plaintiffs need not respond.**

15. Plaintiff Daniel Francisco admitted that he is "capable of submitting an application" for a permit granting an exemption from the Bulk Gun Purchase Law but does not assert that he has applied. *See* Decl. of Amanda Morejón Ex. G, Pl. Francisco's Resps. to Defs.' First Set of Reqs. for Admis. No. 3.

**<u>RESPONSE</u>: This Statement pertains to a plaintiff in the consolidated case *Struck v. Davenport*, No. 3:24-cv-9479. Accordingly, the *Benton* Plaintiffs need not respond.**

16. Plaintiff Firearm Policy Coalition ("FPC") admitted that at least one FPC member is "capable of submitting an application" for a permit granting an exemption from the Bulk Gun Purchase Law but does not assert that any member has applied. *See* Decl. of Amanda Morejón Ex. H, Pl. FPC's Resps. to Defs.' First Set of Reqs. for Admis. No. 3.

**<u>RESPONSE</u>: This Statement pertains to a plaintiff in the consolidated case *Struck v. Davenport*, No. 3:24-cv-9479. Accordingly, the *Benton* Plaintiffs need not respond.**

17. Plaintiff National Rifle Association of America ("NRA") admitted that at least one NRA member is "capable of submitting an application" for a permit granting an exemption from the Bulk Gun Purchase Law but does not assert that any member has applied. *See* Decl. of Amanda Morejón Ex. I, Pl. NRA's Resps. to Defs.' First Set of Reqs. for Admis. No. 3.

**<u>RESPONSE</u>: This Statement pertains to a plaintiff in the consolidated case *Struck v. Davenport*, No. 3:24-cv-9479. Accordingly, the *Benton* Plaintiffs need not respond.**

18. Plaintiff Benton has simply declared that he "does not believe" he "meet[s]" the requirements for obtaining a permit granting an exemption from the Bulk Gun Purchase Law. *See* Decl. of Amanda Morejón Ex. B, Pl. Benton's Resps. to Defs.' First Set of Reqs. for Admis. Nos. 4, 5.

**RESPONSE: Undisputed that Benton stated that he does not believe he would qualify for an exemption. Disputed as immaterial. As Plaintiffs explain in their accompanying memorandum, whether or not Plaintiffs applied for an exemption is irrelevant to their standing to challenge New Jersey's handgun rationing scheme. *See* Benton Plaintiffs' Combined Opposition at 1-5. Moreover, Plaintiff Benton is not an attorney and is not required to reach a legal conclusion as to his own eligibility for a discretionary exemption. *See Ill. Nat'l Ins. Co.*, 85 F. Supp. 3d at 792. Plaintiffs' accompanying memorandum addresses legal arguments concerning their ineligibility for an exemption.**

19. Plaintiff CNJFO has simply declared that it lacks "knowledge" as to whether at least one CNJFO member "satisfies" the requirements for obtaining a permit granting an exemption from the Bulk Gun Purchase Law. *See* Decl. of Amanda Morejón Ex. C, Pl. CNJFO's Resps. to Defs.' First Set of Reqs. for Admis. Nos. 4, 5.

**RESPONSE: Undisputed that CNJFO lacks knowledge as to whether one or more of its members qualify for an exemption. Disputed as immaterial. As**

**Plaintiffs explain in their accompanying memorandum, whether or not Plaintiffs applied for an exemption is irrelevant to their standing to challenge New Jersey's handgun rationing scheme. *See* Benton Plaintiffs' Combined Opposition at 1-7. Moreover, Plaintiff CNJFO's declarant is not an attorney and is not required to reach a legal conclusion as to a member's eligibility for a discretionary exemption. *See Ill. Nat'l Ins. Co.*, 85 F. Supp. 3d at 792. Plaintiffs' accompanying memorandum addresses legal arguments concerning their ineligibility for an exemption.**

20. Plaintiff GOA has simply declared that it lacks "knowledge" as to whether at least one GOA member "satisfies" the requirements for obtaining a permit granting an exemption from the Bulk Gun Purchase Law. See Decl. of Amanda Morejón Ex. D, Pl. GOA's Resps. to Defs.' First Set of Reqs. for Admis. Nos. 4, 5.

**<u>RESPONSE</u>: Undisputed that GOA lacks knowledge as to whether one or more of its members qualify for an exemption. Disputed as immaterial. As Plaintiffs explain in their accompanying memorandum, whether or not Plaintiffs applied for an exemption is irrelevant to their standing to challenge New Jersey's handgun rationing scheme. *See* Benton Plaintiffs' Combined Opposition at 1-7. Moreover, Plaintiff GOA's declarant is not an attorney and is not required to reach a legal conclusion as to a member's eligibility for a discretionary exemption. *See Ill. Nat'l Ins. Co.*, 85 F. Supp. 3d at 792. Plaintiffs'**

**accompanying memorandum addresses legal arguments concerning their ineligibility for an exemption.**

21. Plaintiff GOF has simply declared that it lacks "knowledge" as to whether at least one GOF supporter "satisfies" the requirements for obtaining a permit granting an exemption from the Bulk Gun Purchase Law. *See* Decl. of Amanda Morejón Ex. E, Pl. GOF's Resps. to Defs.' First Set of Reqs. for Admis. Nos. 4, 5.

**<u>RESPONSE</u>: Undisputed that GOF lacks knowledge as to whether one or more of its supporters qualify for an exemption. Disputed as immaterial. As Plaintiffs explain in their accompanying memorandum, whether or not Plaintiffs applied for an exemption is irrelevant to their standing to challenge New Jersey's handgun rationing scheme. *See* Benton Plaintiffs' Combined Opposition at 1-7. Moreover, Plaintiff GOF's declarant is not an attorney and is not required to reach a legal conclusion as to a supporter's eligibility for a discretionary exemption. *See Ill. Nat'l Ins. Co.*, 85 F. Supp. 3d at 792. Plaintiffs' accompanying memorandum addresses legal arguments concerning their ineligibility for an exemption.**

22. Plaintiff Struck has simply declared that he does not think he is "eligible to receive" a permit granting an exemption from the Bulk Gun Purchase Law. *See*

Decl. of Amanda Morejón Ex. F, Pl. Struck's Resps. to Defs.' First Set of Reqs. for Admis. No. 3.

**<u>RESPONSE</u>: This Statement pertains to a plaintiff in the consolidated case *Struck v. Davenport*, No. 3:24-cv-9479. Accordingly, the *Benton* Plaintiffs need not respond.**

23. Plaintiff Francisco has simply declared that he does not think he is "eligible to receive" a permit granting an exemption from the Bulk Gun Purchase Law. *See* Decl. of Amanda Morejón Ex. G, Pl. Francisco's Resps. to Defs.' First Set of Reqs. for Admis. No. 3.

**<u>RESPONSE</u>: This Statement pertains to a plaintiff in the consolidated case *Struck v. Davenport*, No. 3:24-cv-9479. Accordingly, the *Benton* Plaintiffs need not respond.**

24. Plaintiff FPC has simply declared that it does not think at least one FPC member is "eligible to receive" a permit granting an exemption from the Bulk Gun Purchase Law. *See* Decl. of Amanda Morejón Ex. H, Pl. FPC's Resps. to Defs.' First Set of Reqs. for Admis. No. 3.

**<u>RESPONSE</u>: This Statement pertains to a plaintiff in the consolidated case *Struck v. Davenport*, No. 3:24-cv-9479. Accordingly, the *Benton* Plaintiffs need not respond.**

25. Plaintiff NRA has simply declared that it does not think at least one NRA member is "eligible to receive" a permit granting an exemption from the Bulk Gun Purchase Law. *See* Decl. of Amanda Morejón Ex. I, Pl. NRA's Resps. to Defs.' First Set of Reqs. for Admis. No. 3.

**RESPONSE: This Statement pertains to a plaintiff in the consolidated case *Struck v. Davenport*, No. 3:24-cv-9479. Accordingly, the *Benton* Plaintiffs need not respond.**

* * *

**OMNIBUS RESPONSE TO STATEMENTS 26 THROUGH 68: In addition to the specific Responses that follow, Plaintiffs generally dispute Statements 26 through 68 on the grounds that these voluminous and repetitive Statements largely repackage various historical assertions and vague conclusions made in Defendant's "expert" reports, effectively converting them into improper requests for admission. Many of these Statements are merely historical conclusions drawn from purported historical facts presented in Defendant's reports but not included in her Statements here. Of course, statements "that 'blur[] the line between fact and opinion' and include 'arguments cloaked as "undisputed facts"' are improper under the Rule and will not be considered by the court." *Ill. Nat'l Ins. Co.*, 85 F. Supp. 3d at 792; *see also Scott*, 527 F. App'x at 126-27 ("'expert[] opinions that are without factual basis and are based on**

**speculation or conjecture are … inappropriate material for consideration on a motion for summary judgment'"). Moreover, the purpose of a statement of material facts "is to clarify the facts of the case to assist the Court in deciding whether summary judgment may be granted,"** ***Raghbat v. Cooper Health Sys.*****, 2018 U.S. Dist. LEXIS 82375, at *15 (D.N.J. May 16, 2018), and to that end, a statement should be "concise."** ***United States v. Brookman*****, 2010 U.S. Dist. LEXIS 32535, at *4 (D.N.J. Mar. 29, 2010). Paragraphs 26 through 68 of Defendant's Statement of Material Facts advances neither purpose.**

26. Historically, firearms were not widely commercially available, but rather sold discretely "in hardware stores, general stores, or pawn shops." *See* Decl. of Amanda Morejón Ex. J, Report of Dr. Brennan Rivas (hereafter "Rivas Rpt.") ¶ 46.

**<u>RESPONSE</u>: Disputed that "firearms were not widely commercially available." Plaintiffs have shown that pistols during the Founding era were routinely sold in pairs.** ***See*** **ECF No. 92-4 at 27-28. Undisputed that firearms were sold in "hardware stores, general stores, [and] pawn shops," just as they are today.**

27. In fact, "large-scale retail enterprises that could afford to purchase and store more products than the independent shopkeeper" did not even exist until "the early twentieth century." *See* Rivas Rpt. ¶ 48.

**RESPONSE: Disputed as to lack of materiality and relevance to the question of whether the Challenged Laws comply with the Second Amendment. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022) ("To justify its regulation … the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."); *ANJRPC, Inc. v. Att'y Gen. N.J.*, 183 F.4th 211, 232 (3d Cir. 2026) ("we must look to Founding-era laws"). Disputed that "large-scale retail enterprises" for firearms did not exist at the Founding. In July of 1775, Virginia passed an ordinance establishing "an arms manufactory near Fredericksburg."[1] Within two years, the factory "produced about twenty muskets per week."[2] Examples of such armories and factories abound and are too numerous to cite here. Although most firearms were imported during the Founding era, rather than manufactured domestically, "[i]t is estimated that during the War of Independence about 80,000 muskets were American mixed-pattern muskets."[3] And "[o]n April 2, 1794, an act of Congress established two national armories."[4] The Springfield Arsenal employed "a workforce of forty skilled craftsmen." *Id.***

[1] https://encyclopediavirginia.org/primary-documents/an-ordinance-for-providing-arms-and-ammunition-for-the-use-of-this-colony-july-1775/.
[2] https://encyclopediavirginia.org/entries/lewis-fielding-1725-1781-or-1782/.
[3] https://www.si.edu/object/rappahannock-forge-musket%3Anmah_1057591.
[4] https://www.nps.gov/spar/learn/historyculture/upload/SPAR_15455.pdf at 1.

28. "These market conditions naturally limited the number of firearms a buyer could purchase at a given time" in the pre-Civil War period. *See* Rivas Rpt. ¶ 49.

**<u>RESPONSE</u>: Disputed as to lack of materiality and relevance to the question of whether the Challenged Laws comply with the Second Amendment. *See Bruen*, 597 U.S. at 17 ("To justify its regulation … the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."); *ANJRPC*, 183 F.4th at 232 ("we must look to Founding-era laws"). Disputed that "market conditions naturally limited the number of firearms a buyer could purchase at a given time...." At his death, George Washington owned numerous firearms.[5] A survey of Founding-era probate inventories found gun ownership in as many as 73 percent of them, a "particularly high" percentage given that only 79 percent of inventories "list[ed] any clothes."[6] And to arm the colonial militias, Massachusetts purchased hundreds of firearms from private persons, usually multiple at a time ("Six small arms were received of Mr. Abner Ellis, for the use of this colony," "Forty-four small arms were received of Benjamin Ely," "Eight small arms were received of Col. John Dickinson," and "One hundred small arms**

[5] https://www.chnm.gmu.edu/probateinventory/pdfs/wshgtn99.pdf.
[6] https://scholarship.law.wm.edu/cgi/viewcontent.cgi?article=1489&context=wmlr at 1778.

**were delivered Col. Glover, for the use of his regiment”).[7] Finally, the statement that firearm availability was “naturally limited” is vague and subjective. *See Sunoco, Inc. v. MX Wholesale Fuel Corp.*, 565 F. Supp. 2d 572, 575 (D.N.J. 2008) (“A party … must do more than just rest upon … vague statements.”); *Alli Rest. v. Amtrust N. Am. Inc.*, 2026 U.S. Dist. LEXIS 39002, at *5 (D.N.J. Feb. 25, 2026) (“‘subjective beliefs … cannot forestall summary judgment’”).**

29. Cost likewise played a role in the relative dearth of bulk firearm sales because, even as late as 1875, “[m]any guns cost upwards of fifty dollars,” which “would cost approximately $1,100.00 today. These high prices, particularly in conjunction with the relative cash- and credit-poverty of many Americans, mean[t] that the acquisition of numerous firearms was fairly cost-prohibitive.” *See* Rivas Rpt. ¶ 45.

**<u>RESPONSE</u>: Undisputed that that the cost of firearms at the Founding played a role in the number of firearms a person could acquire, as it does today. Disputed as to lack of materiality and relevance to the question of whether the Challenged Laws comply with the Second Amendment. *See Bruen*, 597 U.S. at 17 (“To justify its regulation … the government must demonstrate that the regulation is consistent with this Nation’s historical tradition of firearm**

[7] https://tile.loc.gov/storage-services/public/gdcmassbookdig/journalsofeach177417mass/journalsofeach177417mass.pdf at 584.

**regulation."); *ANJRPC*, 183 F.4th at 232 ("we must look to Founding-era laws").**

30. Similarly, "[r]apid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get." *See* Decl. of Amanda Morejón Ex. K, Rpt. of Dr. Robert Spitzer (hereafter "Spitzer Rpt.") ¶ 3.

**RESPONSE: Disputed as to lack of materiality and relevance to the question of whether the Challenged Laws comply with the Second Amendment. *See Bruen*, 597 U.S. at 17 ("To justify its regulation … the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."); *ANJRPC*, 183 F.4th at 232 ("we must look to Founding-era laws"). Disputed that there were no "convenient gun sales processes" at the Founding and that guns were not "easy to get." In the July 10, 1778, Virginia Gazette, it was advertised that "The following Goods are just arrived ... and well suited for wholesale purchasers … 150 pair of pistols...."[8] Countless such newspaper ads ran throughout the colonies, such as "Just Imported, and to be**

---

[8] https://research.colonialwilliamsburg.org/DigitalLibrary/view/index.cfm?doc=ResearchReports%5CRR1442.xml&highlight.

**SOLD cheap … Guns, Silver mounted and plain Pistols" (Oct. 27, 1774),[9] "a number of the best kind of RIFLES, with bullet moulds" (June 7, 1776), "Pocket Pistols" (Nov. 14, 1777), and "Blunderbusses, pistols with swivels, [and] muskets" (Feb. 12, 1780).[10] Firearms were widely available, gun sales processes were simple (*i.e.*, exchange cash for gun), and guns were "easy to get" at the Founding. Finally, whether or not firearms were "easy to get" is vague and subjective. *See Sunoco*, 565 F. Supp. 2d at 575 ("A party … must do more than just rest upon … vague statements."); *Alli Rest.*, 2026 U.S. Dist. LEXIS 39002, at *5 ("'subjective beliefs … cannot forestall summary judgment'").**

31. That is, before the end of the nineteenth century, "[m]anufacturing and distribution networks for finished goods in the United States did not allow for the kinds of bulk purchases that are possible today." *See* Rivas Rpt. ¶ 44.

**<u>RESPONSE</u>: Disputed that "[m]anufacturing and distribution networks for finished goods in the United States did not allow for the kinds of bulk purchases that are possible today." As explained in Response 30, a contemporaneous newspaper advertisement offered 300 imported pistols ("150 pair") for sale in one batch.**

---

[9] https://research.colonialwilliamsburg.org/DigitalLibrary/view/index.cfm?doc=ResearchReports%5CRR0079.xml.

[10] https://research.colonialwilliamsburg.org/DigitalLibrary/view/index.cfm?doc=ResearchReports%5CRR0079.xml&highlight.

32. For those reasons, historic "market conditions naturally limited the number of firearms a buyer could purchase at a given time" and individuals living in "cash-poor, credit-dependent non-urban areas" also "very likely lacked the resources to own numerous firearms." *See* Rivas Rpt. ¶ 49.

**RESPONSE: Disputed for the reasons stated in Response 28. Undisputed that "market conditions" have always "naturally limited the number of firearms a buyer could purchase at a given time," and that many Americans always have "lacked the resources to own numerous firearms." Disputed insofar as Defendant suggests that such limitations generally restricted purchasers to a single firearm. Contemporaneous records establish that pistols were commonly purchased in matched pairs. *See* ECF No. 92-4 at 27-28.**

33. And "[w]hile general stores, sporting goods stores, and hardware stores across the country presented guns for sale, the scale of their holdings and size of their inventories remained a far cry from what we see at gun shows or big-box retailers today." *See* Rivas Rpt. ¶ 11.

**RESPONSE: Undisputed that gun stores generally maintained smaller inventories than modern firearms retailers. However, the population of the United States was substantially smaller at the Founding, and modern big-box retailers did not exist. Disputed as to the inference that the mere difference in inventory size establishes that firearms were difficult to obtain or that**

**purchasers were limited in the number of firearms they could acquire. Finally, whether Founding-era firearm availability was a "far cry" from that of today is vague and subjective. *See Sunoco*, 565 F. Supp. 2d at 575 ("A party … must do more than just rest upon … vague statements."); *Alli Rest.*, 2026 U.S. Dist. LEXIS 39002, at *5 ("'subjective beliefs … cannot forestall summary judgment'").**

34. Founding Era governments likewise lacked centralized background check systems to address escalating episodes of crime involving a number of popular arms. *See* Rivas Rpt. ¶¶ 37–43, 32.

**<u>RESPONSE</u>: Undisputed that no background-check systems existed for firearm purchases at the Founding, and that the absence of such systems facilitated the immediate transfer of firearms without government preapproval.**

35. In fact, it was not until 1881 that at least one state, Illinois, developed systems that required every dealer of firearms to register all sales of deadly weapons. *See* Rivas Rpt. ¶ 32.

**<u>RESPONSE</u>: Undisputed that neither firearm registration nor firearms-dealer registration requirements existed at the Founding and, as Defendant argues, not until at least 1881.**

36. But "no organized system of gun purchase limitation laws could feasibly exist until the modern era, given that such a policy entails the interdiction

of government in coordination with dealers in a comprehensive and coordinated effort to maintain comprehensive and detailed records of who was buying and selling guns, including the number of guns purchased over time. Such a system would (and does) require constant information collection, updating, and information recirculation—tasks that were simply beyond the capabilities of governments until the modern era." *See* Spitzer Rpt. ¶ 6; *see also* Rivas Rpt. ¶ 43.

**<u>RESPONSE</u>: Disputed that no "gun purchase limitation laws could feasibly exist until the modern era," or that such "tasks" were "beyond the capabilities of governments." Courts and court records existed at the Founding, and governments possessed the means to regulate firearms dealers, require identifying marks on firearms, conduct localized investigations into prospective purchasers, and impose mandatory waiting periods. Disputed to the extent that Defendant implies that the purported absence of such restrictions establishes governmental incapacity to impose them. *See United States v. Rahimi*, 602 U.S. 680, 739-40 (2024) (Barrett, J., concurring) (disputing whether "founding-era legislatures maximally exercised their power to regulate"). That is legal argument and, in fact, historical absence is evidence against constitutionality. *See Bruen*, 597 U.S. at 19 ("government must affirmatively prove that its firearms regulation is part of the historical tradition"); *id.* at 26 ("lack of a distinctly similar historical regulation addressing that problem is relevant**

**evidence that the challenged regulation is inconsistent with the Second Amendment"). Disputed because this Statement draws historical inferences and speculates about hypotheticals, rather than stating facts. *See Ill. Nat'l Ins. Co.*, 85 F. Supp. 3d at 792 ("Statements that 'blur[] the line between fact and opinion' and include 'arguments cloaked as "undisputed facts"' are improper under the Rule and will not be considered by the court."); *Scott*, 527 F. App'x at 126-27 ("'expert[] opinions that are without factual basis and are based on speculation or conjecture are … inappropriate material for consideration on a motion for summary judgment'"). Disputed because Plaintiffs lack knowledge as to what an "organized system" is, or what "such a system" that did not exist "would … require."**

37. So one "widespread response" was instead "to restrict the sales of weapons and/or tax their retail dealers." *See* Rivas Rpt. ¶ 24.

**RESPONSE: Disputed, as this Statement consists of argumentative conclusions rather than discrete facts. Disputed that there was ever any historical "widespread response" to "restrict the sales of weapons" to Americans. As Plaintiffs' accompanying memorandum explains, historical sale restrictions targeted, at most, groups who were not considered among "the people" who held Second Amendment rights. *See* Benton Plaintiffs' Combined Opposition at 44-46; *see also Rahimi*, 602 U.S. at 723 (Kavanaugh, J., concurring)**

**(cautioning against reliance on "the history that the Constitution left behind"). Disputed insofar as Defendant attempts to characterize isolated or discriminatory restrictions as evidence of a widespread historical tradition of limiting Americans' purchase of multiple firearms.**

38. These laws included "licensing, registration, and taxation systems." *See* Rivas Rpt. ¶ 36.

**<u>RESPONSE</u>: Disputed because this Statement advances historical conclusions and argumentative characterizations rather than discrete facts. Disputed that any historically relevant firearm regulations included "licensing, registration, and taxation systems." Disputed because Defendant's assertion is also inconsistent with her own preceding statements that such regulatory systems did not exist at the Founding. *See* Statements 35-37. Defendant cannot simultaneously cite the historical absence of such systems to establish their supposed infeasibility, and in the same breath invoke their existence as evidence of a historical regulatory tradition.**

39. Examples of such sales laws include an 1838 Florida law that established a sales restriction that "placed a steep annual tax of $200 upon anyone who chose 'to vend dirks, pocket pistols, sword canes, or bowie knives.'" *See* Rivas Rpt. ¶ 25.

**RESPONSE: Undisputed that an 1838 Florida law taxed vendors of certain weapons, on the theory that such weapons were "unusually dangerous."[11] *See NAGR v. Lamont*, 153 F.4th 213, 244 (2d Cir. 2025). Disputed that the 1838 Florida law regulated firearm purchasers or created purchase quantity limitations. Accordingly, disputed as immaterial and irrelevant because the 1838 Florida law did not ration handguns (different "how"), and it regulated weapons for a different reason (different "why"). Here, Defendant does not claim handguns are "unusually dangerous" – nor can she. *See Bruen*, 597 U.S. at 47. Further disputed on the grounds that the 1838 Florida law is immaterial and irrelevant because it was a territorial law, it was adopted nearly half a century after 1791, and it does not "confirm[]" any tradition that existed at the Founding. *See Bruen*, 597 U.S. at 37.**

40. Likewise, an 1837 Alabama law imposed a tax on the sale of bowie knives "at $100 per instance (equivalent to approximately $3,195.27 today)." *See* Rivas Rpt. ¶ 25.

**RESPONSE: Undisputed that the 1837 Alabama law taxed transferors of certain weapons, on the theory that such weapons were "particularly 'dangerous' or 'deadly.'"[12] *See Bianchi v. Brown*, 111 F.4th 438, 508 & n.36 (4th**

[11] https://firearmslaw.duke.edu/wp-content/uploads/2023/04/1838-FL-An-Act-to-prevent-any-person-in-this-Territory-from-carrying-arms-secretly-%C2%A71.pdf.
[12] https://armsdb.org/wp-content/uploads/2026/04/1837-Ala.-L.-Chap.-11-p.-7.pdf.

**Cir. 2024) (Richardson, J., dissenting); *see also id.* at 466-67 (majority opinion). Disputed that the 1837 Alabama law regulated handguns as a class or created purchase quantity limitations, or even involved firearms in the first place. Accordingly, disputed as immaterial and irrelevant because the 1838 Florida law did not ration handguns (different "how"), and it regulated weapons for a different reason (different "why"). Here, Defendant does not claim handguns are "particularly dangerous" – nor can she. *See Bruen*, 597 U.S. at 47. Further disputed on the grounds that the 1837 Alabama law is immaterial and irrelevant because it was adopted nearly half a century after 1791, and it does not "confirm[]" any tradition that existed at the Founding. *See Bruen*, 597 U.S. at 37.**

41. 1837 and 1838 Georgia and Tennessee laws, respectively, also similarly imposed "criminal sales restrictions" designed to "'guard and protect … citizens … against the unwarrantable and too prevalent use of deadly weapons.'" *See* Rivas Rpt. ¶ 26.

**<u>RESPONSE</u>: Undisputed that the 1837 Georgia[13] and 1838 Tennessee[14] laws restricted the sale of certain weapons, on the theory that such weapons were "excessively dangerous." *See Bianchi*, 111 F.4th at 466-67 & nn.4-5; *see also McDonald v. City of Chicago*, 561 U.S. 742, 933 (2010) (Breyer, J., dissenting). Disputed that the 1837 Georgia and 1838 Tennessee laws regulated firearm purchasers or created purchase quantity limitations. Accordingly, disputed as immaterial and irrelevant because the 1838 Florida law did not ration handguns (different "how"), and it regulated weapons for a different reason (different "why"). Here, Defendant does not claim handguns are "excessively dangerous" – nor can she. *See Bruen*, 597 U.S. at 47. Moreover, the 1837 Georgia law generally banned the possession of most pistols and is therefore an invalid analogue under *District of Columbia v. Heller*, 554 U.S. 570 (2008), which recognized the constitutional protection of handguns, and that there is no historical tradition of banning the same. The 1837 Georgia law also was partially struck down in *Nunn v. State*, 1 Ga. 243 (1846), as Defendant later admits. *See* Rivas Rpt. ¶ 27. Further disputed on the grounds that the 1837**

[13] https://firearmslaw.duke.edu/laws/1837-ga-acts-90-an-act-to-guard-and-protect-the-citizens-of-this-state-against-the-unwarrantable-and-too-prevalent-use-of-deadly-weapons-c2a7c2a7-1-4.

[14] https://firearmslaw.duke.edu/laws/1837-1838-tenn-pub-acts-200-an-act-to-suppress-the-sale-and-use-of-bowie-knives-and-arkansas-tooth-picks-in-this-state-ch-137-c2a7-1.

**Georgia and 1838 Tennessee laws are immaterial and irrelevant, because they were adopted nearly half a century after 1791, and they do not "confirm[]" any tradition that existed at the Founding. *See Bruen*, 597 U.S. at 37. Further disputed insofar as this Statement contains Defendant's expert characterization of the purported purposes of these laws, rather than undisputed fact.**

42. These laws were also oriented to "prohibit[ ] dealers from selling to particular groups of people" to prevent crimes by those believed to pose "a danger to the community when armed." *See* Rivas Rpt. ¶ 31.

**<u>RESPONSE</u>: Disputed because this Statement advances a legal conclusion concerning the historical relevance of the laws identified in Statements 39-41, rather than stating an undisputed material fact. Accordingly, no Response is required. *See Ill. Nat'l Ins. Co.*, 85 F. Supp. 3d at 792.**

43. "[O]ne significant impetus to the cultivation of illicit interstate gun trafficking was the construction of the interstate highway system, inaugurated with the enactment of the Federal-Aid Highway Act of 1956. As one study noted, 'a panel dataset spanning all 3,131 counties between 1960 and 1993' found that 'the opening of an interstate highway in a county led to an 8.1% rise in total index crime' and 'an increase in violent crime.'" *See* Spitzer Rpt. ¶ 4.

**<u>RESPONSE</u>: Disputed because the term "significant impetus" calls for a subjective characterization and is vague. *See Sunoco*, 565 F. Supp. 2d at 575**

**("A party … must do more than just rest upon … vague statements."); *Alli Rest.*, 2026 U.S. Dist. LEXIS 39002, at *5 ("'subjective beliefs … cannot forestall summary judgment'"). Further disputed on the grounds that the Statement is immaterial and irrelevant to the constitutional question presented, and consists of argumentative conclusions and speculative causal inferences rather than discrete, undisputed material facts. Specifically, disputed insofar as Defendant suggests that firearms trafficking did not exist before the establishment of the interstate highway system. Defendant's own historical evidence establishes that governments sought to prevent the unlawful distribution of firearms long before establishment of the interstate highway system. *See* Statements 47, 61.**

44. "[L]aws that limit gun purchases per month are a recent remedy to a contemporary problem, tied at least in part to an unintended consequence of the construction of the interstate highway system beginning in the 1950s. While convenient mass interstate travel existed before this time, mostly by railroad and buses, these latter forms were public, whereas auto transport is private and controlled by the driver." *See* Spitzer Rpt. ¶ 10.

**<u>RESPONSE</u>: Undisputed that "laws that limit gun purchases per month are a recent remedy" without historical analogue. Disputed that so-called "firearms trafficking" is a "contemporary problem." *See Nguyen v. Bonta*, 140 F.4th 1237 (9th Cir. 2025); *see also* Statements 47, 61; ECF No. 95-1 at 48, 41 (citing**

**colonial arms trafficking). Otherwise disputed insofar as the Statement advances speculative causal inferences and argumentative historical conclusions rather than undisputed material facts.**

45. "Interstate highways are today recognized as the primary corridors for 'iron pipeline' gun trafficking—the term applied by law enforcement to gun trafficking patterns from states with lax gun laws to states with stricter laws—such as is the case with Interstate Route 95 along the U.S. east coast." *See* Spitzer Rpt. ¶ 5.

**<u>RESPONSE</u>: Disputed because the terms "primary corridors" and "lax gun laws" are vague and subjective, and Defendant fails to identify by whom or under what criteria interstate highways are supposedly "recognized" as such corridors. *See Sunoco*, 565 F. Supp. 2d at 575 ("A party … must do more than just rest upon … vague statements."); *Alli Rest.*, 2026 U.S. Dist. LEXIS 39002, at *5 ("'subjective beliefs … cannot forestall summary judgment'"). Disputed because the characterization of certain states' firearms laws as "lax" is subjective and argumentative, particularly insofar as it characterizes the allowance of constitutionally protected conduct as evidence of impliedly deficient regulation. *See Sunoco*, 565 F. Supp. 2d at 575; *Ill. Nat'l Ins. Co.*, 85 F. Supp. 3d at 792. Disputed on the additional grounds that the Statement is immaterial and irrelevant to the constitutional question presented, and consists**

**of argumentative conclusions and characterizations rather than discrete, material facts.**

46. All why "gunrunners use major Interstate highways as their smuggling routes" and why "restricting handgun purchases to one per month is an effective means of disrupting the illegal interstate transfer of firearms." *See* Spitzer Rpt. ¶¶ 8, 9–10.

**<u>RESPONSE</u>: Disputed because this Statement is a sentence fragment that fails to articulate a complete, intelligible, factual assertion. Disputed because Defendant has provided no evidence as to whether restricting handgun purchases to one per month is an "effective means" of preventing unlawful firearms trafficking or crime. Disputed because the Statement is immaterial and irrelevant, because whether or not New Jersey's handgun rationing scheme effectively reduces crime has nothing to do with whether it is constitutional. *See District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008); *Bruen*, 597 U.S. at 22-24 (rejecting interest balancing, which examines the importance of vague governmental interests).**

47. Indeed, historically, "[w]hile there were instances in which government authorities attempted to identify or stop secret movements of guns, they did not face a societal problem akin to modern concerns about trafficked guns and their use in organized crime." *See* Rivas Rpt. ¶ 50.

**RESPONSE: Disputed that unlawful firearms trafficking is a modern societal problem for the reasons stated in Response 44. Further disputed that historical firearms-trafficking concerns were not "akin to modern concerns," as this Statement constitutes a disputed legal argument rather than an undisputed fact. Disputed insofar as Defendant seeks to imply that modern firearms trafficking presents an "unprecedented societal concern" warranting a less stringent historical analogue under *Bruen*, 597 U.S. at 27. Whether historical and modern societal problems are sufficiently analogous, and what standard of historical analysis applies, are legal questions for the Court, not facts to be established through a statement of material facts. *See id.* at 25 n.6 ("The job of judges … is to resolve legal questions presented in particular cases or controversies. … Courts are thus entitled to decide a case based on the historical record compiled by the parties.").**

48. One 1676 Virginia law expressly limited the quantity of arms that persons could possess at a time, specifically "one gunn and tenn charges of powder and shott" under certain circumstances. *See* Spitzer Rpt. ¶¶ 13, 24.

**RESPONSE: Disputed because the appropriate place for the airing of historical analogues and the making of legal arguments is in summary judgment briefing, not a statement of material facts. Disputed that the 1676 Virginia law was a historical quantity restriction on the firearms that colonists could purchase or**

**possess generally. Rather, the law restricted the sale of firearms and ammunition to American Indians, who were considered outside the body politic, without imposing any limitation on purchases by colonists themselves. Disputed that this law constitutes a relevant historical analogue because it was enacted more than a century before ratification, it does not "confirm" any Founding-era tradition, and it imposed an entirely different burden on the right to acquire firearms – none at all for members of the political community. *See* Benton Plaintiffs' Combined Opposition at 44-45.**

49. A 1763 New York law limited the quantity of gunpowder kept within two miles of city hall. *See* Spitzer Rpt. ¶ 16.

**RESPONSE: Disputed because the appropriate place for the airing of historical analogues and the making of legal arguments is in summary judgment briefing, not a statement of material facts. Disputed that the 1763 New York law was a historical quantity restriction on the firearms that colonists could purchase or possess generally. Rather, the law regulated the storage of gunpowder for fire-safety purposes. *See Heller*, 554 U.S. at 632; *ANJRPC*, 183 F.4th at 243. Disputed that this law constitutes a relevant historical analogue, as its purpose and burden are fundamentally different from New Jersey's handgun rationing scheme, and it is the only such Founding-era law that Defendant offers in her Statement of Material Facts. Further disputed on relevance and materiality**

**grounds, as the Third Circuit already has rejected gunpowder storage laws as historically relevant. *See ANJRPC*, 183 F.4th at 243.**

50. An 1827 New Haven, Connecticut, ordinance also imposed a quantity limit of one pound of gunpowder on individuals. *See* Spitzer Rpt. ¶ 21.

**RESPONSE: Disputed for the reasons stated in Response 49.**

51. One 1857 New Jersey measure restricted individuals from keeping more than two pounds of gunpowder on hand a given time, with the exception that individuals may keep more than two pounds if "in a magazine at least fifty feet distant from any building." *See* Spitzer Rpt. ¶ 29.

**RESPONSE: Disputed for the reasons stated in Response 49.**

52. "[L]icensing as a regulatory tool is an old policy technique, dating to the 1600s." *See* Spitzer Rpt. ¶ 84.

**RESPONSE: Undisputed that licensing requirements for various businesses, trades, and occupations have existed for centuries. Disputed that such licensing practices have any relevance or materiality to the question at issue here, as most do not even involve firearms, and none restrict the number of firearms an individual may purchase within a specified period.**

53. Laws requiring licensing of commercial dealers of goods existed as early as 1642 in the Connecticut colony. *See* Spitzer Rpt. ¶ 71.

**<u>RESPONSE</u>: Disputed as to relevance and materiality because the cited source does not establish that the 1642 Connecticut law generally required licensing of commercial dealers of goods, much less the licensing of individuals to acquire multiple firearms. Rather, the law "barred the sale or barter of weapons to Indigenous people as well as 'to any person inhabiting out of this Jurisdiction,'" absent a license. Spitzer Rpt. ¶71. Disputed that the law imposed any restriction on the number of firearms an individual could acquire, and in any event, it is irrelevant and immaterial to the issue here because the law was enacted nearly 150 years before 1791 and Defendant presents no evidence that it persisted into the Founding period.**

54. One 1689 New Hampshire law prohibited commerce in arms without first obtaining a license. *See* Spitzer Rpt. ¶ 71.

**<u>RESPONSE</u>: Disputed because the cited source does not establish that the 1689 New Hampshire law generally prohibited commerce in arms without a license. Rather, the law prohibited the sale of firearms to "Indians, or the neighbouring French," absent a license. Spitzer Rpt. ¶71. Disputed that the law imposed any restriction on the number of firearms an individual could acquire, and in any event, it is irrelevant and immaterial to the issue here because the law was enacted more than 100 years before 1791 and Defendant presents no evidence that it persisted into the Founding period.**

55. An 1814 Illinois measure expressly disallowed commerce vis-à-vis Natives unless a license was first obtained. *See* Spitzer Rpt. ¶ 72.

**<u>RESPONSE</u>: Undisputed that the 1814 Illinois law prohibited the sale of firearms to American Indians absent a license. Disputed that the law imposed any restriction on the number of firearms an individual could acquire, and in any event, it is irrelevant and immaterial to the issue here because the law regulated sales to a particular group of persons who were not part of "the people," rather than limiting the quantity of firearms a member of "the people" could purchase. *See* Spitzer Rpt. ¶72.**

56. An 1802 New York law imposed licensing requirements on "pawn brokers, and dealers in sale of second hand" goods. *See* Rivas Rpt. ¶ 54.

**<u>RESPONSE</u>: Undisputed that the 1802 New York law required licensing of certain businesses. Disputed for the reasons stated in Response 55.**

57. An 1812 New York law continued licensing requirements for secondary market dealers and imposed even greater restrictions including categorical restrictions on from whom a secondary goods dealer could accept secondhand goods. *See* Rivas Rpt. ¶ 53.

**<u>RESPONSE</u>: Undisputed that the 1812 New York law required licensing of pawnbrokers and dealers in secondhand goods and imposed additional**

**restrictions on those businesses. Disputed for the reasons stated in Response 55.**

58. An 1821 Philadelphia law likewise specifically imposed licensing restrictions on secondary market dealers and prohibited dealing in stolen and other unlawful goods. *See* Rivas Rpt. ¶ 53.

**RESPONSE: Undisputed that the 1821 Philadelphia law imposed the stated restrictions. Disputed for the reasons stated in Response 55.**

59. An 1863 Chicago licensing law also used "licensing as a way of regulating secondhand and junk dealers in addition to pawnbrokers." *See* Rivas Rpt. ¶ 54.

**RESPONSE: Undisputed that the 1863 Chicago law imposed the stated restrictions. Disputed for the reasons stated in Response 55. Disputed as to relevance and materiality due to the law's temporal distance from the Founding era and the lack of any similar Founding-era tradition to confirm.**

60. Many other nineteenth-century state laws operated similarly in that they used licensing and related means to closely regulate secondary markets of goods. *See* Rivas Rpt. ¶ 54 & n.109.

**RESPONSE: Undisputed that other laws imposed similar restrictions. Disputed for the reasons stated in Response 59.**

61. One 1676 Virginia law restricted trading certain quantities of arms with Natives with the purpose of attempting "to stem or otherwise control arms trading with Indigenous people." *See* Spitzer Rpt. ¶¶ 13–14.

**RESPONSE: Undisputed that the 1676 Virginia law generally prohibited the sale of firearms to American Indians. Disputed that the law imposed any restriction on the number of firearms Virginians could acquire, and in any event, it is irrelevant and immaterial to the issue here because it came more than a century before ratification, and it regulated sales to a particular group of persons who were not part of "the people," rather than limiting the quantity of firearms a member of "the people" could purchase. *See* Spitzer Rpt. ¶¶13-14.**

62. Firearms trafficked interstate that are later used in crimes are more likely to have been initially purchased via multi-gun sales and later unlawfully transferred via secondary distributions to criminals. *See* Spitzer Rpt. ¶¶ 8–9.

**RESPONSE: Plaintiffs lack knowledge as to whether this claim is true and therefore dispute. Further disputed that "[f]irearms trafficked interstate that are later used in crimes are more likely to have been initially purchased via multi-gun sales." Defendant's factual basis for this Statement provides that "between twenty-to-twenty-five percent of handguns obtained at crime scenes were initially purchased as part of a multi-gun sale." Spitzer Rpt. ¶9. This**

**means that, at worst, only one in four trafficked firearms was part of a multi-gun sale, and in fact the vast majority (75 to 80 percent) were purchased in a single-gun sale. In other words, Defendant's data proves the opposite of her claim. Finally, disputed as immaterial and irrelevant, because whether or not firearms are used in crimes has nothing to do with whether the Challenged Laws are constitutional. *See Heller*, 554 U.S. at 634-35; *Bruen*, 597 U.S. at 22-24 (rejecting interest balancing, which examines the importance of vague governmental interests).**

63. In fact, at least one study found that "between twenty-to-twenty five percent of handguns obtained at crime scenes were initially purchased as part of a multi-gun sale," Spitzer Rpt. ¶ 9, which may later be trafficked in a secondary distribution to criminals, *id.* ¶ 8.

**RESPONSE: Plaintiffs lack knowledge as to whether this claim is true and therefore dispute. Further disputed for the reasons stated in Response 62.**

64. The "reselling of stolen guns in secondary markets" was a concern for governments in the nineteenth century. *See* Rivas Rpt. ¶ 50.

**RESPONSE: Undisputed that governments have regulated markets of stolen goods. Disputed as to relevance and materiality to the constitutionality of the Challenged Laws, because this Statement does not demonstrate that 19th-century governments ever restricted the number of firearms Americans could**

**acquire. Further disputed as to relevance and materiality due to the subject matter's temporal distance from the Founding era and the lack of any similar Founding-era tradition to confirm.**

65. The historical record reflects that secondary markets of goods had an "inherent connection to criminal activity" that "justified regulatory safeguards designed to prevent and/or remedy that activity." *See* Rivas Rpt. ¶ 54.

**RESPONSE: Undisputed that secondhand goods sometimes were connected to crime. Disputed for the reasons stated in Response 64. Further disputed as immaterial and irrelevant, because whether or not firearms are used in crimes has nothing to do with whether the Challenged Laws are constitutional. *See Heller*, 554 U.S. at 634-35; *Bruen*, 597 U.S. at 22-24 (rejecting interest balancing, which examines the importance of vague governmental interests).**

66. Secondary markets, like pawn shops, secondhand stores, junk stores, scrap dealers, and auction houses, "became sites for the disposal of stolen property." *See* Rivas Rpt. ¶ 54.

**RESPONSE: Undisputed that these stores sometimes were connected to stolen property. Disputed for the reasons stated in Responses 64 and 65.**

67. At bottom, "the offloading of stolen goods to secondhand stores and pawnbrokers" was a "cause of concern among Americans," especially in the nineteenth century. *See* Rivas Rpt. ¶ 55.

**<u>RESPONSE</u>: Undisputed that stolen goods were a concern for 19th-century Americans. Disputed for the reasons stated in Responses 64 and 65.**

68. Thus, "longstanding regulations targeted pawn brokers, secondhand stores, junk shops, scrap metal dealers, and auction houses for heightened scrutiny by government officials due to their connection to downstream crime." *See* Rivas Rpt. ¶ 12.

**<u>RESPONSE</u>: Plaintiffs lack knowledge as to whether these regulations were "longstanding" since the Founding and therefore dispute this subjective characterization. Further disputed for the reasons stated in Responses 64 and 65.**

Dated: Lake Success, New York
November 23, 2026

Respectfully submitted,
HARFENIST KRAUT & PERLSTEIN, LLP

By: *Steven J. Harfenist*

Steven J. Harfenist
*Attorneys for Plaintiffs*
3000 Marcus Avenue, Suite 2E1
Lake Success, New York 11042
T: (516) 355-9600
F: (516) 355-9601
E: SHarfenist@hkplaw.com

Oliver M. Krawczyk*
Ambler Law Offices, LLC
115 South Hanover Street, Suite 100
Carlisle, PA 17013
T: (717) 525-5822
E: oliver@amblerlawoffices.com
**Admitted Pro Hac Vice*